**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| THE IDAHO REPUBLICAN PARTY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>BEN YSURSA, in his Official Capacity as<br>Secretary of State of the State of Idaho,<br><br>Defendants. | Case No. 1:08-cv-00165-BLW |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT-INTERVENORS' MOTION
FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

This case is about the Idaho Republican Party's (the "IRP") demand for a court-ordered, taxpayer-financed advantage from the State of Idaho ("Idaho" or the "State") in the form of forced partisan registration.  The Court should reject the IRP's complaint as the IRP is entitled to no such thing.

*Wash. State  Grange v. Wash. State  Republican Party,* 128 S.Ct. 1184 (2008), established without question that the State is not obligated to offer special rights or privileges to political parties.  The State is within its authority to run its primaries in a fully non-partisan manner.  Idaho has not so far chosen to eliminate political parties from the ballot.  Rather, the State offers numerous special rights and privileges to political parties far beyond those available to independent voters or candidates.  Notwithstanding the State's largesse, the IRP complains that the advantages it receives under Idaho law are not enough – that it is not enough that the state offers the party automatic ballot access, a taxpayer-funded primary election, identification

of party candidates on the general election ballot, rights to recommend successors to partisan offices, and even a mechanism to donate funds to the party on one's tax return.

Indeed, the Republican Party wants more. The party argues that it has a constitutional right to require the State to invade voters' privacy and taxpayers' pocketbooks and impose partisan registration on the State and its citizens. Fortunately, the Constitution requires no such thing, and this Court can rightly tell the Idaho Republican Party to take its complaints to the legislature, where they will be rejected, if history is any guide.

## THE FACTUAL BACKGROUND

Idaho politics is well-known for its "independent streak." Although the Republican Party currently dominates, Idaho elected Democrat Cecil Andrus its Governor and Democrat Frank Church its Senator four times each. Idaho also gave independent Ross Perot some of his highest vote percentages in the nation in the 1992[1] and 1996[2] elections. Currently, independents comprise 28 percent of the vote in Idaho, constituting the second-largest voting bloc in the state behind Republicans.[3]

Idaho's ballot access laws reflect the influence of independent voters. Requirements for independent candidates to gain ballot access are not onerous, and generally could be met by major party candidates without difficulty. Similarly, the barriers for a political party to gain ballot access are not high. Idaho is one of twenty states that do not require partisan registration and that allow registered voters to participate in the party primary of their choice.[4]

At the same time, Idaho law offers numerous privileges to political parties. Political parties have easy access to the ballot, subject only to de minimis criteria such as placing at least

---

[1] U.S. Election Atlas, http://www.uselectionatlas.org.
[2] *Id.*
[3] 19th Annual Idaho Public Policy Survey," College of Social Sciences and Public Affairs, Boise State University, http://ppa.boisestate.edu/ssrc/archive/annualpolicysurvey.pdf, p. 24.
[4] See paragraph 13 and Exhibit A to Affidavit of Jacqueline Salit submitted herewith.

three state-wide candidates on the ballot in the prior general election or receiving at least three percent of the vote in the last governor's election.  I.C. § 34-501(1)(a) & (b).  Nominees for qualified parties receive automatic ballot access in the general election, as well as party identification on the general election ballot.  I.C. § 34-906.  In Idaho, an "R" next to a candidate's name on the ballot has often guaranteed a general election victory.  Political party committees who organize according to the statutory criteria have the right to nominate successors to certain partisan offices if the office-holder does not complete his or her term.  I.C. §§ 59-904A (legislative offices); 59-906 (county offices).  And qualified political parties even receive a check-box on Idaho's state income tax return, allowing taxpayers to designate $1 in general fund moneys to be donated to the political party of the taxpayer's choice.  I.C. §§ 34-2502, 63-3088.

In an Idaho primary election, voters receive a ballot when they enter the polling place which includes ballots for all parties with contested primary elections.  The voter may fill out the ballot for any one party, but the ballot is invalid if choices for more than one party are checked.  *See* I.C. § 34-904.  The Republican Party has attempted to convince the Idaho Legislature to change Idaho's system and adopt a closed primary in the last two legislative sessions, without success.  *See, e.g.,* S1208, S1506, S1507aa, 59th Leg., 2nd Sess. (Id. 2008).

