### *Exhibit D: Critique of the Moore Information Survey*

### *Summary Points*

1.  There are significant deficiencies in the Moore Information poll that limit the inferences that can be drawn from the survey and the applicability to this legal dispute.

2.  The timing of the Moore Information survey—over 19 months after the 2008 Idaho primary—is problematic; 13% of the respondents have demonstrably false memories of their behavior, and another 19% could not recall their behavior in the most salient races in the 2008 primary election.

3.  There is evidence of significant bias of different types in the survey responses.

4.  The question construction for key questions is problematic and outside the norms of academic and commercial political polling. The question about how respondents vote in primary elections presents options that are not mutually exclusive. Rather than asking for *party identification*—the best way to measure partisanship—the survey asks a vague question about behavior that likely exhibits memory bias and social responsibility bias.

5.  The study suffers from an incredibly small sample, especially for key sub-groups, has an unusually low response rate, uses questions for which there was no precedent or pretesting, and relies on sampling weights which are not replicable.

6 [ADM]. The reported sampling error for drawing inferences about Democratic voters from the Moore Information survey is plus or minus 10% or greater.

*Introduction*

This section highlights the significant deficiencies of the survey conducted by Moore Information on January 6-7, 2010, the limitations of the inferences that can be drawn from that survey, and, most importantly, how these limitations substantially undermine the applicability of this survey to the legal dispute.

Herb Asher (2007) in his authoritative textbook *Polling and the Public* warns the reader to be very skeptical of commissioned polls, because while they can be of the highest quality when executed well, they can also be constructed with a purpose in mind (Asher 2007).  In this case, that purpose is an attempt to demonstrate crossover voting in Idaho primaries, as opposed to an attempt to integrate well-established scholarship on elections in the pursuit of a scientifically-informed investigation of the voting behavior of the electorate of Idaho in its open primary elections.  The timing of this survey, the many structural issues present in its execution, and the low quality of the data resulting from the survey all call into question the reliability and the veracity of the claims being made by the plaintiff.

Before we go further we should define some terms: bias, validity, and reliability.

The term "bias" is used frequently in the public opinion and survey research literature.  A similar term that the reader can use in its place, when "bias" is present as a verb, is "a systematic error that reduces the accuracy of," and when a noun is "reduced accuracy due to systematic error."

Another term that should be defined is "measurement validity" or "validity."  Validity is the idea, simply put, that you are accurately measuring the concept that you think you are measuring with the instrument you are using—in this case survey questions.  The term "accuracy" is a good synonym for validity.

"Reliability" is one more term that should be defined.  Does the instrument or measurement tool you are using yield consistent and stable results in repeated measures over time?  For example, a tape measure is a very reliable measurement tool, whereas using your foot to mark off a distance is less reliable.  The term "precision" is a good synonym for reliability.

A metaphor of a target can be used to illustrate reliability, validity, and bias as concepts.  The effects of bias can be likened to a sustained crosswind on hitting the center of the target (in this case measuring a concept in political reality).  If we know where that wind is coming from and it is consistent, we can account for it in our aim if the shooter is skilled; either way, it still makes hitting the target harder than usual.

To continue the metaphor, in repeated measures, the best analog for validity is the straightness of the rifling in the barrel.  If the barrel is true, we will be accurate and hit the center of the target (again, an accurate representation of political reality) each time we attempt to hit the target.

Reliability, in repeated measures, is comparable to the ability of the shooter to stand still while shooting.  If the shooter has the shakes or does not have the same shooting stance each time a shot is taken, a lack of precision will be evident.

In short, as will be demonstrated, because of all of the failings present in this survey, we cannot make valid inferences about Idaho voters.

### *Concerns about the Conduct of the Survey*

*1. The party constructing a survey must have sufficient information on the topics to prevent the use of vague or incorrect questions.*  Many of the key questions used in the Moore Information survey, discussed in greater detail below, are inadequate measures of the underlying concepts from the literature on American political parties, public opinion and voting behavior.  The Moore Information survey appears to show a basic ignorance of a series of concepts that are nearly universal and fundamental in surveys of public opinion and political behavior.

*2. The population of respondents being sampled must have sufficient information on the survey topics to give sensible answers to questions.  In this survey, evidence shows that this not the case.*  It is important to note that most surveys of political attitudes and behavior ask questions about the current attitudes of a respondent or how the respondent would behave at that moment in time, or ask about respondent behavior in the recent past.  For example, the 2008 post-election American National Election Study (ANES), the survey of record among public opinion and political behavior scholars, which conducts face-to-face interviews with over 2000 respondents, was "administered November 5 through December 30, 2008," beginning just days after the election, while being in the field for almost two months (ANES 2008).[1]

In comparison, the Moore Information survey was conducted January 6-7, 2010, a date 14 months after the 2008 general election and over 19 months after the 2008 primary election, held May 27, 2008 (Moore Information Report 2010, p. 1).  Key concepts, namely the attempted measure of partisan identification and past voting behavior, in the Moore Information survey depended very much on respondent recall of their behavior, not just in the 2008 primary electoral events, but, due to the question wordings, elections ranging back through the entire voting history of the respondent.

