***Exhibit E: Understanding Party Identification, Crossover Voting, and Strategic Voting in the Idaho Context***

***Summary Points***

1. In the scholarship on public opinion and political behavior, party identification is measured as an attitude that is causally prior to any voting behavior. It has been measured in a nuanced and standard way in the study of public opinion and political behavior consistently for over 50 years. This question is fundamental to the discussion of political behavior and crossover voting.

2. The approach of Moore Information's report with regard to party identification reflects a perspective that: 1) is at odds with widely held standard practice in academic and commercial political polling; 2) makes conclusions drawn from the analysis highly questionable; 3) prevents valid comparisons with existing research on crossover voting in primaries.

3. How one measures crossover voting determines how much crossover voting one will find. According to the very scholars that Professor Munger cites in his report, crossover voting should be defined by the number of one side's partisan identifiers voting in another party's primary—that is, not including Independents as crossover voters.

4. Party Organizations, if they are concerned about limiting partisan diversity within their party, should be substantially less concerned with Independents than with opposing partisans. Independents, and especially Independent-Leaning Republicans, are likely to be positively inclined towards and ideologically in tune with the Republican Party.

5. Crossover voting is rarely a hostile act; instead it is a sincere expression of democratic preferences, except in the rarest of cases. These rare cases are called "negatively strategic behavior" in the political science literature. The very authors Professor Munger relies upon for his definitions of crossover voting in his report, as well as many others, come to the conclusion that negatively strategic voting is very rare, and this rare behavior even more rarely affects electoral outcomes.

6. There is no proof of Trojan Horse voting in the academic literature.

7. Closing the primary to reduce crossover voting *may* reduce the probability of a very rare set of negatively strategic behaviors, but it could also have the very real and immediate effect of 1) excluding part of the general electorate, and their very likely sincere democratic preferences, from the candidate selection process in Idaho's elections, 2) producing more ideologically extreme candidates, and 3) reducing political participation in the process.

*Introduction*

This exhibit lays out the public opinion and political behavior literature relevant to crossover voting. It is necessary to bring together many different components to understand this discussion. The first section lays out the role of attitudinal party identification in the public opinion/voting behavior literature. The second section contrasts the approach of the literature regarding the standard measure of party identification with the question and approach of the Moore Information report. The third section is a discussion of the measurement of party identification and its role in the voting behavior literature. The fourth is a discussion of various aspects of the crossover voting literature itself and a discussion of how partisan identification and parties fit in with voting behavior in primary elections and how the literature measures crossover voting as a concept. Finally, we discuss the implications of the measurement of crossover, and particularly "negatively strategic," voting particularized to the Idaho context.

*The Funnel of Causality in Voting Behavior*

Attitudinal party identification is perhaps the most prominent explanatory concept in the literature on political attitudes and behavior, because it is "the most important factor connecting voters' backgrounds, social settings, and their more immediate assessments of issues and the candidates" in a particular election (Abramson, Aldrich, and Rohde 2009, p. 193). Expressing the primacy of party identification, Weisberg and Greene (2003) call party identification "the linchpin of our modern understanding of electoral democracy, and it is likely to retain that crucial theoretical position" (Weisberg and Greene 2003, p. 115).

Importantly, as opposed to the measure used in the Moore Information survey, the concept of party identification is measured as an attitude, and very much distinct from, and causally prior to, behavior—in this case voting behavior (Campbell, Converse, Miller, and Stokes 1960; Weisberg and Greene 2003). Eagly and Chaiken (1998) offer this definition:

> "There are different usages of the term [attitude] in the social psychology literature, and the meaning given to it has evolved over the years. The definition given in the 1998 edition of the *Handbook of Social Psychology* is that an attitude is a 'psychological tendency that is expressed by evaluating a particular entity with some degree of favor or disfavor.' According to this definition, an attitude is an internal state, not directly observable, but inferred from observables. It is expressed by evaluative responses of some degree of favorability or unfavorability." (Eagly and Chaiken 1998, p. 269).

The model of political behavior that is most taught in public opinion and political behavior courses prominently features attitudinal measures of partisan identification as a key predictor of voting behavior at the level of the individual voter; it is ubiquitously known as the Funnel of Causality (see Figure E-1, or "Figure 9-1" from original text).

Figure E-1: The Funnel of Causality Predicting Vote Choice



Source: Dalton, Russell. 2008. *Citizen Politics*, p. 171

Thus, the Funnel of Causality,

> "provides a useful device for organizing the factors that can influence voting choices. To understand voting, one has to recognize the causal relationship between the many factors involved.
>
> - The wide end of the funnel represents broad *social conditions* that structure political conflict; attention shifts to explicitly more *political factors* as we move through the funnel.
> - The factors on the left are temporally *distant* from the actual voting decision; the factors on the right are more *proximate* to voting choice.
> - The factors on the left are *conditions of society*, and then groups; the factors on the right are considerations made by the *individual voter*.
>
> In sum, the Funnel of Causality is a framework that connects the various elements—either distant or proximate—that influence voting choices." (Dalton 2008, p. 172, emphasis original)

This discussion of party identification as an attitude, as well as its place in the voting decision, is important to this report for many reasons; for example, the reader can gain an understanding of the diverse number of factors that can affect voting, how partisanship fits into the literature on voting (and therefore crossover voting), and others. However, primary among those reasons is that party identification is *causally prior to other political attitudes and behavior*, which we will discuss in the section to follow.