Thanks, in part, to the support of independent voters, the Republican Party is the dominant political party in Idaho, currently holding all statewide elected offices, all four Congressional seats, and 79 of 105 legislative seats.  Furthermore, the Republican primary, surprisingly often, provides the only opportunity for voters to participate in a contested election.  In both 2006 and 2008, 11 legislative seats included a Republican primary with no general

election opponent.  If county elections and token opponents were included, the total would be much higher.  Affidavit of Gary G. Allen, pp.1-2, par. 2.

Plaintiffs claim that Idaho's system of non-partisan registration and open primaries violates its freedom of association because "permitting non-Republicans" to vote in the Republican Party primary "weakens, dilutes and obstructs" the process of selecting a candidate "who most closely represents the views ideals and interests of members of the Republican Party."  (Complaint, paragraphs 23 and 24.)  Plaintiffs seek to compel the State of Idaho to conform its primary elections to Section 4 of Article IX of a rule adopted by the Party's State Central Committee on June 2, 2007:

> Only persons who have registered as a Republican prior to the Primary Election will be allowed to vote on an Idaho Republican Party ballot in that Primary Election.

Plaintiffs, however, are unable to point to a single Republican candidate nominated in an open primary who would not have been nominated had the primary been held in accordance with the above rule.  Nor can they point to a single candidate who diluted his or her message because of the present system.[5]  Plaintiffs rest their case entirely on "common sense,"[6] and one 1998 study that concludes that Members of Congress from states with closed primaries take more extreme policy positions than those elected in states with open primaries.[7]

In addition to lacking empirical support, the logic of the IRP's "common sense" position is entirely circular.  First, there is the question of what is the measure of a candidate's adherence to the "views, ideals and interests" of the Republican Party.  The IRP says it is the

---

[5] Deposition of Norman Semanko, State Chairperson of the Idaho Republican Party (hereinafter "Dep.") , pp. 18-20, 27-32, attached to the Affidavit of Gary G. Allen as Exhibit "A."
[6] Dep. pp. 162-63.
[7] Elizabeth R. Gerber & Rebecca B. Morton, "Primary Election Systems and Representation," Oxford University Press, 1998, pp. 321-22.

party platform.[8] The platform is adopted at the IRP state convention.  However, the delegates to the convention are chosen by committee persons who are elected in the same open primary the IRP challenges.[9]

Second, Plaintiffs complain that non-Republicans are permitted to vote in its primaries. However, it is impossible to determine whether persons who are not "registered" Republicans vote in the Republican primary, since voter registration by party does not occur.  Similarly, it is impossible to determine whether persons who are not "members" of the Idaho Republican Party vote in the Republican primary as the party has no membership list and cannot identify who its members are.[10]

In addition, the IRP would not apply a litmus test to choose candidates or to reject primary winners who do not measure up.  They agree that the outcome of a primary election is the best means to determine who the best candidate is.[11] Nor would they apply any litmus test in determining who can register in the Republican Party.[12] In the absence of a litmus test, Republican registrants could easily include the very apocryphal Democrats whom the Republicans fear would cross over and cause mischief, as well as independents who wish to have a say as to the Republican nominee.[13]

---

[8] Dep. pp. 24-25.
[9] Dep. pp. 87-91.
[10] Dep. pp. 95-97.
[11] Dep. pp. 85, 109-10, 139-40.
[12] Dep. pp. 136-37.
[13] In states and counties where, as in Idaho, one party is dominant, persons often register into that party even if they don't share its views.  They do so in the hope it will help them obtain a government job or benefit, or at least not be disadvantaged.  They also do so because they realize that the primary election is the only competitive one.  There is evidence that when the political equation becomes more evenly balanced between the major parties, enrollment figures become more reflective of voters' actual beliefs and preferences.  Lambert, Bruce, "G.O.P. Poised to Lose Voter Lead in Nassau," *New York Times*, September 14, 2008.