*A. Researchers writing questions about past behavior or events must be cognizant that these kinds of questions may make unreasonable demands on the memory of the respondent.*

Memory effects can be influential in measurements obtained by asking the respondent to remember and report behavior and, in turn, may bias the result of that measurement.  Less important facts are forgotten more quickly than more important ones and memory becomes less accurate the longer the length of time from the behavior being asked about (e.g., Oskamp and Schultz 2004; Tourangeau, Rips, and Rasinski 2000).  This is why most surveys about electoral behavior and attitudinal correlates are conducted in relative temporal proximity to the election being studied itself: because in Americans' day-to-day lives, even as much as we political scientists would like for it to be otherwise, there are usually many more pressing matters for citizens to remember than for whom they voted in a primary election over 19 months ago, let alone for whom

---

[1] The response rate for the American National Election Studies 2008 Time Series Study was 59.5% (AAPOR RR1).  These response rates will be discussed in further detail below.  More information can be found at this website: http://www.electionstudies.org/studypages/2008prepost/2008prepost.htm

they have voted across the span of their lifetime.  In fact, the *only* question ever asked on political surveys in which respondents are asked to recall a behavior from more than a month or so earlier is vote choice in previous presidential elections, because it is the most salient election held.  It is literally unheard of to ask a survey respondent to recall the vote for a less memorable political office for anything but the very recent time period.

Even with the possibility of these memory effects, there are methods by which memory effects can be mitigated.  They include giving a survey respondent more time by lengthening the interview and using multiple cues, or by interviewing respondents multiple times.  None of these steps were taken in the conduct of this survey to our knowledge.  (Tourangeau, Rips, and Rasinski 2000, especially ch. 3; Oskamp and Schultz 2004)

Using the data provided from the survey, Saunders ran analyses to discover the presence of these potential memory bias effects in the data used in the Moore Information report.  This was done by comparing the results of the sample on certain questions to known parameters of the political process in the real world or election results.

In the first analysis, using the responses of the 400 primary voters in this sample, respondents were asked which candidate they voted for over 19 months earlier in the presidential and senatorial primaries.  Table D-1 presents below a simple crosstabulation of two questions from the survey; these are Question 12 (presidential vote in the 2008 primary) and Question 13 (senatorial vote in the 2008 primary) from the survey.[2]

As is common knowledge to the parties in this case (e.g., "Affidavit of Defendant Ben Ysursa," Document 26-3, filed October 24, 2008)[3], in Idaho's open primary, a voter is restricted to vote on only one party's ballot, no matter the mode of vote collection (paper, punch card, or optical scan ballot).  Therefore, it is physically impossible to vote in primaries of different parties in Idaho.  Yet, a disturbingly large portion of the survey respondents have indicated that they have done just that.

Entries in the cells equate to the percentage of voters in that cell from the overall sample of 400; for example, 42.93% of voters voted for both John McCain and Jim Risch in their respective primary elections, both Republicans.  In this example, readers will note that this particular cell is "unshaded."

Contrast this with the shaded cells throughout the table; these cells represent either respondents who admitted to not knowing or not remembering one or both of their votes in these two elections, or who remembered voting for a candidate from one party in one of these elections and a candidate

---

[2] It should be noted that the analyses reported here use the survey weights as computed by Moore Information, which as of the writing of this report we have concerns about as noted below in the structural issues section; all analyses throughout this report will be using them unless otherwise noted because it allows for comparison with the results of the Moore Information report of January 14, 2010.
[3] This was also confirmed in an email conversation with Tim Hurst, Chief Deputy Secretary of State of Idaho.

Table D-1: Crosstabulation of 2008 Presidential and Idaho Senatorial Vote from Moore Information Survey Data

|  | Larry LaRocco, D | Jim Risch, R | "another candidate" | "don't know/don't remember" | Total |
|---|---|---|---|---|---|
| Barack Obama, D | 15.49% | 7.13% | 0.25% | 3.18% | 26.04% |
| Hillary Clinton, D | 2.40% | 0.98% | 0.25% | 0.35% | 3.98% |
| John McCain, R | 4.15% | 42.93% | 0.44% | 6.04% | 53.56% |
| Ron Paul, R | 0.47% | 4.80% | 0.50% | 0.68% | 6.45% |
| "another candidate" | 0.22% | 0.97% | 0.00% | 0.35% | 1.54% |
| "don't know/don't remember" | 0.51% | 1.47% | 0.25% | 6.19% | 8.42% |
| Total | 23.24% | 58.28% | 1.69% | 16.79% | 100.00% |

| | | |
|---|---|---|
| Potential "Correct" Respondents | 273.04 | 68.26% |
| | | |
| "don't know/don't remember" | 76.06 | 19.02% |
| "false memory" | 50.90 | 12.73% |
| Total | 126.96 | 31.74% |

Source: Moore Information Survey Dataset, Provided by Counsel, April 6, 2010
Note: Cell entries are percentages of the overall sample
Shaded cells highlight the percentages of respondents who did not know or remember one of the candidates from one
of the elections or had "false memories" of the election, defined as voting for a candidate from one of each of the parties
Survey weights were used in the construction of the crosstabulation, which results in non-integers in the count results.

of another party in another. The latter meant, of course, that these respondents had reported false memories of their voting behavior in at least one of these two elections.

The total sum of those who could not remember one or both of their votes in these two elections combined with those who had false memories adds up to 31.74% of the sample, or, conversely, only 68.26% had a valid memory regarding just the 2008 Idaho primary election.[4] To our knowledge, the results reported by Moore Information included all of these individuals in their analysis of crossover voting, as they reported a valid N of 400, not 273 (the valid number of respondents had these cases been excluded). As will be discussed below when we discuss statistical significance, if we were to reduce the valid number of respondents further, any estimates drawn from the survey are less likely to be statistically significant.

In sum, nearly a full third of the voters upon which the Moore Information survey bases its analyses *do not even have accurate memories of their behavior in the most salient races of the 2008 primary election*. Needless to say, including all these respondents in the analyses should lead one to strongly question the validity of these analyses and the conclusions drawn from them.