### *The Variation of Partisanship in Voting Behavior*

In his report, Professor Munger cites Adamany (1976) in the first paragraph under "Analysis", (p. 2, emphasis added): "Cross over voters—voters who do not ***identify*** with the party in whose primary they cast ballots." Note well the word "identify" which is indicative of a measure of an attitude: partisan identification.

Below is question 3, the measure of "partisan affiliation" as termed and used in the Moore Information survey. We have already discussed many of the problems with the question wording itself as a valid measure of partisanship in Exhibit D. However, we should also discuss this question in the context of the extant literature on partisan identification.

> 3. Next, which of the following best describes how you usually vote?
>    (READ 1-2, 4-5; 5-4, 2-1)

This is a question asking the respondent about his or her past voting behavior. The study then goes on to use this question as the key segregating variable (GOP v. non-GOP) along which analyses of crossover voting are structured.

As mentioned in Exhibit D (p. 18), this question is poorly conceived for many reasons, namely because it asks respondents to, at that moment, remember how they have "usually voted," not in recent elections, not in the last election which was at best 14 months earlier, but over their entire voting history, then do a calculation on the spot, and then answer appropriately (for other problems with the Moore Information measure, please see Exhibit D, pp. 18-19).

Even with all of the problems detailed in the section on the Moore Information survey, it is still more disturbing to us that in *every* study that has analyzed crossover voting brought to bear by both sides in this proceeding, some attitudinal measure of party identification, and not past voting behavior, has been used as the key measure distinguishing crossover voting behavior; it is essentially attitude, not voting behavior, that has come to define Party in the Electorate.

Most of the studies mentioned in this literature review on crossover voting use the canonical American National Election Studies (ANES) partisan identification question as originally put forth by Campbell, Converse, Miller, and Stokes in their work *The American Voter* (Campbell et al. 1960), including Adamany (1976, fn 20) and Hedlund (1978) mentioned by Professor Munger in his report, but also Wekkin (1991), Hedlund (1978), Hedlund, Watts, and Hedge (1982), Hedlund and Watts (1986), Southwell (1989, 1991) and others. The literature that does not use the exact ANES question still uses a similar attitudinal measure of party identification, yet the questions used in the

Moore Information survey made no attempt to measure partisan identification as it is usually measured in the literature.

Most of the measures of attitudinal partisanship across these many studies are asked in exactly the same fashion because that measure is used by the ANES, which has used the same question to measure attitudinal partisanship since its inception over 50 years ago, and is used in a vast majority of academic research. Even most non-academic pollsters rely on this measure, or one similar, in published research, and the few that do not use the ANES measure verbatim all most definitely ask questions about respondent's attitudinal partisanship as a key distinguishing variable.

Had the Moore Information survey asked some version of this canonical identity question, preferably the "seven-point scale" (discussed in greater detail below), in addition to the Moore Information question, an analysis would have been possible to at least see the degree of correlation between the attitudinal and behavioral measures, and then allow for a further discussion of the validity of the measure.[1] However, this is impossible because the question was not asked. This omission therefore means also that there is simply no way to compare the findings detailed in the Moore Information report to the findings in the extant literature related to crossover voting, because the literature uses an attitudinal party identification question in each and every case. Any comparison would be invalid.

It is not our place to speculate as to the motives for using this question instead of the standard partisan identification question or some equivalent. What we can say with confidence, however, is that this decision: 1) is at odds with widely held standard practice in academic and commercial political polling; 2) makes conclusions drawn from the analysis highly questionable; 3) prevents valid comparisons with existing research on crossover voting in primaries.[2]

### *The Attitudinal Measure of Partisanship*

The canonical ANES question of party identification as originally framed by Campbell, Converse, Miller and Stokes (1960) reads:

---

[1] It is fair to say that voting behavior measure used by Moore Information is likely at least somewhat correlated with the ANES measure of party identification, but we have no way of knowing the extent of that correlation, nor is it possible to assess the validity of the Moore Information behavioral measure *as a proxy measure* for attitudinal party identification as it was used in the Moore Information report. This is especially problematic without having valid questions measuring party identification and voting behavior, preferably with both the ANES question and the Moore Information "affiliation" question being asked in the same survey to do a test of these relationships. However, even if this were the case (and this is not possible, because we could not find any other data source with these two questions in it, as it seems that the Moore Information behavioral question lacks precedent in any research survey that we have seen) it would still be problematic. This is because these concepts, and the measures that attempt to capture them, are *causally linked—attitude prior to behavior.* As one can see from our discussion of the Funnel of Causality above, there are many variables in this theory in the causal path between attitudinal party identification and vote; this all means that using self-reported vote as a measure of partisan identification is not a valid proxy for party identification *conceptually* either.

[2] Further, we cannot compare the partisanship numbers that do exist to any other publicly available survey of Idaho voters. The Boise State University SSRC's survey was on the entire Idaho electorate, the Moore Information report was on Idaho primary voters only, so we cannot use the SSRC survey to infer the partisanship or ideology of the Moore Information sample. The two are different populations, and it is difficult to compare the two, even in an open primary system that is inclusive of the entire electorate, it is likely the case that fewer Independent identifiers participated. So, no comparisons can be made.