Nor does the IRP identify a minimum time period before the election by which someone should be required to register into the party.[14] When asked how this would be different than the current system where a voter goes to the polls and asks to vote in the IRP primary, IRP Chairman Semanko engaged in the following colloquy with Defendant-Intervenors' counsel:

105

```
20      Q. That's what I'm asking.  What difference
21  does it make whether a voter makes that choice at the
22  point at which they vote or whether they make it a
23  week or month before?
24      A. It's not so much when they make it.  It's
25  what determination are they making?  Are they showing
```

106

```
 1  up to vote in the primary and then perusing and
 2  deciding what to do?  Or are they showing up as a
 3  registered Republican or to register as a Republican
 4  or a Democrat and then voting pursuant to that
 5  registration?
 6      It makes a big difference.  Because the
 7  person who shows up and registers to be a Republican
 8  is the only one entitled to vote, pursuant to the
 9  rule and our right of association, in that Republican
10  primary.
11      The same thing for the Democrats if they
12  choose to implement this.  As with their caucus for
13  president, then only those people are entitled to
14  vote.  And you don't allow folks who aren't
15  affiliated or aren't willing to make that affiliation
16  to step in and be part of that voting process for the
17  candidate selection but then lends itself to a name
18  borne on the ballot for the general election.[15]
```

Plaintiffs assert that the Republican Party has an absolute right to have its rule enforced even though there might be other means by which its objective of excluding voters whose views are antithetical to those of the Party may be met.  Therefore, Plaintiffs are unwilling to accept a private alternative to the state-sponsored primary:  the party does not seek and apparently would

---

[14] Dep. pp. 105-08.

[15] The full text of the deposition is annexed as Exhibit A to the Affidavit of Gary G. Allen submitted herewith.

not accept a so-called "firehouse primary," that is, a private primary operated and funded by the

Republican Party similar to the Idaho Democratic Party's presidential caucus[16], or a

requirement that voters sign a pledge that they do not harbor views that are antithetical to those

of the Republican Party before being permitted to vote in the primary.[17]  The IRP also rejects

---

[16] Dep. pp. 153-56, 176-77.

[17] The following colloquy occurred at the Semanko deposition:

                                   144
25   Q. Would the interest of the Republican Party

                                   145
 1   and its freedom of association be met if the State of
 2   Idaho said, we want to keep the open primary system,
 3   but we're going to implement a law that says before
 4   you can vote, pick that Republican ballot, you have
 5   to sign such a pledge?  Would that violate -- would
 6   the freedom of association of the Republican Party
 7   still be violated?
 8      A. I think unless the rule that's been adopted
 9   is the one that is implemented, that our right of
10   association would be violated.  What you're
11   describing is not, in my view, consistent with
12   section four of Article IX, the party rule.

                    *         *         *
 4      Q. Would you agree that from the vantage point
 5   of the plaintiffs, the issue in the case is whether
 6   the State of Idaho or the Republican Party makes the
 7   decision as to who can participate in the Republican
 8   primary, putting aside the content of the particular
 9   rule.  Isn't that really what you're saying?
10      A. The question is whether the state law is
11   unconstitutional.  The primary election law is
12   unconstitutional in view of our party rule and our
13   right of association in setting forth the manner in
14   which we can select our candidate.
15          The issue isn't who is in charge, who gets
16   to pick the candidate.  Because clearly Republicans
17   get to pick the candidate.  The issue is whether the
18   Idaho Republican party primary election law violates
19   the constitutional right for the Republican Party to
20   choose their own candidate.

                    *         *         *

                                   150
 1      Q. Isn't the premise of your position that it's
 2   the Republican Party who should make that decision
 3   regardless of the content of it, not the State of
 4   Idaho?

any other system inconsistent with its party rule, including, for example, a system where the

IRP would choose its candidates entirely outside the primary process and place independent

candidates on the ballot.

In the eyes of the Idaho Republican Party, there is only one solution for what it

perceives to be an open primary that it claims severely burdens its associational rights: to force

Idaho's voters, contrary to the will of the Idaho Legislature, to register their party affiliation in

the public record, at taxpayer expense, and to exclude from its primary those persons who were

unwilling to check the Republican box on the court-mandated registration form.  Those

excluded would include the eleven individual Defendants-Intervenors as part of a group

including up to 28 percent of Idaho's voters who consider themselves independents.