Furthermore, the simple analysis here understates the problem, if anything, as surely a non-trivial portion of those respondents who answered "correctly" for both presidential and senate vote were rewarded for guessing correctly, rather than actually recalling, their past behavior.

This finding obviously represents a potentially large source of memory effect bias in the sample, and seriously calls into question the validity of any inferences drawn from analysis of this survey. In truth, this highly problematic reliance on flawed memories on its own should be enough to strongly question any conclusions drawn from this survey; however, it is but one of many substantial problems.

B. *The effects of social desirability bias can seriously distort survey findings.*

Converse (1974), in his discussion of the American populace, described a large portion of the electorate as having "nonattitudes," and lacking the political will, knowledge, and ideological sophistication to have ideologically consistent attitudes when it came to politics (Converse 1964, 1970, 1974). So, from the start, a large portion of the electorate starts at a deficit when it comes to being conversant with political and ideological concepts.

Oskamp and Schultz (2004) in their book *Attitudes and Opinions* describe social desirability (or "social responsibility") bias as when a respondent, "[o]n any topic where society's norms point to one answer as more socially desirable than another, such as a 'good' answer like having voted for the winner of any election" overreports 'good' behaviors and underreports the 'bad.' Oskamp and Schultz (2004) go on to note that the presence of social desirability bias can seriously detract from the validity of analyses conducted on these kinds of biased sample data. This is because it is often difficult to determine the source of the bias and then account for it with sample weighting, as, for

---

[4] The "invalid" number of respondents is also potentially higher, since another 2.7% of respondents replied that they voted for "another candidate," but we have no way of knowing for sure whether these responses represented false memories or not. They could be claiming to vote in a third party's primary and not for one of the candidates listed with the brand name of one of the two major parties, but there is no way to tell because of how the question is asked.

example, social desirability bias can occur among those who are younger and of lower socioeconomic status (Cahalan 1968), but also among highly educated respondents who firmly believe in voting (e.g., Silver, Anderson, and Abramson 1986). Interestingly, Oskamp and Schultz (2004) go on to note that others like Krosnick (1999) "found little intentional denial of such behaviors and attributed much overreporting of voting to fading memory" (Oskamp and Schultz 2004, pp. 126).

With all this in mind, Saunders prepared crosstabulations that compared the proportions of votes actually cast in the 2008 Idaho presidential and senatorial elections (Source: Idaho Secretary of State, *Idaho Election Results*, http://www.sos.idaho.gov/ELECT/results.htm) to those reported by the sample. These are reported in Tables D-2 and D-3 below.

To do this, data were used from the sample resulting from the same Questions 12 and 13 used above asking the respondents to recall for whom they had voted in the 2008 Idaho presidential and senatorial elections. However, this time the analysis focuses on the proportion of voters who said they voted for a particular candidate or said they voted for a candidate who was not listed among the options in the sample, after excluding those who said they did not know or could not remember who they voted for in those elections. This was then compared to the total proportion of all the votes cast in the 2008 Idaho primary elections.

The differences are rather astonishing, but are exactly what we would expect to see with both memory bias effects (due to the length of time since the election) and social responsibility bias effects taking place in the sample.

Sample voters only reported voting for Hillary Clinton at a rate of 4.35%, while the percentage in the overall electorate voting in all primary elections was 9.58%, a difference of 5.23%. To interpret this further, this means that, in political reality, 9.58% of all of the voters who voted in any Idaho presidential primary in 2008 voted for Hillary Clinton, whereas only 4.35% of the entire sample *said* they voted for Hillary Clinton in a presidential primary in 2008, meaning the sample contains a rather large amount of underreporting of voting for Hillary Clinton or 54.6%[5] of the actual vote total for Clinton; this discrepancy is likely due to memory or other biasing effects.

Barack Obama received only 14.24% of the actual vote in the 2008 Idaho primary, but in this sample, respondents reported voting for Obama at a rate of 28.43%; this represents an overreporting of the Obama vote among the sample that almost doubled (99.7%) Obama's actual vote in the 2008 Idaho primary election.

Sample voters reported voting for John McCain at a rate of 58.49%, while the actual percentage of the primary vote was 51.94%, an overreport of 6.54% (or 12.6% over the actual voting rate). The sample underreported voting for Ron Paul at a rate of 7.05%, while the actual percentage of the primary vote was 17.69%, a raw difference of 10.64%, and a 60.2% underreport as compared to the rate of voting that actually occurred in the election.

---

[5] The reader should keep in mind that the percentages of underreport and overreport cited in the table and in the document are the result of the comparison between the responses of the sample and what actually happened in the Idaho primary elections. The desired result for those conducting the survey would be "0%" in these rates; as can be seen the deviations in the sample from political reality are quite large in these data.

Table D-2: Social Desirability Bias in the Moore Information Survey Data—Idaho 2008 Presidential Election

| | | Total Votes in Election | Actual % of Total Vote | % from Weighted Sample | % Difference from Total Vote | % Difference/% Total Vote |
|---|---|---|---|---|---|---|
| United States President | | | | | | |
| DEM | Hillary Clinton | 16,122 | 9.58% | 4.35% | -5.23% | -54.61% |
| DEM | Keith Russell Judd | 734 | 0.44% | | | |
| DEM | Barack Obama | 23,980 | 14.24% | 28.43% | 14.19% | 99.65% |
| DEM | NONE OF THE NAMES SHOWN | 1,966 | 1.17% | | | |
| REP | John McCain | 87,460 | 51.94% | 58.49% | 6.54% | 12.60% |
| REP | Ron Paul | 29,785 | 17.69% | 7.05% | -10.64% | -60.17% |
| REP | NONE OF THE NAMES SHOWN | 8,325 | 4.94% | | | |
| | "Other" vote total | 11,025 | 6.55% | 1.69% | -4.86% | -74.24% |
| Total presidential votes | | 168,372 | | | | |