> "Generally speaking, do you think of yourself as a Republican, a Democrat, an Independent, or what?"

Often this question is used in this closed-end format (and given the small numbers, the "others" are typically dropped from analyses where partisanship is an important factor), as it is in the Boise State Policy Survey discussed in Exhibit B (pp. 2-3), and is used as a three-point scale (see Figure E-2).

Figure E-2: The Three-Point Party Identification Scale as Generated by the ANES Attitudinal Measure

Republican    Independent    Democrat

Frequently, and especially in academic studies of voting behavior, the question is "branched," meaning that if the respondent answers "Republican" or "Democrat," the interviewer follows up with "Would you call yourself a strong Republican [Democrat] or a not very strong Republican [Democrat]?" [option depends on answer].

If the respondent answers "Independent," the interviewer asks: "Do you think of yourself as closer to the Republican Party or to the Democratic Party?" If they respond that they are closer to a certain party, they are classified as leaning toward the party they specify. These respondents are the "leaners," or "partisan Independents," as compared to the "pure Independents," who are those who refuse to acknowledge partisan ties even when pressed.

These responses are then lined up and used as an ordinal measure of partisanship called "the seven-point scale," which as demonstrated in Figure E-3 ranges from "Strong Republican" to "Strong Democrat. "

Figure E-3: The "Seven-point Scale": The Party Identification Scale as Generated by the ANES Attitudinal Measure



| Strong Republican | Weak Republican | Ind Leaning Republican | Independ-ent | Ind Leaning Democrat | Weak Democrat | Strong Democrat |

The "seven-point scale" questions are often used in other academic surveys and by media and political pollsters—or questions very similar are used.[3] Among the most notable features of this seven-point scale is that, in terms of both attitudes and behaviors, Independent-Leaning Republicans and Independent-Leaning Democrats (generally referred to as "leaners") are essentially partisans. Their positions on issues, their attitudes towards both parties, and their

---

[3] For example, Gallup uses a very similar question: "In politics, as of today, do you consider yourself a Republican, a Democrat, or an Independent?" The 1992 Voter Research and Surveys used in some of the cases studied by Alvarez and Nagler (1997) asked voters leaving the primary polling place: "No matter how you voted today, do you usually think of yourself as a: 1) Strong Democrat, 2) Not strong Democrat, 3) Strong Republican, 4) Not strong Republican, 5) independent, 6) something else?" The point is that all of them are asking the respondent to report their attitudinal identification with a party and not how they have behaved in the past as a measure of the respondent's party affiliation.

voting behavior are largely indistinguishable from that of avowed partisans (Keith et al. 1992). They self-identify as "Independent" largely due to positive attitudes towards the pro-social value of political independency, rather than any less positive regard towards their preferred party (Greene 2000). Also, in presidential elections it is a very common occurrence for "leaners" to support their party's presidential candidate at rates greater than that of weak partisans.[4] Because of both these patterns, it is standard practice among both scholars and pollsters to group "leaners" with strong and weak partisans. Thus, in exploring the role of "Independents" in open primaries, it is essential to bear in mind that a substantial portion of these voters are, in terms of their political attitudes and behaviors, not all that different from those who self-identify with a party label.[5]

It is likely the case that, as we can see from the SSRC study of the entire Idaho electorate discussed in the elections section, because of the large proportion of the electorate that identifies itself as conservative, a larger proportion of Independents in open primaries are Independent-Leaning Republicans. However, again, because the question was not asked in this way, either by SSRC or by Moore Information, we cannot know for sure.

So, with this evidence and an understanding of scholarship, it logically follows that Independent-Leaning Republicans are likely a substantial majority of non-Republican identified voters in Idaho primaries. Most political scientists would not consider any Independents crossover voters and, as we have discussed, leaners are considered partisans in the literature. We cannot know this with certainty in the Idaho context because of the lack of appropriate questions and valid data, of course, but this is a logical deduction. Had the attitudinal partisanship question been asked as it should have been, we would be able to see if this was the case.

### *Party Identification and the Crossover Voting Literature*

Professor Munger depends heavily on the Alvarez and Nagler (2002) book chapter in his report and deposition. This chapter—a study of five assembly races in California *under the blanket primary system*—serves as an important basis for parts of Professor Munger's theoretical framework; Professor Munger in his deposition also attributed this piece as the source of the question used in the Moore Information survey, which of course it is not.[6]

In the very paper that Professor Munger cites, Alvarez and Nagler (2002) say in the chapter that they were trying to validly measure,

> "what respondents 'usually thought of (themselves) as'; thus we were measuring partisan identification, not partisan registration. Since the primary purpose of the

---

[4] For example, according to the 2008 ANES, 91% of Independent Leaning Democrats voted for Obama in 2008 as compared to 86% of Weak Democrats (ANES 2008).
[5] This explanation lines up with the explanations of leaners and discussions of party identification's role in crossover voting in the literature. (Wekkin 1991; Hedlund 1978; Hedlund, Watts, and Hedge 1982; Hedlund and Watts 1986).
[6] It should also be noted that Professor Munger also, after expressing concern about the validity of non-peer reviewed articles (namely the Alvarez and Nagler 1997 piece, which was submitted as an expert report in the *Jones* case) in his deposition, so heavily depends on an Alvarez and Nagler (2002) book chapter as the very heart of his analysis—a book chapter, that Alvarez himself segregates away from "peer-reviewed" articles on his CV (R. Michael Alvarez's CV, accessed March 25, 2010, http://www.hss.caltech.edu/~rma/rma%20vita_JAN182010.pdf).