---

```
 5      A. Again, it's the members of the Idaho
 6  Republican Party, those that are registered as
 7  Republicans prior to the primary election that should
 8  make that decision.  That's what that --
 9      Q. Not the decision as to who can vote, not the
10  decision as to who the candidate could be, the
11  decision as to how the Republican Party primary is
12  conducted.
13       Aren't you saying that the bottom line here
14  is that the Republican Party should decide who can
15  participate in the Republican primary, not the State
16  of Idaho?  Isn't that really what --
17      A. No.  The State Central Committee of the
18  Republican Party adopts the procedure by which we
19  select our candidates.  That is manifest in a rule.
20      Q. Right.
21      A. If the exercise of that rule or right of
22  association is prohibited by a state statute, that
23  state statute is unconstitutional.  That's the issue
24  here, is whether this statute, which prohibits us
25  from exercising our right of association and

                        151
 1  selecting our own candidate selection process, is
 2  unconstitutional.
 3       You can characterize it however you want.
 4  It is a clear case of whether the right of
 5  association of the Constitution is infringed upon by
 6  a state statute.  That's what is at issue in this
 7  case.
```

The individual Defendants-Intervenors, as stated in their motion to intervene, are persons who do not wish to affiliate with any political party and value their non-affiliation.

## ARGUMENT

**I.      To Prevail in this Case, the IRP Must Demonstrate that the Idaho Primary System Under all Sets of Facts Imposes a Severe Burden on its Associational Rights Not Justified by a Compelling State Interest.**

As a threshold matter, the IRP appears to have made a facial challenge to the Idaho primary election law.  The IRP is not challenging any particular application of the law, but rather argues that the law is unconstitutional in any application because it conflicts with the IRP rules.  To prevail on such a challenge, the IRP must demonstrate that there is no set of facts under which the law could be constitutionally applied.  *Wash. State Grange*, 128 S.Ct. at 1190-91.

Turning to the standards the Court will apply to make that determination, the U.S. Constitution grants the states a "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, Sec. 4, cl. 1, which power is matched by state control over the election process for state offices."  *Wash. State Grange,* 128 S.Ct. at 1191.  Idaho has granted a broad right of suffrage, and gives the Idaho legislature the right to regulate it.  Idaho Const. Art. VI Sec. 2 :

> Every male or female citizen of the United States, eighteen years old, who has resided in this state, and in the county where he or she offers to vote for the period provided by law, if registered as provided by law, is a qualified elector.[18]

Under the current state of the law, the legislature has the authority to implement partisan registration and to limit participation in the party primary to party enrollees.  If Idaho adopted

---

[18] The Idaho Constitution grants the authority to regulate the right of suffrage to the Idaho legislature.  Article VI, Section 4 of the Idaho Constitution states as follows:  "The legislature may prescribe qualifications, limitations, and conditions for the right of suffrage, additional to those prescribed in this article, but shall never annul any of the provisions in this article contained."

such a system, non-aligned voters would not have the right to participate in a party primary. *Nader v. Schiffer*, 417 F. Supp. 837 (D. Conn. 1976), *aff'd no op.*, 429 U.S. 989 (1976).

However, the State is under no obligation to conduct a partisan primary. In *Wash. State Grange, supra,* the Supreme Court rejected a facial challenge to a primary system where all voters are allowed to participate and the top two candidates advance to the general election regardless of party affiliation. Candidates are allowed to state their party preference on the ballot in a way that does not imply party nomination or endorsement. In so holding, the Supreme Court clearly implies that a fully non-partisan primary, without party labels, would not infringe on political parties' associational rights. That is, the inclusion of political parties in primary elections is optional, not mandatory.

Notwithstanding, there are circumstances where state regulation of partisan primaries can go too far and infringe on a political party's rights of association. In *California v. Jones*, the Supreme Court invalidated California's "blanket primary" in a partisan registration state. In this system, registered voters could vote for whichever candidate they choose for each race, without regard to party affiliation. The Supreme Court held that this system imposed a severe burden on the associational rights of the political parties because it allowed voters registered with another political party to participate in choosing a party's nominee. *California Democratic Party v. Jones,* 530 U.S. 567, 581-82 (2000). None of the interests advanced by the State of California in support of its system were found sufficiently compelling to justify the burden imposed on the parties. *Id.* at 583-86.[19]

---

[19] In his dissent, joined in by Justice Ginsberg, Justice Stevens stated:

> In my view, the First Amendment does not mandate that a putatively private association be granted the power to dictate the organizational structure of state-run, state-financed primary elections. It is not this Court's constitutional function to choose between the competing visions of what makes democracy work-party autonomy and discipline versus progressive inclusion of

*Jones* included two critical considerations and one omission which deserve close attention in this case.  First, *Jones* was decided in a partisan registration state.  As a result, it was easy to determine that non-party members were participating in the party's primary.