Source: Moore Information Survey Dataset, Provided by Counsel, April 6, 2010; and
Idaho Secretary of State, Idaho Election Results, http://www.sos.idaho.gov/ELECT/results.htm, accessed April 1, 2010
Note: An entry of "0%" in the last two columns would represent equivalence between the sample and the actual vote

Table D-3: Social Desirability Bias in the Moore Information Survey Data--Idaho 2008 Senatorial Election

|  |  | Total Votes in Election | Actual % of Total Vote | % from Weighted Sample | % Difference from Total Vote | % Difference/% Total Vote |
|---|---|---|---|---|---|---|
| United States Senator | | | | | | |
| DEM | David J. Archuleta | 11,074 | 6.77% | | | |
| DEM | Larry LaRocco | 29,023 | 17.73% | 27.92% | 10.19% | 57.48% |
| DEM | Kevin Volkmann | 20 | 0.01% | | | |
| REP | Fred M. Adams | 4,987 | 3.05% | | | |
| REP | Brian E. Hefner | 2,915 | 1.78% | | | |
| REP | Bill Hunter | 4,280 | 2.61% | | | |
| REP | Richard Phenneger | 6,532 | 3.99% | | | |
| REP | Jim Risch | 80,743 | 49.33% | 70.04% | 20.72% | 42.00% |
| REP | Hal James Styles Jr. | 2,082 | 1.27% | | | |
| REP | Scott A. Syme | 16,660 | 10.18% | | | |
| REP | Neal Thompson | 5,375 | 3.28% | | | |
|  | "Other" vote total | 53,925 | 32.94% | 2.04% | -30.90% | -93.82% |
| Total senatorial election votes | | 163,691 | | | | |

Source: Moore Information Survey Dataset, Provided by Counsel, April 6, 2010; and
Idaho Secretary of State, Idaho Election Results, http://www.sos.idaho.gov/ELECT/results.htm, accessed April 1, 2010
Note: An entry of "0%" in the last two columns would represent equivalence between the sample and the actual vote

It should be noted here that with this amount of bias, in addition to standard memory effects from data being collected so far out from the election, two other sources of bias are also possible. The first is the possibility that respondents did not understand that this was a question about the primary election instead of the general election, and therefore reported how they voted in the general. The second is the possibility of the presence of "winner's bias" (e.g., Atkeson 1999), which is also a concern for validity if not accounted for, in both the Obama and McCain results (and the comparisons from the senatorial election below are even more striking). The winners'—at least winners in the primary, and Obama's winner's bias could be from his overall presidential win in the general election, even though Obama lost Idaho—proportions were all higher than their actual vote share.

Finally, for the presidential primary vote analysis, those who reported voting for "another candidate" other than these four candidates in the sample amounted to 1.69%, while the actual percentage was 6.55%, a difference of 4.86% (or -74.2% of the actual vote); this is yet another strong indicator of social desirability bias.

The results on the senatorial race are even more stunning.[6] Democrat Larry LaRocco won 17.73% of the total vote in the Idaho 2008 senatorial race. However, the sample reported voting for LaRocco at a rate of 27.92%, a difference of 10.19% and an overreport of 57.5% compared to the actual vote percentage.

Even more striking: Senator Risch won 49.33% of the total votes in the 2008 Idaho senatorial primary election, but the sample reported voting for him at a rate of 70.04%. This is a difference of 20.72% or a 42% overreport compared to the actual election results.

Perhaps even more conspicuous, and an interesting illustration of a possible interaction of memory and social responsibility bias effects, 32.94% of voters voted for candidates other than Risch and LaRocco in the senatorial primary while only 2.04% reported that they voted for "another candidate" in Idaho's 2008 senatorial primary in the sample, an underreport by a *factor of 16* or 93.8% compared to the percentage of actual vote.

In every single race that was measured in these questions, as compared to actual vote share of the candidate in political reality, there is an indication of a large amount of bias of some kind, whether it is memory, social desirability, winner's bias, or some combination thereof.[7] These sources of bias are a concern for validity if they are not accounted for, and it appears that they have not been so.

---

[6] The survey question on the senatorial race only gave the respondent three options, Risch, LaRocco, or "another candidate."

[7] One other piece of evidence is interesting about respondent recall and this survey. This sample was drawn from a list of primary voters secured from the Secretary of State's Office. The first question respondents were asked, after their identity was confirmed, was "Did you vote in the 2008 primary election?" 43 of the voters said they did not vote in the primary, even though there was proof that they did. These respondents were then discharged from further participation in the survey, and therefore are not included in the data analyzed here. While the possibility of errors on the part of the Idaho Secretary of State's office exists, this is likely more evidence about potential respondent memory deficits with regard to an inconsequential event (to them personally) that occurred so far in their past; the most plausible explanation for at least some of these cases is that they likely did vote in the primary election but did not remember even doing so. In short, it is very likely that, in addition to the heavy memory bias effects documented above, another full 10% of the primary voters who engaged in the survey *could not even correctly remember that they had voted in the primary*.

The data we have from this survey, however, are burdened by yet other complicating factors. First, this was a survey on primary election behavior well in the past: primaries are less participated in and less salient and thus less memorable events. Furthermore, there is also the legitimate concern of whether or not respondents actually understood that this was a question about primary elections and not general elections because of how the questions were framed. Third, this survey involved asking the respondent to recall their voting behavior in down-ballot races, and further a down-ballot race that was in a primary; there is some evidence for this idea as the "don't know/don't remember" response very nearly doubled from the presidential race (8.42%) to the senatorial race (16.79%). One can imagine what the results might have been for a generic Idaho State House vote question.