survey was to measure the intent of voters, this is the more appropriate partisanship measure [in comparison to looking at registration] (see Chapter 5 by Sides, Cohen, and Citrin in this volume)." (Alvarez and Nagler 2002, p. 110; referring to Sides, Cohen, and Citrin 2002, pp. 77-106)

The Sides, Cohen, and Citrin (2002) chapter to which Alvarez and Nagler (2002) refer the reader in the quote above gives a very detailed discussion of measuring partisanship and how it fits into the study of crossover voting in the larger study of California's blanket primary:

"First, how should the political party to which a person belongs be defined? One possibility is *party registration.* Under this definition, voters cross over when they vote for a candidate from a party other than the one in which they are registered." (Sides, Cohen, and Citrin 2002, p. 77-78, emphasis original)

Of course, analyzing voters by party registration is not a possibility in Idaho, as there is no partisan registration as there was in the analysis of California, which while still having partisan registration, also had a blanket primary. Sides, Cohen, and Citrin (2002) continue:

"Another alternative is to define crossover voting based on *party identification.* Whereas party registration is a legal formality, party identification is a psychological construct, an enduring tie between a citizen and a particular political party. Party identification does not entirely determine one's vote, and therefore affiliating with a party is conceptually distinct from voting for that party's candidate (Miller and Shanks 1996). Nevertheless, if party identification constitutes, in V. O. Key's phrase, a 'standing decision,' then voting against one's normal affiliation in the absence of any strategic consideration implies a weakening of loyalty, either temporary or permanent. Because voters vary in the intensity of their party identification, defining crossover voting with this as the reference point allows for a deeper analysis of its underlying psychology, since one can compare strong and weak partisans."

Another definitional issue concerns the self-styled political independent. In the case of party registration, 'independents' include both members of minor parties and those who do not register with any party ('nonpartisans'). In the case of party identification, 'independents' profess no attachment to any party. Strictly speaking, any independent (however defined) who votes for a Democrat or Republican engages in crossover voting (Adamany 1976). […] *However, because Democratic and Republican party officials worry mostly about potential mischief by the major opposition party, not about the votes of minor-party members and nonpartisans, we focus primarily on crossover voting among Democrats and Republicans.*" (Sides, Cohen, and Citrin 2002, p. 77-78, emphasis added)

This discussion, taken from the very pieces that Professor Munger cites in his report and depositions, raises very important points that are germane to our discussion of the Moore Information Survey and Professor Munger's report:

1. Attitudinal party identification is a fundamental measure by which we can determine crossover voting, especially if partisan registration data are not present, which it is not in Idaho. Sides, Cohen, and Citrin (2002) also use the "seven-point" scale in their analyses (p. 101).

2. Adamany (1976) began with the notion that any non-partisan not in a particular party's primary is a crossover voter. However, this and much of the literature that followed since that time argues that because party officials should be more concerned about potential mischief (or "negative strategic voting") by identifiers of the major opposition party: it is crossover voting among Democrat and Republican identifiers in the opposing party that should be considered as a threat. The literature reflects this change in perspective over time. (Wekkin 1991; Hedlund 1978; Hedlund, Watts, and Hedge 1982; Hedlund and Watts 1986; Alvarez and Nagler 1997, 2002; Southwell 1988, 1991).

3. In their study of crossover voting, Alvarez and Nagler (2002), as discussed in the Sides, Cohen, and Citrin (2002) chapter, analyzed crossover voting by "focus[ing] primarily on crossover voting among Democrats and Republicans" (Sides, Cohen, and Citrin 2002, p. 78). This is not the operational definition used in the Moore Information Survey report; instead a comparison was made between GOP and non-GOP voters, which as discussed earlier is at best fallacious.

As we discussed in Exhibit D, the key comparison here is among Republicans, Independents, and Democrats *as primary voters*, not as general members of the Idaho electorate. Further, the Republican Party Organization should find Independents to be of substantially lesser concern than partisan Democrats. Among Independents, they should find Independent-Leaning Republicans of less concern than pure Independents, and Independents of less concern than Independent-Leaning Democrats, and so on down the continuum discussed above in Figure E-3.

In order to do an appropriate analysis of these ideas and provide an answer to the pressing questions about the Idaho primary in a way that corresponds with the literature, we would need to have data on how different the types of partisans, especially the proportion of Independent-Leaning Republicans, pure Independents and Democratic identifiers in the Republican primary electorate, are from Republican identifiers who voted in the 2008 Idaho Republican primary. However, we cannot do that with the data supplied to us in this survey because, as has been noted, valid questions measuring this concept were not available, and even if the questions had been asked, the data would likely have been invalid because of the memory bias effects present in a study conducted so temporally distant from the past event being queried.

*Strategic Crossover Voting*

We accept the typology of crossover voting that Munger offers in his report (p. 2), as cited in the Alvarez and Nagler (2002) chapter on California's blanket primary. That typology is included here, along with an explanation of each of the types that warrant explanation:

1. "*Sincere* crossover voting occurs when a person votes for a candidate of another party because he likes that candidate better than any of the candidates in his own party primary. Thus, a sincere crossover voter has evaluated all of the candidates running for nomination

    in all parties and has decided to vote for the candidate he most prefers, regardless of that candidate's party affiliation."