Second, the *Jones* majority relied on empirical data demonstrating the extent of cross-over voting by members of one party in the primary of another.  For example, according to a 1997 survey of California voters relied on by the Supreme Court, 37 percent of Republicans said that they planned to vote in the 1998 Democratic gubernatorial primary, and 20 percent of Democrats said they planned to vote in the 1998 Republican United States Senate primary.  *Id.* at 578.

Subsequent cases have rejected challenges to primary election systems because the challengers had failed to produce evidence demonstrating harm from non-affiliated voter participation in the primary.  *Wash. State Grange v. Wash. State Republican Party,* 128 S.Ct. 1184, 1191 (2008), focused on the lack of harm to the plaintiffs' associational rights in upholding the Washington non-partisan system:

> Of course, it is *possible* that voters will misinterpret the candidates' party-preference designations as reflecting endorsement by the parties. But these cases involve a facial challenge, and we cannot strike down I-872 on its face based on the mere possibility of voter confusion. See *Yazoo,* 226 U.S., at 219, 33 S.Ct. 40 ("[T]his court must deal with the case in hand and not with imaginary ones"); *Pullman Co. v. Knott,* 235 U.S. 23, 26, 35 S.Ct. 2, 59 L.Ed. 105 (1914) (A statute "is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are").  Because respondents brought their suit as a facial challenge, we have no evidentiary record against which to assess their assertions that voters will be confused.  See *Timmons,* 520 U.S., at 375-376, 117 S.Ct. 1364 (STEVENS, J., dissenting) (rejecting judgments

---

the entire electorate in the process of selecting their public officials-that are held by the litigants in this case. *O'Callaghan v. State,* 914 P.2d 1250, 1263 (Alaska 1996); see also *Tashjian,* 479 U.S., at 222-223, 107 S.Ct. 544; *Luther v. Borden,* 7 How. 1, 40-42, 12 L.Ed. 581 (1849).  That choice belongs to the people.  *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 795, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)."

*Jones,* 530 U.S. at 599.

> based on "imaginative theoretical sources of voter confusion" and
> "entirely hypothetical" outcomes). Indeed, because I-872 has never been
> implemented, we do not even have ballots indicating how party
> preference will be displayed. It stands to reason that whether voters will
> be confused by the party-preference designations will depend in
> significant part on the form of the ballot. The Court of Appeals assumed
> that the ballot would not place abbreviations like " 'D' " and " 'R,' " or
> " 'Dem.' " and " 'Rep.' " after the names of candidates, but would
> instead "clearly state that a particular candidate 'prefers' a particular
> party." 460 F.3d, at 1121, n. 20. It thought that even such a clear
> statement did too little to eliminate the risk of voter confusion.

*Wash. State Grange*, at 1194.

In addition, In *Democratic Party v. Barbour*, 529 F.3d 538 (5th Cir. 2008), the Court of

Appeals overturned a Mississippi district court ruling that such a system unconditionally

infringed on the Party's freedom of association. The Court noted:

> Even if the MSDP had enacted party policies in favor of a closed primary
> system, and thereby proved its standing to sue, a serious question of
> ripeness would remain. The party asserts that because it is required
> unconstitutionally to associate with non-Democrats who vote in its
> primary, its purely legal challenge to § 23-15-575 is neither premature
> nor hypothetical. A pre-enforcement challenge to the law is generally
> ripe "if any remaining questions are purely legal ones; conversely, a case
> is not ripe if further factual development is required." *Monk,* 340 F.3d at
> 282. The difficulty with this argument is the assumption that only legal
> issues remain in dispute between the parties. Mississippi's AG notes that
> MSDP has never attempted to challenge voters pursuant to the process
> outlined in the *Cole Opinion.* Exercising its rights by means of that
> process could have yielded data proving or disproving (a) the existence
> of party raiding; (b) the practicability of the process; and (c) whether the
> party's associational rights were actually infringed by a semi-closed
> primary. It is certainly conceivable, for instance, that the party's mere
> public announcement of its intent to challenge suspected non-Democrat
> voters would discourage raiding attempts. Further, the party admitted in
> discovery that it was unaware of any primary voters who did not support
> Democrat party principles or intend to support the party's nominees. In
> sum, while it might be true that § 23-15-575 permits party raiding, the
> existence and extent of such raiding are factual questions that cannot be
> assessed until MSDP has made some effort to enforce the existing law.
> Only after § 23-15-575 has been enforced can the novel legal issue of its
> effect on the MSDP's associational rights be compared with the blanket
> primary at issue in *Jones*.