Because of the large number of elections citizens face in our system and the difficulty in obtaining information about them, many citizens do not acquire, and in turn retain, information about "down-ballot" contests like those for lesser-known statewide races or the state legislative races well as they do "top of the ballot" races. Therefore, voters are more dependent on heuristics like partisan identification when they make their choices on these races (Mondak 1993a, 1993b; Atkeson 1999, Schaffner and Streb 2002). This in turn means they are less likely to actually remember what they have done politically long in the past, which may also mean that memory effects and social desirability bias may be more and more prevalent the further down-ballot we get from presidential elections.

The lesson is that, in the planning phase of a survey, especially one that is on a relatively arcane subject, and one that is about an event far in the past, great care must be taken that possible memory effects are either counteracted by the design, or that the study design allows to estimate the memory effect itself, so that the correction during data analysis is possible. As far as we know to this point, none of these steps were taken. And as is apparent from the resulting data, steps needed to be taken.

In summary, obvious substantial memory/recall and social responsibility bias effects are present in this sample. This further calls into question the validity of any inferences drawn from analysis of this survey.

***Other Structural Issues for the Survey***

Beyond all of the memory and social desirability bias issues presented in the section above, which is truly enough to invalidate the data from and inferences drawn from the survey on its own, we also have a responsibility to discuss many of the structural issues that must be noted about this survey, so that the reader can understand the context in which this survey was conducted and how the study and the data resulting from it could have been improved.

1. Pretests (using key informants or focus groups to test the questionnaire prior to the survey going into the field) are recommended in order to test the efficacy of each survey instrument, especially when questions that are not canonical are being used—as we will see below, these questions are not (Oskamp and Schultz 2004; Presser et al. 2004). Pretests were not conducted for any of these survey questions to our knowledge.

2. Sampling.  A sufficient sample size is important for a valid survey to be drawn from a population.  I regularly ask students in class, "which is better, all things being equal, a survey of 400 voters or a survey of 800 voters?"  Their answer, which my students always seem to get right, is the larger one.  The sample size for this survey is small (N=400).  A low sample size does not guarantee bias (and reduced accuracy), but a low sample size does indicate a risk of bias, and that risk grows the smaller the sample size.  This is especially the case with regard to small but analytically important subgroupings; any analysis with them may have problems with statistical significance.

3. Response Rates.  Largely due to increasing refusals, response rates across all modes of survey administration have declined, in some cases precipitously (AAPOR 2008a).  Even in the face of this, sufficient response rates are important for assuring a lack of bias in the results drawn from survey samples.  Just as in the example above, if I ask a student in class, "which is better, all things being equal, a response rate of 30% or a response rate of 7.3%?" the answer I get is the higher response rate.

The reported response rate for the Moore Information survey is 7.3% (AAPOR RR1 as per AAPOR 2008a).  This is a *very* low response rate in comparison to most political surveys (namely the American National Elections Study) designed to address important scholarly questions, e.g., crossover voting.  Although a low response rate does not guarantee the presence of bias (the researcher may still achieve a representative sample of the population they are trying to study), a low response rate does indicate an enhanced risk of bias due to the decreased probability of randomness—and that risk grows the lower the response rate.[8]

Just as a comparison, the data that were cited as a source in Exhibit B from the Boise State University Social Science Research Center's (SSRC) *19th Annual Idaho Public Policy Survey,* had an AAPOR RR1 of 30%.  This rate was likely achieved because the survey was in the field for a longer time, which is a more costly endeavor.  Data collection for the 2008 study ran from November 14 through December 16, 2007, for the base study and data collection for the oversample ran from December 13, 2007, to January 10, 2008.  (Source: http://ppa.boisestate.edu/ssrc/archive/2008-annualsurvey19.pdf, p. 7 of the "Technical Report," p. 56 of the PDF.)[9]

4. Small sample size and low response rate can indicate risks of lower accuracy/bias on their own, but it is also apparent that the potential for a bias problem to exist is compounded when both exist simultaneously—and they do in this survey—and that risk grows as sample sizes go lower and response rates shrink (Babbie 2009; Asher 2007; Sivo et al. 2006).

---

[8] For those not familiar with the idea of response rates, I suggest this very good primer from the website of the *Washington Post*: http://www.washingtonpost.com/wp-srv/politics/polls/poll_response_rate.html.  My undergraduate methods students find it very helpful.  For a deeper explanation, I would suggest the website of the American Association for Political and Social Research (AAPOR): http://www.aapor.org/Response_Rates_An_Overview.htm.

[9] Two things to note about this report.  First, the SSRC reports a different response rate (AAPOR RR3) of 56.4%, my 30% figure (AAPOR RR1) was calculated using the AAPOR Response Rate Calculator using the unweighted figures from this page of the technical report.  Second, this survey was not asking any post-election voting behavior questions, and therefore was not subject to any temporal memory problems, save the standard deficiencies of respondents.  But, unfortunately, this also means that no questions in that survey were available to help inform us about the rate of crossover voting in Idaho.  However, the partisanship and ideology numbers were a helpful baseline to illustrate the political lay of the land in Idaho.