2. *"Hedging* is a form of strategic crossover that occurs when crossover voting is motivated by the fact that the voter is faced with a situation in her party where the winner is certain, either due to incumbency or to a very strong candidate in that party. The voter thus crosses over to vote in the other party's primary, since that primary is more competitive and thus the voter's ballot might have greater influence in that race than in her own party's race."

For example, with George Bush a certain Republican presidential nominee in 2004, a Republican voter in New Hampshire might decide that he should vote for John Kerry in the Democratic primary as he finds him the least objectionable Democrat, should a Democrat go on to win the presidential race.  Although the voter is behaving strategically in the choice of which primary to vote in, notably, the voter is voting for *his sincerely preferred candidate* in the race in which he participates.

3. "A second type of strategic crossover, which we call *impact voting*, is another form of hedging. Impact voting occurs in one-party districts when a voter from the minority party casts a ballot in the dominant party primary because she is certain that the nominee of the dominant party will win the general election and thus wants her vote to have some influence or impact on which dominant-party candidate will win the general election and represent her own interests."

This was the case for many voters in Southern states for the first half of the 20th century as Democratic one-party domination meant that the only way to have any influence on one's own representation was to vote in a Democratic primary.

4. *"Raiding* is strategic crossover in which voters support a weak candidate in the opposing party's primary so that their own party's candidate will have a better chance of winning in the general election."  (Alvarez and Nagler 2002, p. 107-108)

An example of this would be 2008 Obama supporters voting in a Republican primary for Ron Paul because they saw him as the least credible threat to an Obama victory.

The problem is, of course, what Professor Munger does with this typology.  Munger posits that every type of voting listed above except sincere voting is negative, and while that may perhaps be the view of any Party Organization (as alluded in earlier section, the more partisan Party Organization wants to decrease outside influence as much as possible with regard to candidate selection), this is not the view held by the extant research, as we will see below.

Further, it is important to note that, in a situation where there are multiple primary elections in an open primary, (i.e., Governor, Senator, US House, State Legislator in the same electoral cycle, which is typically the case), the incentives for a voter to behave in a negatively strategic fashion are substantially reduced compared to what would occur in a blanket primary system because the stakes of crossover in an open system are higher than in a blanket primary.  In choosing a crossover vote based on a single race, a voter therefore foregoes the opportunity to vote in other races for their own party in which he or she likely has a sincere preference. In that way, open primaries are

self-regulating as multiple races in the same open primary thus create a strong disincentive for crossover voting.

Professor Munger then creates a nightmare scenario in his report (p. 3), the idea of Trojan Horse crossover voting, that does not exist anywhere in the published literature on crossover voting. This is probably because, while admittedly slightly possible, it is highly unlikely (see Exhibit F). Professor Munger suggests that crossover voting of any type other than pure "sincere" is evidence for "mischief" to reinforce the Trojan Horse scenario; further, Professor Munger basically takes evidence for any *strategic* crossover voting, e.g., impact voting, etc., and implies that it is evidence for Trojan Horse voting, which is not what the extant literature tells us is the case. This will be discussed in further detail in Exhibit F.

### *Strategic Voting in the Literature*

Inside the Idaho open primary system, especially in a one-party state like Idaho where the Republican Party primaries are in most cases the "only game in town," voters do likely cross over; they have to in order to have any meaningful influence in elections and express their sincere preferences with regard to their own representation, just as voters did in the one-party Democratic South a generation ago. And, as we noted in Exhibit B (pp. 12-13), Idaho is the most one-party state and the least electorally competitive state in the United States on the Ranney Index.

After citing a few well-known incidents of public exhortations by public figures to behave in a negatively strategic fashion—to participate in raiding—Hershey (2010) notes that, "[s]tudies of open primaries have found little evidence of raiding, however. Voters usually crossover to vote their real preferences rather than to weaken the party in whose primary they are participating (Wekkin 1991)." So, most of this crossover is sincere expression of preferences, not insincere negative strategic voting (Southwell 1988, 1991; Wekkin 1988, 1991; Alvarez and Nagler 1997, 2002; Ranney, 1966). The conclusion from all of this literature is that *crossover voting is rarely a hostile act; instead it is a sincere expression of democratic preferences*.

To further expound on this idea, we should discuss another reclassification of these types of crossover voting behavior in the literature: one put forth by Southwell (1991) that is informative to this perspective. Her contribution to the debate is that the crossover behaviors listed above fit into the categories of sincere voting, positive strategic voting (which includes "hedge" voting and "impact" voting from the Alvarez and Nagler (2002) typology above) and negative strategic voting, which is another term for "raiding" behavior. The Southwell (1991) classification and her findings regarding crossover voting in the 1988 Super Tuesday Presidential Primaries are laid out below, along with her research findings regarding open primaries, in Figure E-4.