> "Further factual development, as well as an actual policy contrary to the statute, would enhance this case's fitness for judicial review. *See Texas v. United States,* 523 U.S. 296, 301, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998) ("The operation of the statute is better grasped when viewed in light of a particular application."). Likewise, "postponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts with further opportunity to construe the statute." *Id.*

*Barbour*, 429 F.3d at 547-48.

Further, *Jones* included no discussion of alternatives available to the parties to avoid the harm of which they complain. For example, in *Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007), the Court held that in a state-sponsored open primary, the Virginia Republican Party had a right to enforce a party rule requiring voters to sign a document renouncing their affiliation with any other party, indicating their agreement with Republican Party principles, and expressing their intent to support Republican nominees. *Jones* provides no analysis of whether a loyalty pledge of this kind, either implemented expressly under the law, or as a matter of party rule, would sufficiently protect the party's associational rights. *Miller v. Brown* further mentions the possibility of a party operating a private "firehouse" primary, at the party's own expense, as an alternative to the state-run system.

Moreover, *Washington State Grange* raises another issue regarding the measure of the burden placed on political parties. Given that partisan ballot access and other special rights granted to political parties are mere privileges that the State is not obligated to grant, Defendant-Intervenors contend that the measure of those privileges should be considered in weighing the extent of the burden placed on a political party by participating in an open primary.

Finally, *Washington State Grange* clarifies that if the statute imposes only modest burdens on a political party's associational rights, that the State need only demonstrate that such burden is counterbalanced by important interests of the State.  *Id.*, at 1191-92.

In sum, the IRP's burden in this case is to demonstrate that, under any set of facts, the law imposes a severe burden on the party's associational rights that is not justified by a compelling state interest.  Important considerations in this analysis include:  (1) the difference between partisan registration and non-partisan registration; (2) the need to show harm; (3) the necessity for the IRP to consider alternatives that the law may allow that would protect their associational rights; and (4) a balancing of the privileges granted to a party against the burdens that the system places upon it.  If the system imposes only a modest burden on the IRP's associational rights, the State need only show that such burden is counterbalanced by important state interests.

## II.      The IRP has not Demonstrated that Idaho's Open Primary is Unlawful.

The sections below address the following issues:  (A) The severity of the burden on the IRP's associational rights; and (B) The importance of the State's interests in the absence of a severe burden.  These issues are discussed in turn in the sections below.

### A.      The IRP has not demonstrated a severe burden on its associational rights.

Applying the tests outlined above, the IRP has not demonstrated a severe burden on its associational rights.  The first consideration is the important difference between a partisan registration state addressed in *Jones* and a non-partisan registration state such as Idaho.  In *Jones*, it was possible, if not easy, to tell whether cross-over voting was occurring because voters were required to register by party.  In Idaho, it is essentially a meaningless question.  One cannot tell whether people who are not registered as Republicans are voting in the

Republican primary because there is no party registration.  One cannot tell if persons who are

not members of the IRP are voting in the Republican primary because there is no membership

list.  The IRP therefore has a fundamental problem in asserting that its associational rights are

violated, particularly in a facial challenge, because the party has no idea who the people are

who comprise the association with which outsiders allegedly are interfering, or, for that matter,

who the outsiders are.  In essence, the IRP is asking the court to implement partisan registration

so that the IRP can determine if there is a problem.  However, the IRP has to come to court with

proof; it cannot ask the court to create it for the party.

Put another way, it is not clear what, if any, burden is imposed on the IRP.  The absence

of something the IRP wants – a closed primary and partisan registration – cannot be found to

impose a burden on them.  At his deposition, Chairperson Semanko took the position not that a

discernable burden had to be alleviated, but that the State of Idaho had to conform to the IRP's

rule.  This is particularly ironic since a majority of delegates to the IRP's 2008 convention

voted in favor of continuing the current system.[20]

A related problem for the IRP is the lack of harm.  Chairperson Semanko was quite

candid in his deposition that the IRP had no evidence that participation of non-affiliated voters

had ever affected the outcome of an IRP primary, or had caused any candidate or nominee of

the party ever to stray from the values, ideals or beliefs of the IRP.  The sole burden identified

by the IRP is that the primary system does not comport with the party's rule.  We respectfully

submit that the IRP bears a higher burden to prevail in this case.