Other steps could have been taken to raise both the sample size and the response rate. For example, the sample size could have been increased by extending the amount of time the survey was in the field—as it was, the survey was only in the field for two days (note the Boise State SSRC survey was in the field for a month for its original sample), or the survey could have been conducted using a panel design using multiple contacts with respondents. The low response rate could have been increased in a number of ways: more call backs, conducting face-to-face interviews, better assimilating compliance principles into the survey design, giving respondents a preliminary notification by postcard or phone call, mixing the mode (using mail and internet) of the surveys, or offering financial and/or non-monetary incentives (Asher 2007 ch. 4, p. 93-96; Cialdini 2008; DeLeeuw and Van Den Zouwen 1988; Dillman, Smyth, and Christian 2009; Dillman et al. 2009; Fox, Crask, and Kim 1988; Hembroff et al. 2005; Singer et al. 2000; Willimack et al. 1995).

All of these suggestions amount to standard procedures for generating a survey with a response rate which allows much greater confidence in the validity of the data. To our knowledge, none of these steps were taken to increase the quality of these data. Even if everything else about the survey had been conducted according to the best practices of professional and academic survey researchers—which we have amply demonstrated it clearly was not—such low response rate in conjunction with a small sample is cause for very serious concern.

5. Sampling weights are often needed to derive population estimates from a survey sample so as to correct for imperfections in the sample that might lead to bias (e.g., nonresponse, etc.) and other departures between the sample and the reference population. This may be necessary when samples attempt to get at populations that have unequal probability of selection, have patterns of increased non-response, or to make sure the samples fit key variables of interest (age, race, sex, etc.) to make the sample conform to a known population and its distribution along those known parameters (e.g., Heeringa, West, and Berglund 2010; Oskamp and Schultz 2004; Babbie 2009; Asher 2007).

Moore Information provided us a dataset with survey weights they constructed, the same one they used in the analysis presented in the original Moore Information report. We used these weights in the analyses presented earlier so that they would be using the same dataset and weights, and in turn be comparable. However, we have reservations about the validity of these weights.

Moore Information, in a response to an email query dated April 6, 2010, said that the weights were constructed to represent "party affiliation by county." The problem is that there are no party affiliation data by county that exist as parameters to construct the weights that we could find, at least no official data from the Secretary of State's office, because there is no party registration in Idaho.

We sent an email query on April 14, 2010 to opposing counsel asking for more information on how these sample weights were constructed so that we could assess their validity; we have yet to hear a response. In another email a few days later, we also asked who constructed the questions for this survey; we are also yet to hear a response back to that query.

The analyses that we conducted above that indicated the presence of bias used the same sample weights that Moore Information provided.  Since the whole purpose of sample weights is to remove systematic bias, obviously those weights did not remove the various types of bias that are still present in the data.  Therefore, from the evidence of bias we have demonstrated to this point, we must come to the conclusion that these data are quite flawed, even with the survey weights.

6 [ADM].  The reported margin of error is incorrect.  When drawing inferences about the Idaho electorate from a sample of Idaho voters, it is important to assess the statistical significance of any findings.  A finding that is statistically significant cannot be explained by chance alone; i.e., a statistically significant finding suggests that the observed patterns are likely to hold in the population.  Statistical significance is computed at a given confidence level.  By convention, a 95% confidence level is typically used.  This means that for nineteen out of twenty random samples, a significant pattern observed in a sample will be indicative of the same pattern in the population; of course, this also means that one out of twenty times we will get the inference incorrect.  An analyst typically reports a sampling error—or margin of error—as a way to express the level of statistical significance of any estimate.  For example, a survey might measure the fraction of the population that identifies as a Republican as 58%, plus or minus 5%.  The 5% sampling error suggests that in the population, the true fraction of Republicans likely falls between 53% and 63%.

The survey results from Moore Information indicate that "[t]he potential sampling error associated with this survey is plus or minus 5% at the 95% confidence level" (p. 1).  This is reflected in Professor Munger's report, which claims "…the results are accurate at plus or minus 5%, at the standard 95% confidence level of interpretation" (p. 14).

Any result drawn from the entire survey of 400 respondents would have a sampling error of plus or minus 5%.  However, most of the inferences drawn from the survey are from much smaller sub-populations, such as the 196 "Non-GOP voters" and, perhaps more appropriately, the 104 respondents who claim to usually vote for Democrats (Question 3).  If we were to remove those individuals with demonstrably false memories, or those who could not remember their past behavior, the margin of error would be much greater.

For any sub-population, the margin of error is dramatically higher.  In Figure D-1, I plot the most conservative sampling error for the estimation of a proportion using the conventional formula (Agresti and Finlay, 2009, p. 110-112).  The broad line in the figure shows the margin of error for a given sample size.  For a sample of 196 respondents, the sampling error is 6.9%.  For a sample of 104 respondents, the sampling error is 9.6%.  For small groups, the sampling error is much higher.  Any inferences drawn about these subpopulations must be done so in light of the correct sampling error.

**Figure D-1.** The amount of sampling error at the 95% confidence level for the estimation of a proportion for a given sample size (computed for the most-conservative sample proportion of 50%).



*Measuring Concepts: Key Questions in the Survey*

Even with all of the indictments of the structural problems and the problems with the sample data behind the results of the Moore Information survey, it is our obligation to discuss the significant methodological flaws in the construction of the key questions used in the crossover voting analysis. Many of the deficiencies noted above with regard to potential memory/recall bias effects and other problems apply to these questions as well, so I will not reiterate those concerns here except where they interact with another concern.

Instead, I will include the questions key to the Moore Information analysis of crossover voting (Questions 15, 16, and 3), including the wording and response options, as copied from the Moore Information report.  Then I will offer my thoughts and suggestions for how the questions could have been improved.  Most of these suggestions for how the questions could be improved come directly from many of the textbooks I have used in my courses, namely Babbie (2009), Bradburn, Subman, and Wansink (2004), Asher (2007), and Oskamp and Schultz (2004).