The Party Organization, according to Southwell (1991) and others (cited below), should be most concerned with "negative strategic voting" in which "members of the opposition party select the weakest candidate in order to help their own party's choice in the general election," and "the possibility that nonparty members could dilute or alter the outcome of the primary if they were allowed to participate." This is because, in all the other forms of crossover voting, the voters are

actually voting their sincere preference given the choices. The arguments and evidence that negative strategic voting, or raiding, is not an issue are laid out by Southwell (1991):

> "Political scientists, in contrast to party leaders, have tended to minimize the effects of strategic voting in primaries. As Sorauf (1984) concluded, 'There is little evidence to suggest that [strategic voting] is more than a worrisome myth.' Riker (1982) suggested that the complicated nature of raiding a party's primary prevents such a strategy from being used by enough voters to make a difference. Previous empirical research on strategic voting has reached similar conclusions about the possibility of strategic voting (see Ranney 1972; Abramowitz, McGlennon, and Rapoport, 1981; Hedlund and Watts, 1986)." (Southwell 1991, pp. 789-90)

Figure E-4: Sincere, Positive, and Negative Strategic Voting in the 1988 Super Tuesday Open Primaries



In her study of the 1988 Super Tuesday open primaries, Southwell found that 79% of voters voted sincerely, 18% of voters voted in a "positively strategic" manner, and 3% voted in a "negatively strategic" manner in open primaries (Southwell 1991, p. 791).

Source: Author adapted from Southwell's (1991) findings analyzing the 1988 Super Tuesday Primaries.

Southwell (1991) further summarizes the literature saying, "Previous researchers are also generally in agreement that crossover voters rarely affect the outcome of primary elections, although such voters do make up a considerable portion of the primary electorate and may alter the margin of victory (see Ranney, 1972; Adamany, 1976; Hedlund, 1978; Lengle, 1981, Hedlund, Watts, and Hedge, 1983; Geer, 1986; Hedlund and Watts, 1986)." (Southwell 1991, p. 791)

When negative strategic voting does occur, Southwell (1991) states that "the relative successes of the various presidential candidates were nearly identical under three scenarios [a comparison of open primaries versus semi-closed and closed primaries] of different types of primary" (p. 789) and "Candidate fortunes are minimally affected by allowing independents or opposing partisans to participate" (p. 795). Southwell also found that there was more negatively strategic voting *in closed primaries* (6%)—further accentuating the point that negatively strategic voting can still occur and may actually occur *more* in closed primaries—than there was in open primaries (3%) (pp. 791-792, Table 1).

Southwell (1991) also acknowledges, realistically, that there is always going to be the potential for "nightmare scenarios" where partisans from the other side "raid" a primary, making the primary more competitive or perhaps even changing the outcome. However, Southwell (1991) goes on to say that these occurrences are "rather improbable" in American politics and goes on to argue that

"it could be argued that the outcome of even such an occurrence would benefit the party rather than harm it. If the outcome of the primary contest is altered when independents or opposing partisans are allowed to participate, then this is an indication that the candidate favored by most party regulars is *not* likely to fare well in the November election because he or she lacks a broad appeal." (Southwell 1991, p. 794, emphasis original).

In the same piece from which Professor Munger garnered the definitions of crossover voting and on which he relies so heavily on in his report and deposition, Alvarez and Nagler (2002), in their studies of California blanket primaries, primaries more "open" than those in Idaho, come to the conclusion that their results,

> "[…] are generally consistent with the conclusions we reached in earlier analyses of crossover voting in Washington State primaries and in presidential primaries (Alvarez and Nagler 1997) and in other analyses of the June 1998 primary in California (Alvarez and Nagler 2000a). *In all of these studies, we find that most crossover voting is motivated by sincere considerations, and that very little of such voting is motivated by a desire to raid the other party's primary. The main motivation for crossover voting, in fact, stems from incumbency; when an incumbent is in a primary election, there is usually high crossover for the incumbent candidate.*" (Alvarez and Nagler 2002, p. 120-121, emphasis added)

They go further:

> "Outside of crossover voting for incumbents, though, why is there so little crossover voting? More to the point, why is there so little strategic crossover voting? We believe that there is a simple explanation: strategic crossover voting requires a great deal of voter coordination (Cox 1997). That is, to be a strategic crossover voter requires a fair amount of information about both the dynamics within your own party and the other party primaries *and* about what is likely to happen in the general election. To be successful, strategic crossover needs to be coordinated on certain candidates—and it is difficult for voters on their own to engage in such coordination. Only when political elites, the mass media, or candidate campaigns provide these coordination cues will there be high levels of strategic voting and will this strategic voting sway the election outcome. Thus the important question really should be, 'Under what circumstances will elites or candidates be willing and able to undertake the costs of voter coordination in blanket primary elections?'" (Alvarez and Nagler 2002, p. 121, emphasis original)

Note, the above was a discussion of *blanket primary elections*, which are more "open" than open primaries are, as we discussed in Exhibit C. As silly as it sounds to say, it is an important point that must be emphasized: *open primaries are more "closed" than blanket primaries.*

In short, the most thorough analysis of crossover voting in the most open type of primary elections—blanket primaries—conducted by two of the most esteemed scholars of American

politics, and the paper that Professor Munger relied on for his report conclude that not only is there little evidence for strategic crossover voting, but based on empirical and theoretical understandings of American political behavior, we should not expect to find evidence for this above the barest levels.