The third consideration is the need for the IRP to consider alternatives.  This

requirement seems especially plain in a facial challenge.  We cannot see how the IRP can

demonstrate a facial infirmity when it refuses to consider interpretations of the Idaho election

---

[20] Dep., pp. 66-67.

statutes that would mitigate the burdens on the party.  There are several options that Defendant-

Intervenors submit the IRP is obligated to consider.  First, the IRP points to the Idaho

Democratic Party's ("IDP") presidential caucus (the "Caucus")[21] as an example of how

exclusion of non-affiliated voters could occur.  The Caucus is the equivalent of a "firehouse

primary," a privately funded primary.  Given that the Caucus proceeds each four years in Idaho,

there would seem to be a reasonable likelihood that this option comports with Idaho election

laws.  However, the IRP refuses to consider this option or apparently even to discuss it with the

Secretary of State, stating that only implementation of partisan registration complies with the

party's rule.  Second, the IRP should consider the possibility of a loyalty pledge as was upheld

in *Miller v. Brown*.  The IRP refuses again, citing its party rule.  Finally, the IRP could opt out

of the partisan primary system entirely and place independent candidates on the ballot,

promoting its candidates and party brand however it chose.  This is also not an option in the

IRP's eyes, even though it would impose no burden on the party's associational rights.

Defendants-Intervenors submit that the IRP's claims are not ripe unless they can show that all

permissible options under Idaho law place undue burdens on the IRP's associational rights.

*Barbour*, 429 F.3d at 547-48.

  The final consideration is to balance the privileges the State has granted to the IRP with

the burdens of which the IRP complains.  The IRP has taken advantage of the State's offer to

become a qualified political party, and has organized itself accordingly.  The benefits are

significant:  (1) the party receives automatic ballot access as long as it meets de minimis criteria;

(2) the State provides a taxpayer funded primary election; (3) the party's label is placed

adjacent to the candidate's name on the general election ballot – the potent  "R" designation

---

[21] On February 5, 2008, the Caucus was held at sites in each county designated by the IDP wholly at IDP expenses. Over 20,000 people participated state-wide. *Idaho Statesman, Feb. 6, 2008, "It's All Obama at Valley Caucuses."*

that is the envy of other political parties in Idaho; (4) party committees have the right to

nominate successors to the governor if an officeholder leaves office before his/her term is up;

and (5) the State provides a check box on Idaho state income tax forms where a taxpayer can

donate $1 to the party each year.  The IRP no doubt values these privileges and wishes to

maintain them.  The State is not obligated to provide any of these privileges and could eliminate

them all without violating the IRP's associational rights.

These privileges are offset only by a fear held by some in the IRP that non-affiliated

voters -- whatever that means with no registration or membership list -- are helping to choose

the IRP's candidates.  As discussed, however, the IRP has offered no evidence any of this is

occurring.  Further, there is no evidence that the remedy the party seeks to implement - partisan

registration presumably changeable at any time - would solve the problem.  If all that is

required to vote in the IRP primary is to register Republican, nothing stops the apocryphal

Democrats who would cross over or the unwelcome independents from signing the registration

roll.  Indeed, the only difference between this system and the current system is a public

declaration of party affiliation, even though it might only last for one day.  The IRP has not

produced a shred of evidence that changing to partisan registration would better protect the

party's values, beliefs and interests than the current system where voters can determine if they

want to support IRP candidates when they enter the voting booth.[22]

---

[22] In addition, the IRP's request to impose partisan registration places the Court on a dangerous slippery slope.  If the IRP can force the State to impose partisan registration simply by adopting a party rule, what prevents a political party from adopting other tests that the State has to implement on their behalf?  Could it compel the State to require that a voter say the Pledge of Allegiance, give a secret handshake or to whistle "Dixie" prior to being allowed to vote.