15. Which of the following best describes how you vote in Idaho primary elections? (READ 1-7, 7-1)

| | | |
|---|---|---|
| I always vote for Democrats | * | 10% |
| I usually vote for Democrats | 1% | 20% |
| I vote for more Democrats than Republicans | - | 11% |
| **Total Democrats** | **1%** | **41%** |
| I vote for candidates of both parties | 16% | 35% |
| **Total Republicans** | **79%** | **12%** |
| I vote for more Republicans than Democrats | 18% | 7% |
| I usually vote for Republicans | 37% | 2% |
| I always vote for Republicans | 24% | 3% |
| depends | 2% | 7% |
| don't know/NA | 1% | 4% |

This question is poorly conceived operationally: it asks the respondents to, at that moment, remember how they have voted not just in the 2008 primary elections over 19 months earlier, but over their entire primary voting history, segregate all of their prior general election votes from the prior primary votes, do a calculation on the spot, and then answer appropriately using the response options provided.

Question 15 would have been better posed as "How did you vote in the 2008 Idaho primary election?" or "Which party's primary did you vote in, Republican, Democrat, or Other in 2008?" Those both would have been more valid questions than the one used in Question 15, at least with regard to asking about a specific event—aforementioned memory concerns aside.

It is very likely that there are memory bias effects present in this measure as well. Even though two of the survey questions prior to Question 15 ask primarily about the respondent's voting behavior in the 2008 election, which may have helped focus the respondent to focus on the 2008 election, as we have seen, those questions (Questions 12 and 13) were plagued by obvious memory and social desirability bias effects.

The response options for this question are also poorly worded, invalid, and not mutually exclusive or clear to the respondent—the basic parameters of response option design in any textbook on the matter (e.g., Bradburn et al 2004; Oskamp and Schultz 2004; Babbie 2009; Asher 2007). The respondent cannot reasonably be expected to validly negotiate these options and give a valid answer: For example, the response read over the phone of "I vote for candidates of both parties" may imply the idea of perfect equivalence of the respondent's voting record on the two parties in this scale, a 50-50 ratio if you will, whereas the options (which are rotated so that each party is mentioned first in the comparison before and after the "both parties" option) "I vote for more Republicans than Democrats" (or vice versa) could mean to the respondent that, if they could somehow remember and calculate that they have a 51-49 or a 55-45 or a 60-40 ratio of voting "in primary elections," which option should they pick? They are still voting for candidates of both parties, and yet they are voting for more Republicans than Democrats (and vice versa also applies). In more technical terms, these response options are therefore not mutually exclusive.

Yet, this is a key measure in the analysis that was conducted and presented in the Moore Information report. Further, the above distinction is very crucial to the cutoff point of who voted in which primary elections, leading to the next question which asks about state legislative elections. All of which in turn allegedly demonstrates the prevalence of crossover voting in Idaho primary elections.

It is difficult to discern what amount of bias this wording might have on the results, but it is a concern as it would likely inflate the amount of crossover voting reported. It would have been more appropriate to ask the respondent "about what percentage of the time did you vote for Republicans in the 2008 primary election?", because then one could have at least avoided this issue; however, the aforementioned memory effects would have still been present.

Also, I caution my students against the usage of words like "always," "usually," and asking respondents to do comparisons ("more ... than") to figure out the best response option unless it simply must be done; while this particular problem is far from fatal, these wordings are far from clear and place demands on the respondent that can bias results at the margins and further threaten validity. In a survey that already places apparently unreasonable demands on the memory of many respondents, we should expect that such problematic question wordings would only accentuate the validity problems already present.

16. IF Q15=RESPONSE 1-3 (ALWAYS DEMOCRATS/USUALLY DEMOCRATS/MORE DEMOCRATS): Have you ever voted in a Republican primary for a State Legislative candidate?

| | | |
|---|---|---|
| yes | ** | 39% |
| don't know/don't remember | ** | 4% |
| no | ** | 57% |

I must reiterate, "ever" is a very long time. The question we are really trying to get at is if a respondent crossover voted in a particular election and if so, why? Does this measure capture that concept? I would argue that it does not.

This question is also about state legislative elections. As discussed above, recall about these elections is likely even more subject to memory/recall bias because state legislative elections are even more lesser-known down-ballot races than statewide primaries. This means that citizens are also more subject to not having information about them, and respondents are, in turn, therefore less likely to retain any information about them. In the voting booth, this means that they are more likely to use their attitudinal partisan identification as a heuristic shortcut to make those votes in the first place. In response to a survey, that is also likely the case.

This question asks the respondent to make an unreasonable calculus likely riddled by memory bias effects. We could see the presence of "winner's bias" in these results as well, because Republicans are the most salient and effective party in Idaho. This could in turn inflate the amount of crossover voting reported by the sample—all voters, even Democrats and Independents, may be more likely

to remember voting for Republicans because they hear about Republicans winning a much larger number of elections in Idaho than Democrats.

3. Next, which of the following best describes how you usually vote?
(READ 1-2, 4-5; 5-4, 2-1)

| | | |
|---|---|---|
| mostly or only for Republicans | 74% | - |
| a few more Republicans than Democrats | 26% | - |
| **Total Republicans** | **100%** | - |
| **Total non-Republicans** | - | **100%** |
| the person/Independent | - | 39% |
| **Total Democrats** | - | **52%** |
| a few more Democrats than Republicans | - | 18% |
| mostly or only for Democrats | - | 35% |
| don't know | - | 9% |

Question 3 is the crucial measure by which the distinctions throughout the report are made with regard to "party affiliation," the GOP/non-GOP distinction in the Moore Information report.