### *Party Organization in Crossover Voting*

As we have seen from this discussion, the definition of crossover voting is a complicated one and has subjective components.  The Sides, Cohen, and Citrin (2002) and Alvarez and Nagler (2002) pieces detailed the argument well about the use of the attitudinal partisanship as a measure and that we should focus on partisans crossing over as the potential problem area, especially with regard to raiding behavior.  This means that we should be focusing on the definition that a crossover voter is a Democratic voter who votes in a Republican primary or a Republican voter who votes in a Democratic primary, not the GOP v. non-GOP distinction drawn in the Moore Information report.  And further, with regard to Independents, we should understand that most of them are likely voting sincerely or with positive intent, reflecting their true preferences.

From the perspective of the Party Organization, of course, a voter is crossover voting when they do not avowedly identify with a party but vote in that party's primary election, in turn playing a role in choosing the party's candidate.  This is the motivation for any Party Organization to want to close its primary, perhaps making the primary constituency more partisan and thus reducing the moderating influence Independents may have in a closed primary, unless they chose to register, sincerely or insincerely, with a political party to participate in its primary.

It is likely that voters outside the party's base identifiers would like to play a role in the selection of candidates that they will later vote on in the general election so that they may have a say in their own representation, especially when the Republican primary is the "only game in town."  Other voters who may be inclined towards the party ideologically, or may align with the party's brand name but think the party too extreme at the moment and consider themselves "Independent" may also want to have a say in who runs in the general election.  The point is that scholarly research leads us to firmly conclude that the overwhelming majority of these voters who are voting in primaries are expressing their sincere preferences, and those who are behaving strategically generally do not have ill intent towards candidates or partisans, but rather are behaving in a "positively strategic" manner (Southwell 1991).

### *Measuring Crossover Voting*

Alvarez and Nagler (1997) conducted an analysis that was submitted as expert testimony for the *Jones* blanket primary case in California.  In a version of that paper, they sum up the difficulties in the crossover voting literature as thus:

> "There is disagreement in the literature over the definition of crossover voting. This disagreement centers on independent voters. As much of the early literature was generated by a Democratic Party platform rule that explicitly grouped independent voters with Republicans, the early literature reflected that categorization in defining a crossover voter. We use the term "crossover voting" to refer to when identifiers of

> the opposing party vote in the primary (i.e., Republicans vote in the Democratic primary or Democrats vote in the Republican primary)." (Alvarez and Nagler 1997, p. 4)

We agree that this is a very important distinction because the underlying point is that *how you conceive of and measure crossover voting determines how much crossover voting you will find*. If one includes Independents in the measure of crossover voting, of course you are going to increase the number of crossover voters you find (e.g., Wekkin 1988, 1991; Hedlund 1978; Hedlund et al. 1982; Hedlund and Watts 1986).

After having systematically reviewed the extant empirical literature on crossover voting (Abramowitz et al. 1981; Adamany 1976; Alvarez and Nagler 1997, 2002; Hedlund 1978; Hedlund et al. 1982; Hedlund and Watts 1986; Ranney and Epstein 1966; Southwell 1989, 1991; Wekkin 1989, 1991), it would seem that an effective estimate of the average of crossover voting in the literature comes in at around 10%, under the strict definition of crossover voting—of one side's partisan identifiers voting in another party. Alvarez and Nagler (1997) agree with this assessment:

> "Most disagreement in the literature on the amount of crossover voting is based simply on disagreement over the definition of crossover voting. The literature seems to agree that when speaking of strictly partisan crossover voting (as opposed to counting Independents as crossovers), there is on the order of 10% crossover voting in primaries." (Alvarez and Nagler 1997, p. 6)

This estimate obviously does not preclude larger numbers of crossover voting in particular elections in particular contexts, but with no evidence to the contrary, assuming more without further evidence does not make sense in the Idaho context.

Further, and more importantly, it must be remembered that most of this crossover voting is an expression of sincere democratic preferences. As Southwell (1991) pointed out in her study, only about 3% of voting in open primaries was negatively strategic.

The numbers described above are not large, and certainly while the potential is always there for these "nightmare scenarios" as described by Southwell (1991) to come to pass, the risk is minimal; especially if we remember the relative lack of contested primary elections in Idaho detailed in Exhibit B. Over the past eight electoral cycles in Idaho--of the 840 Republican state legislative primaries, only 35 (4.2%) of them were decided by a margin of *less than 5%* (p. 6, Table B-2). If we put this in the context of the many other explanations that can be brought to bear in explaining electoral outcomes (Exhibit C), one can see how much of a jump it takes to say that any single cause, namely negative strategic voting or primary type—keeping in mind that Southwell (1991) found more negatively strategic behavior in *closed* primaries than open ones (6% vs. 3%)—has ever caused any single electoral outcome.

Trojan Horse voting, as Professor Munger describes it, is very likely to be even more rare than this, because it would require more coordination that normal raiding behavior (see Exhibit F for a discussion of this).

These concerns about rare negatively strategic behavior are balanced against the very clear benefits of an open primary in an Idaho context where competitive races are rare, including more open access, increased opportunity for political participation of the entire Idaho electorate, and therefore more democratic influence on candidate selection, less ideologically extreme candidates, and potentially less ideological polarization in Idaho than would be the case were the rules changed to a closed direct primary system.

***Conclusion and Summary to This Point of the Exercise***

Based on a large amount of political science literature and an understanding of attitudinal party identification, political parties, and political behavior, we can conclude in our review of Professor Munger's report thus far that:

1. Surveying the electorate about self-reported political behavior that occurred well over a year and a half earlier, and then finding a method to overcome the many sources of bias that result in the data, is a very difficult task (Exhibit D).