**B.    If the Idaho primary system imposes only a modest burden, it must be upheld if it serves important state regulatory interests.**

If the system is found to impose only a modest burden, it must be upheld if it serves important state regulatory interests.  *Washington State Grange*, at 1191-92.  In *Jones,* the Court recognized the following interests as important: promoting fairness; affording voters greater choice; increasing voter participation; and protecting privacy.  All four are operative in the case at bar.

Moreover, the State serves an additional interest in this case due to the strong presence of independent voters in the Idaho electorate.  28 percent of the Idaho electorate would be excluded from participation in what is often the only contested election if the IRP prevails in this case.  The consideration of this interest weighs heavily in favor of independents.  The burden on the IRP is slight.  It cannot even demonstrate that Democrats or independents have voted in its primary, much less that they are impacting on the outcome or the message of the candidates.  In contrast, the burden of a ruling in favor of the IRP on Defendants-Intervenors and other non-aligned voters would be severe.  They would be deprived of the right to vote in the primary where, often, the actual decision as to who will hold public office is made.  Defendants-Intervenors submit that this impact is severe enough to constitute a compelling interest for the State in the event it were necessary to demonstrate one.

Indeed, Defendants-Intervenors submit that their right to participate in the electoral process and the burden imposed on them must receive independent consideration in the balancing of the respective rights and burdens of the parties.  In *Bush v. Gore*, 531 U.S. 98, 104 (2000), the Supreme Court implies the existence of  a fundamental right to vote that the Court must include in the calculus when weighing the Idaho system's impact on the IRP's associational rights:

> History has now favored the voter, and in each of the several States the citizens themselves vote for Presidential electors.  When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.

This is in accord with earlier statements by the Supreme Court on the subject:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.'  *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).  *Wesberry* involved a federal election. Article I, s 2, of the Federal Constitution declares that Members of the House should be 'chosen every second Year by the People of the several States'; and the Seventeenth Amendment says that Senators shall be 'elected by the people.'  But the right to vote in state elections is one of the rights historically 'retained by the people' by virtue of the Ninth Amendment as well as included in the penumbra of First Amendment rights.  As Mr. Justice Brennan stated in *Storer v. Brown*, 415 U.S. 724, at 756, 94 S.Ct. 1274, at 1291, 39 L.Ed.2d 714,  'The right to vote derives from the right of association that is at the core of the First Amendment, protected from state infringement by the Fourteenth Amendment.'  (Dissenting opinion.)

*Lubin v. Panish,* 415 U.S. 709, 722 (1974).

Here, the legislature of the State of Idaho, informed by the broad grant of suffrage contained in its constitution, has guaranteed its citizens the right to full participation in the electoral system without having to affiliate with a political party.  That right is fundamental, and must not be cast aside by the desire of a faction of the Republican Party for a primary system more suited to its perceived needs.

## CONCLUSION

For all of the above reasons, and those set forth in the moving papers, Defendants-

Intervenors' motion for summary judgment dismissing this action should be granted.

DATED this 24th day of October, 2008.

/s/ Gary G. Allen
GARY G. ALLEN (Idaho SB # 4366)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Telephone: 208-388-1200
Facsimile: 208-388-1300
Email: GaryAllen@givenspursley.com
S:\CLIENTS\10240,1\Mem in Reply to Response to Mot to Intervene.doc



/s/ Harry Kresky
HARRY KRESKY
LAW OFFICE OF HARRY KRESKY
250 W. 57th Street, Ste. 2017
New York, NY 10107
Telephone: 212-581-1516
Facsimile: 212-581-1352
Email: Harrykres@aol.com

Attorneys for Defendants-Intervenors THE
COMMITTEE FOR A UNIFIED INDEPENDENT
PARTY, INC.; the AMERICAN INDEPENDENT
MOVEMENT OF IDAHO; its Chairman MITCH
CAMPBELL; JOHN HAIGHT; CALVIN LEMAN;
ANDREW LOGSDON; BARBARA NELSON;
LAUNA NOBLE; LaMAR ORTON; JASON
RAMSEY; BOYD STOKES; LAURA PIKE
CAMPBELL and JOSEPH BRITTON

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 24th day of October, 2008, I submitted this foregoing to the Clerk of the Court for service on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing, including, but not limited to, the following:

John Eric Sutton          jesutton@jesutton.com

Mike Gilmore          mike.gilmore@ag.idaho.gov


/s/ Gary G. Allen
Gary G. Allen