This question asks the respondent to account for their past *behavior* and it is not a measure of partisan *attitude*, which is used in the entirety of the crossover voting literature, and for that matter is canonical in the public opinion and voting behavior literature.  This is a huge problem for any explanatory distinctions made with this variable, as, even if we had good data to work with here, which we do not, comparisons with work in the extant literature would be invalid, which will be discussed in the next section.

In all honesty, this is a striking shortcoming in this survey.  An attitude-based measure of partisanship has been the largely unquestioned standard in scholarly research for nearly 50 years and has come to be almost universally adopted in non-scholarly political polling as well.  *This one point alone is enough to invalidate this study for any peer-reviewed journal in political science.* However, there are many other problems that need to be documented.

Question 3 is also poorly conceived operationally.  Much like the other questions from the survey highlighted to this point, it asks the respondent to, at that moment, remember how they have "usually voted" not just in the last general election which was at best 14 months earlier, or a primary over 19 months earlier, but over their entire voting history about how they "usually" vote, then do a calculation on the spot, and then answer appropriately using the response options provided.

Worse, it is unclear if the question is asking about primary elections or general elections or all elections.  Remember, the first question the call script asks is, "Did you vote in the 2008 Idaho primary election?"  It is conceivable that the prior question in the survey conditions the answer to how respondents "usually" vote.  There is, unfortunately, no way to tell for sure, but on its face it could be problematic, especially after finding the presence of so much bias discussed in the section above.

The respondent is being asked to recall a political behavior that it is unreasonable for which to expect to gain a valid measure.  If you are going to ask respondents how they usually vote, their responses will be biased toward recent events (Tourangeau, Rips, and Rasinski 2000; Oskamp and Schultz 2004).  The way to avoid this is to ask respondents what party they identify with at that moment.

The respondent is not given the option of "the person" or "Independent" and has to volunteer it; as we will see, "Independent" is a crucial distinction in the political behavior and crossover voting literature.  In questions on attitudinal partisanship, Independent is listed as one of the response options universally, because they are asking about identification, not how voters "usually vote."

Although it may be that from the perspective of the Party Organization (see Exhibit C), everyone who does not vote for a Republican is not a Republican, decades of political science research suggests that this is decidedly not the case.  In fact, had this survey actually measured attitudinal partisanship on the standard seven-point scale (discussed further in Exhibit E), we may have seen a much more nuanced picture of identification with their party, especially among Independents, who likely lean toward the Republican Party in Idaho; instead we were given an invalid and false dichotomy used to make a point that, in turn, demonstrates a surprising lack of knowledge of what we know about public opinion and political behavior, as will be demonstrated further below.

The GOP/non-GOP distinction used in the analysis is another demonstration of this lack of knowledge of the political science literature.  What was done in the Moore Information report comes nowhere close to our understanding of how to measure partisan identification, nor does it show any recognition of how partisan identification actually works in the extant literature of Political Science.  Grouping those who answered that they vote for "a few more Democrats than Republicans" in with people who voted for "Independents" or "the person," neither of which is a valid response option to begin with for "how you usually vote," is an invalid choice that does not gibe at all with what we know about how partisan identification varies or is measured.

Further, what we will discover in Exhibit E, the crossover voting section, is that how one measures crossover voting determines how much crossover voting you find.  In that regard, the GOP/non-GOP distinction made in the Moore Information report is fallacious.  First, the most relevant and key comparison is between these two partisan groups *as primary voters*, not as general members of Idaho electorate how they "usually vote."  This question is written with the assumption that how respondents "usually vote" is consistent, not just between primary and general election, but also has been consistent over time; however, there are voters who do change their partisan identification in their lifetime.

***Validity of the Survey and Results***

We would have preferred to conduct an analysis of Idaho Republicans and Democrats to see a) how much crossover voting there was in the Idaho Republican primary in 2008, b) how much crossover voting and negative strategic voting (defined in Exhibit E) there was in the Idaho Republican primary in 2008, and c) compare that to the existing literature on crossover voting to see if it was more or less than expected in the open primary setting.

However, we cannot do any of that with these data because as has been demonstrated, the data are quite flawed and the questions that we would have needed to ask that are in line with the extant literature on crossover voting, public opinion, and political behavior were not asked, and the ones that were asked did not validly measure the concepts in a way that would facilitate such an analysis that would actually be conversant with the extant literature.

Further, in order to adhere to the ideas of crossover voting discussed in Exhibit E of this report, the literature tells us to compare Republican and Democratic partisan identifiers (read not self-identified Independents) as crossover voters, not the misguided GOP v. non-GOP comparison done in the Moore Information Survey report.

The presence of the large memory bias effects demonstrated here invalidates the further comparisons done with other questions in the Moore Information report using any of these data. As has been shown, many respondents from this sample simply cannot remember, or inaccurately remember, for whom they voted in the most recent and salient of Idaho elections, let alone for which party or for whom they voted in elections further back in time.

I challenge anyone to find a survey that asked respondents this kind of an arcane political behavior assessment this long after an election, used it as a key distinction to explain important, key variation to the study at hand, with a sample size this low, with a response rate this low, and with the presence of so many biasing effects that has ever been considered anywhere close to valid.

The Moore Information survey and its accompanying report, have many flaws that, each one on its own, would not allow a study to survive the peer review process in public opinion or political behavior journals because of their violations of scientific standards.  All of those flaws taken together, however, should give us even more pause about the quality and veracity of the reasoning, logic, and approach taken therein.

Therefore, we reiterate our caution one last time: it is unwise to draw any inferences from the Moore Information report dated January 14, 2010, as it is based on flawed questions, flawed data, flawed reasoning, and a flawed understanding of extant theory.