2. The survey Moore Information conducted failed to include the appropriate measures that would actually let us analyze the issues involved and compare that knowledge to what we already know about crossover voting.  There is a much more nuanced understanding of attitudinal partisan identification that is the very basis of the public opinion, voting behavior, and crossover voting literature that has not been brought at all to bear in this study; so much of the evidence presented has no comparison in the literature (Exhibit D and E).

3. With so many other alternative explanations for electoral outcomes, blaming any electoral loss solely on any single factor, like crossover voting or primary type, is a very difficult case to make (Exhibit C).

4. Crossover voting has likely been present since the adoption of the Idaho direct open primary. Republicans continue to do very well in elections in Idaho, especially over the last 15 years (Exhibit B).

As we saw from our discussion of Southwell (1991), crossover voting is, a vast majority of the time, an expression of the voter's sincere preferences.  This is where the tensions discussed in Exhibit C between Party in Government and Party Organization come into play: each candidate or elected official has to be responsive to their constituency, but Party Organization is likely to see crossover voting as a problem (as discussed in Exhibit C).

There is little proof that Party in Government or Party in the Electorate has been aggrieved by the current open primary system in Idaho (Exhibit B).  Party Organizations, if they are concerned about limiting partisan diversity within their party, should be substantially less concerned with Independents than with opposing partisans, as Independents are likely to be more positively inclined towards and ideologically in tune with the Republican Party.

It is safe to say, in Idaho's one-party context, crossover voting may be a bad thing for Party Organizations and ideologically extreme candidates, but it is *not* a bad thing for the Party in the

Electorate (who all likely want their voices heard in the candidate selection process), the Party in Government (especially those in competitive districts), or the state of Idaho.

5. The Responsible Party Model relies on many assumptions; primarily it assumes two competitive parties and a bell-shaped ideological curve (as Professor Munger drew in his report, pp. 5, 7, and 9) to function properly. We have neither in the Idaho context: instead, we are likely to have many more Republicans than Independents, and more Independents than Democrats according to the SRCC study detailed in Exhibit B (pp. 2-3), combined with a lack of a competitive set of Idaho primary elections. In this context, Party Organization's drive for party responsibility could lead to a more polarized, exclusionary set of politics in Idaho.

In competitive states, strong vigorous parties should be welcomed. In one-party states such as Idaho, overly strong parties are a threat to a properly functioning democracy (Exhibits C and E).

6. After what we have learned from Southwell (1991), the voters of Idaho should be assumed to be voting their sincere preferences until proven otherwise. Negative strategic voting is very likely a non-issue in Idaho. Yes, there may be crossover voting, but most of it is sincere expression of preferences from voters who are likely to be positively inclined towards the Republican Party and its candidates, but may have more moderate or Independent preferences themselves. The amount of raiding from Democratic partisans is very likely small and rarely is enough to affect any specific electoral outcome. The amount of Trojan Horse voting that occurs—well, we don't know, because we have never actually seen it (discussed further in Exhibit F).

There is no definitive proof that has been offered of negative strategic raiding behavior in any data in either Professor Munger's report or the Moore Information report. Nor have we seen any definitive evidence that the outcomes of any particular races were affected by the primary system that now exists in Idaho. This seems to concur with the literature, which tells us that crossover voting rarely affects electoral margins after controlling for other explanations of electoral outcomes, especially to the extent that it changes electoral wins and losses.

With the assumption that a vast majority of the voters of Idaho are voting sincerely, and we see no reason to assume otherwise after a thorough review of the political science literature and the present electoral context in Idaho, we see no problem, aside from the perspective of Party Organization wanting to restrict diversity of opinion within the Party with regard to candidate selection.

7. Contrary to what Professor Munger states in his report (p. 10), crossover voting and raiding behavior can also occur in closed primaries, though perhaps at a reduced rate because of increased costs to the voter (Southwell's (1991) evidence noted above to the contrary, as her findings demonstrated more negatively strategic behavior in *closed* primaries). Most of the time, however, closing the primary would be suppression of true voter preferences instead of negatively strategic behavior.

Even so, in the post-*Help Americans Vote Act* (2002) era, and with same-day registration as Idaho has, it does not cost voters as much time and effort as it used to in order to register to vote or change their registration—so, if a cabal of voters still wishes to coordinate this overly rare

nightmare scenario of a negatively strategic attack under a closed primary system, all this group of voters has to do is coordinate, change their registration on Election Day, then proceed to the polls.

This discussion should at least lead to questions about whether crossover voting, which likely is not a problem, will be reduced by closing the primary and whether closing the primary will reduce the already negligible potential for negatively strategic voting behavior.

8.  Competitive elections are good things for a democracy.  One-party politics, increased polarization, and a lack of competition are not good things for a democracy.

The onus is on candidates and parties to persuade voters to identify with them and vote for them.

The rules under which these candidates fight for votes do indeed matter.

The extant literature shows that closing the primary *may* reduce the probability of a very rare set of negatively strategic behaviors, but closing the primary is likely to have the very real and immediate effect of a) excluding part of the general electorate, and their very likely sincere democratic preferences, from the candidate selection process, b) producing more ideologically extreme candidates, and c) reducing political participation in the process.