# LOCKING UP POLITICAL

# SPEECH

## How Electioneering Communications Laws Stifle Free Speech and Civic Engagement



JUNE 2009

By Michael C. Munger, Ph.D.
INSTITUTE FOR JUSTICE



# LOCKING UP POLITICAL
# SPEECH

## How Electioneering Communications Laws Stifle Free Speech and Civic Engagement

**1** LOCKING UP POLITICAL SPEECH



# EXECUTIVE SUMMARY

Americans were once free to speak about politics without asking permission from the government or being forced to document their political activities for the authorities.  But under the guise of "campaign finance reform," government regulation of political speech has metastasized, spreading far beyond the mere financing of campaigns to monitor and control everyday political speech by ordinary citizens.

The latest wave of such regulation is state and federal laws targeting so-called "electioneering communications."  The term is most closely associated with the federal Bipartisan Campaign Reform Act of 2002, known popularly as McCain-Feingold, and describes broadcast ads that merely mention a federal candidate and that air shortly before an election.  For the first time in American history, federal law brought such speech and the groups that engage in it under the regulatory control of the government.

Soon after the U.S. Supreme Court upheld that law, states began to follow suit—but with even more sweeping regulations of political speech.  Fifteen states now have "electioneering communications" laws, and more are considering them.  Most of those laws impose more onerous requirements and cover more political speech than the federal law.

The unprecedented reach of electioneering communications laws leaves little room for unregulated political activity and puts even clearly non-political civic associations under the control of campaign finance bureaucrats.  The mere mention by a civic group of a candidate or ballot issue on its website, let alone an opinion, can trigger regulation.

The unprecedented reach of electioneering communications laws leaves little room for unregulated political activity and puts even clearly non-political civic associations under the control of campaign finance bureaucrats.

To find out how these laws—and the extensive disclosure and reporting requirements they impose—would impact nonprofits in the real world, this project surveyed more than 1,000 civic groups in Florida, home to the broadest electioneering communications law in the nation.  The responses from more than 230 groups indicate:

- **Non-political groups will likely be swept up by these laws.**  While less than one percent of the groups have an explicitly political mission, 30 percent at least occasionally communicate with the public about policy issues.  These groups could inadvertently find themselves subject to regulation if the issues they care about become part of an election campaign.

- **Most nonprofits will face a heavy regulatory burden under these laws if they speak about politics.**  The nonprofit groups in the sample are quite small, with few donations to support their work (a median of just $35,000 annually) and few employees (a median between three and four people).  Most groups do not have any staff member, or have just one part-time person, tracking the kinds of contributions and expenditures these laws demand to be reported.  Complying with electioneering communications laws would impose potentially large costs on these groups, diverting them from their core missions.

- **These laws will force most organizations to compromise donor privacy if they speak about politics, thereby risking financial support.**  Nearly 70 percent of the nonprofits strongly resist revealing the kind of individual-level donor information required by electioneering communications laws.  More than 36 percent of the groups expect to take a fundraising hit if required to reveal detailed donor information about all contributors.

These results demonstrate that electioneering communications laws impose expensive and intrusive regulations on civic groups if they simply exercise their First Amendment right to speak about politics.  In effect, electioneering communications laws "lock up" ordinary political speech as off-limits to groups without the resources to comply with the regulations.

Legislators would do well to consider repealing these laws and avoid similar expansions of the regulation of political speech, and courts should take seriously the anti-democratic impacts of electioneering communications regulations and the real-world burdens they impose on First Amendment rights.

# INTRODUCTION

Citizen participation in politics is the cornerstone of democratic governance. But in state after state, under the guise of "campaign finance" regulation, new laws are requiring people to get the government's permission and report their political activities to the authorities in order to participate in politics.

The latest wave of such regulation is state and federal laws targeted to so-called "electioneering communications." This term is most closely associated with the 2002 Bipartisan Campaign Reform Act (BCRA), known popularly as McCain-Feingold, and covers political speech in ads on broadcast, cable or satellite radio or TV that merely mentions a candidate for federal office within 30 days of a primary or 60 days of a general election. McCain-Feingold made such speech, and the groups that engage in it, subject to federal regulation, registration and reporting for the first time in American history. Soon after the U.S. Supreme Court gave the green light to regulating such speech in *McConnell v. FEC* in 2003, states began following suit, regulating speech that merely mentions candidates for state or local office and even issues on the ballot. And these state regulations extend beyond broadcast, cable and satellite ads to things like flyers, the Internet, billboards and even hand-lettered signs if the organization purchased the cardboard. Fifteen states have electioneering communications laws, and others are considering them. Most of those laws impose more onerous requirements and cover more political activity than the federal law, BCRA.

Though it has been little noticed or commented on in the media, these laws have expanded the regulation of political speech and speakers beyond what are traditionally thought of as "political" organizations or campaigns. Political committees,

groups of political professionals formed for the purpose of engaging in "express advocacy" (using words such as "vote for," "elect," "support" or "defeat") to get candidates elected to office, have long been regulated. The difference, and it is an ominous difference, is that the new series of electioneering communications laws have extended all the way to regulate ordinary people and groups who merely mention or state an opinion about candidates or issues on the ballot, leaving very little political speech that is beyond the reach of the government. These new laws put even civic associations whose missions are non-political under the control of campaign finance bureaucrats.

This unprecedented expansion of the scope of government regulation of political speech poses at least two potential problems for citizen participation in politics and civic engagement more generally. Both stem from requirements in the law that would force nonprofit groups to disclose detailed information to the government and the general public about the identities and contribution amounts of their donors, as well as an explicit accounting of time and resources the groups devote to political speech.

The first problem these disclosure requirements raise is *increased burden*, in effect explicit and implicit taxes on organizing and acting at the grassroots level, reducing the vitality and vigor of private associations. The second problem is a *chilling effect*. Because of the burdens imposed by the regulations, private associations are less likely to engage in political speech, leading to a less informed electorate. Moreover, if they do speak about politics, they may find themselves subject to a host of onerous regulations.

> States have followed up the federal regulation of "electioneering communications" with laws that regulate even more speech—specifically, the grassroots political speech of ordinary citizens and civic groups.  This level of regulation of basic political speech is unprecedented.

To examine whether electioneering communications laws in fact create problems of an increased burden and a chilling effect on political activity in the real world, I surveyed a sample of more than 1,000 organizations registered as nonprofits in Florida, home to the broadest electioneering communications law in the nation. Indeed, a federal district judge suspended Florida's law days before the November 2008 election, noting that "no court has ever upheld such a sweeping regulation of political speech," and in May 2009 the judge struck down the law entirely, although the state plans to appeal.[1]

As a preview, the results document the very significant costs, and the profoundly anti-democratic impacts, of electioneering communications laws.  Disclosure laws triggered by electioneering activities expose organizations to a significant burden of cost and diversion of resources away from core missions, a possible loss of support from donors who do not wish their contributions and identities to be made public, a chilling effect on political speech and activity, and expose even non-political groups to the possibility of regulation for just speaking about politics.

## "Electioneering Communications": The Latest Frontier of Speech Regulation

When most people think about "campaign finance" law, they think of the regulation of financial contributions to candidates.  But these laws also regulate speech.  In the seminal campaign finance case *Buckley v. Valeo*,[2] the U.S. Supreme Court in 1976 held that Congress could regulate a group's speech in the narrow circumstance where the group has the major purpose of getting a

candidate elected to office—in other words, is a political committee, or PAC—and that group uses the "magic words" of "express advocacy" to do so.  In 2002, Congress passed BCRA, in which it expanded the regulation of political speech to include "electioneering communications," defined as broadcast, cable or satellite ads that merely mention a candidate within 60 days of a general election or 30 days of a primary election. The Supreme Court, in *McConnell v. FEC*,[3] in 2003 upheld Congress' ability to regulate this relatively narrow category of speech, although it subsequently narrowed further the application of the law in 2007 in *FEC v. Wisconsin Right to Life, Inc.* (*WRTL II*).[4]

In *WRTL II*, the Court rejected an attempt to ban an ad that urged citizens to contact their elected representative—also a candidate at the time—about an issue before Congress.  In doing so, the Court held that electioneering communications could be regulated only in very limited circumstances—that is, if they are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."[5] The Wisconsin Right to Life ad at issue, the Court ruled, was susceptible to another interpretation— that is, as a request for its recipients to contact their U.S. Senator to oppose a filibuster.  Thus, it could not be regulated.  As the Court held, "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election.  Where the First Amendment is implicated, the tie goes to the speaker, not the censor."[6]

Despite these limitations, states have followed up BCRA's regulation of "electioneering communications" with laws that regulate even *more* speech—specifically, the grassroots political speech of ordinary citizens and civic groups.  This level of regulation of basic political speech is unprecedented.

# 5

## LOCKING UP POLITICAL SPEECH



Fifteen states have electioneering communications laws, and others are considering them. Most impose more onerous requirements and cover more political activity than the federal law, BCRA.

TABLE 1 *Features of Electioneering Disclosure Laws*

| State (Year Passed) | Definition* | Communications Exempt from Regulation |
|---|---|---|
| **Alaska** (2002) | • Identifies: Candidate (and also attributes to that candidate a position on an important national, state or local political issue) <br> • Media: Radio, TV, cable, satellite, Internet, mass mailing <br> • Time Period: 30 days <br> • Audience: No limit | None |
| **California** (2000) | • Identifies: Candidate <br> • Media: All (because none specified) <br> • Time Period: 45 days <br> • Audience: No limit | None |
| **Colorado** (2003) | • Identifies: Candidate <br> • Media: TV, radio, newspaper, billboard, mail, hand delivery or other distribution <br> • Time Period: 30 days (primary) or 60 days (general) <br> • Audience: Includes members of electorate | News/editorials in the press; business communications; organization's communications solely to members; communications referring to candidate-named bills |
| **Connecticut** (1999) | • Identifies: Candidate <br> • Media: Radio, TV, newspaper, magazine, billboard <br> • Time Period: 90 days <br> • Audience: No limit | Ads referring to candidate as part of a business that first aired before candidacy |
| **Florida***** (2004) | • Identifies: Candidate or ballot issue <br> • Media: TV, radio, print, mail, and (with limited exceptions) telephone and Internet <br> • Time Period: Candidates—beginning of candidacy; ballot issues—designation on ballot or 120 days <br> • Audience: Candidates—1,000+ in relevant geographic area; ballot issues—no limit | Newsletters sent only to members; news/editorials in the press; debates or forums |
| **Hawaii** (1999) | • Identifies: Candidate <br> • Media: Cable, satellite, radio, periodical, newspaper, mail <br> • Time period: 30 days (primary) or 60 days (general or special) <br> • Audience: No limit | News/editorials in the press; in-house bulletins; debates or forums |
| **Idaho** (2005) | • Identifies: Candidate <br> • Media: TV, radio, newspaper, billboard, mail, telephone or other distribution <br> • Time Period: 30 days (primary) or 60 days (general) <br> • Audience: Includes members of electorate for candidate | News/editorials in the press; business communications; organization's communications solely to members; communications referring to candidate-named bills |
| **Illinois** (2005) | • Identifies: Candidate, political party or ballot issue <br> • Media: All <br> • Time Period: 30 days (primary) or 60 days (general or consolidated) <br> • Audience: No limit | News/editorials in the press; debates or forums; non-partisan voter registration and promotion; 501(c)3 charities; communications between labor organizations and members |



| State (Year Passed) | Dollar Threshold for Regulation** | Contributions Required to be Reported | Expenditures Required to be Reported |
|---|---|---|---|
| Alaska (2002) | $500.01 | All related to communication (may require reporting of all contributions)[8] | All related to communication (except for groups with annual operating budget of $250 or less) |
| California (2000) | $50,000 (promise or payment) | $5,000+ related to communication | All related to communication |
| Colorado (2003) | $1,000 per year | $250+ related to communication | All related to communication |
| Connecticut (1999) | $1,000.01 expenditures (not just for electioneering communications) related to candidate for state office | All related to communication | All related to communication |
| Florida*** (2004) | Any spending for groups; $100.01 for individuals | All contributions received[9] | All expenditures the organization makes[10] |
| Hawaii (1999) | $2,000 per year | All related to communication | All related to communication |
| Idaho (2005) | Any spending | $50+ related to communication | All related to communication |
| Illinois (2005) | $5,000.01 in contributions or expenditures (including electioneering communications) per year for nonprofits; $3,000.01 for a candidate, individual or group | $150+ during a reporting period; appears to cover most or all of funds received by organization | $150+ during a reporting period; appears to cover most or all expenditures by organization |

LOCKING UP POLITICAL SPEECH

TABLE 1 *Features of Electioneering Disclosure Laws (continued)*

| State (Year Passed) | Definition* | Communications Exempt from Regulation |
|---|---|---|
| **Louisiana****** (2008) | • Identifies:  Candidate<br>• Media:  Broadcast, cable, satellite<br>• Time Period: 60 days<br>• Audience:  No limit | None |
| **North Carolina** (2006) | • Identifies:  Candidate<br>• Media:  Broadcast, cable, satellite<br>• Time Period: 30 days (primary or nominating convention) or 60 days (general or special)<br>• Audience: 50,000+ in state (for statewide office) or 7,500+ in district (for General Assembly) | News/editorials in the press; debates or forums; grassroots lobbying on specific legislature during legislative session |
| **Ohio** (2008) | • Identifies:  Candidate<br>• Media:  Broadcast, cable, satellite<br>• Time Period: From beginning of candidacy until 30 days before primary and from primary until 30 days before general<br>• Audience:  No limit | News/editorials in the press; debates or forums |
| **Oklahoma** (2005) | • Identifies: Candidate or ballot issue<br>• Media: Broadcast, cable, satellite, handbill, direct mail, newspaper, magazine, billboard<br>• Time Period: 30 days (primary or runoff) or 60 days (general or special election)<br>• Audience: 2,500+ in state house district; 5,000+ in district for district attorney, district judge, associate district judge or Oklahoma State Senate; 25,000+ in state for statewide candidates or ballot measures | News/editorials in the press; debates or forums |
| **Vermont** (2005) | • Identifies:  Candidate (must also promote, support, attack or oppose candidate)<br>• Media:  Newspaper, periodical, radio, TV, public address system, billboards, outdoor facilities, buttons or printed material attached to motor vehicles, window displays, posters, cards, pamphlets, leaflets, flyers or other circulars, direct mailing robotic phone calls, mass e-mails<br>• Time Period: 30 days<br>• Audience:  No limit | News/editorials in the press |
| **Washington** (2008) | • Identifies:  Candidate<br>• Media:  Broadcast, cable or satellite TV or radio, U.S. postal service mailing, billboard, newspaper,  periodical<br>• Time Period: 60 days<br>• Audience:  No limit | Ads for candidate-owned business; news/editorials in the press; debates or forums; slate cards and sample ballots; ads for book, films, etc. written about candidate (or by candidate, 12 months before candidacy); public service announcements; membership communications within political parties, political committees, corporations or unions |
| **West Virginia** (2008) | • Identifies:  Candidates for statewide office and legislature<br>• Media:  Broadcast, cable, satellite, mass mailing, telephone bank, billboard advertising, newspaper, magazine, periodical<br>• Time Period: 30 days (primary) or 60 days (general or special)<br>• Audience:  Relevant electorate | News/editorials in the media; debates or forums; 501(c)3 charities; grassroots lobbying for specific legislation during legislative session; organization's communications solely to members; certain ads for candidate-owned businesses; nonpartisan educational material |

* "Identifies" refers to whether a communication must identify a candidate, ballot issue or both and/or include other language to count as an electioneering communication.  "Time Period" generally refers to the time before an election during which communications count as electioneering communications.

** Unless otherwise stated, the threshold number is the amount that must be spent on electioneering communications.

*** Florida's law was struck down by a federal district court in May 2009 and is not being enforced.  The state plans to appeal.

**** Lousiana requires all electioneering communications to contain a disclaimer identifying the communication's sponsor but does not otherwise regulate electioneering communications.

| State (Year Passed) | Dollar Threshold for Regulation** | Contributions Required to be Reported | Expenditures Required to be Reported |
|---|---|---|---|
| Louisiana**** (2008) | None | None | None |
| North Carolina (2006) | $10,000.01 per year | Only if group receives corporate or labor contributions, then group must create segregated fund for electioneering communications and report all contributions of $1,000+ | $1,000+ related to communication |
| Ohio (2008) | $10,000.01 per year | $200+ related to communication | $1+ related to communication |
| Oklahoma (2005) | $5,000 (expenditures or obligation) | $50+ related to communication (in-state committees) or $200+ (out-of-state committees) | All related to communication |
| Vermont (2005) | $500 for any one electioneering communication | $100+ related to communication | All related to communication |
| Washington (2008) | $5,000 for electioneering communications relating to a single candidate | $250+ related to communication | All related to communication |
| West Virginia (2008) | $5,000 per calendar year, or $1,000 within 15 days of election | $1,000+ related to communication | $1,000+ related to communication |

When most people think about "campaign finance" law, they think of the regulation of financial contributions to candidates.  But these laws also regulate speech.

Fifteen states place legislative limits on grassroots political activity (see Table 1), and others are considering such limits.  Nearly all of the laws have been passed in the period after BCRA and the endorsement of the principle of regulating electioneering communications given in *McConnell*.  Yet most of the laws reach much further than the definition of "electioneering communication" approved by the Supreme Court in *McConnell*.  Indeed, the majority of these laws apply to a larger range of media, including print media such as flyers and newsletters, and the Internet.  Some of them apply to speech about ballot issues as well as speech about candidates.  And several also apply to speech over longer periods of time before an election.  Furthermore, in regard to speech about candidates, state laws go further than what is permissible under *WRTL II* by capturing and regulating large amounts of speech that are not aimed at securing a candidate's election or defeat.  As a result of these expansions of the definition of "electioneering communications," state laws now capture and regulate the ordinary speech of all sorts of grassroots groups.

All of the state electioneering communications laws have a common structure.  They first define a "trigger," or a set of actions or political speech that constitute electioneering communications, and thus bring the organization under the law's requirements; they give exemptions from the regulations; and then they specify the obligations of an organization under the act, as well as punishments for not satisfying the requirements.

TRIGGERS:  The triggers in all 15 states are very similar.  The statutes refer to any paid communication, provided that the communication or message contains some explicit reference,

either by name or otherwise "unmistakable" content, to identify the candidate or the ballot provision.[11]  In some states the communication must also reach the relevant electorate or some number of people—1,000 in Florida, for example—within the relevant electorate.  In other words, these laws cover nearly any speech that costs money to produce and merely mentions, let alone expresses an opinion about, a candidate, or in three states, an issue on the ballot.  That includes speech on websites (which cost money to host and maintain), in newsletters, on flyers and through other common ways that grassroots groups communicate with members and the public.

EXEMPTIONS:  Most of the laws do not regulate spoken expression in direct conversation, and they exclude news stories and editorials by the media.  Other exemptions include newsletters that are seen by members only (clearly impossible for any material posted to the Internet) and debates and public forums.

REQUIREMENTS:  The widest variation in the state statutes can be seen in the requirements once the statute is triggered by at least one non-exempt communication.  But in general, there are two main sets of requirements.  The first is reporting expenditures, and the second is disclosing and reporting contributions.  To report expenditures, the organization is obliged to keep detailed records on how its money is spent and on how employees or volunteers spend their time.  To report contributions, the organization must reveal information about the identities, occupations and exact contribution amounts of some or all donors.

Table 1 provides the following details about state electioneering communications laws:  1) what speech they regulate, 2) what speech is exempted from regulation, 3) how much a group must spend in order to be regulated, 4) whether organizations must report contributions they receive, including



Florida's electioneering communications law—halted by a federal court—is the nation's broadest.  It prevents speakers like Charlotte Greenbarg, left, of the Broward Coalition and Kristina Rasmussen, right, of the National Taxpayers Union from publishing information about ballot issues.  They are joined by Bert Gall, senior attorney of the Institute for Justice, which challenged the law.

personal information about donors, and 5) whether organizations must report their expenditures.  For example, Florida regulates almost all speech that mentions either a candidate or an issue on the ballot.  Its law exempts news stories and editorials in the press, certain forums on candidates and ballot issues, and newsletters that are available only to a group's members.  (Posting a newsletter online would therefore not be exempt and would be regulated.)  As long as a group's communication costs some money to make, no matter how little, it can be regulated.  And Florida's laws require that a group file regular reports on all the contributions it receives and expenditures it makes.

What kinds of organizations and what kinds of political speech are regulated under these laws?  Based on court cases, an advisory opinion from the Florida Attorney General and the plain language of Florida law, all of the following are real-life examples of political activity regulated by Florida's electioneering laws:[12]

- The University of Florida College Libertarians, which has an annual budget of less than $100, wanted to distribute flyers that would be seen by thousands of students, faculty and staff advertising a speech by a candidate on the November 2008 ballot.
- The all-volunteer Broward Coalition of Condominiums, Homeowners Associations and Community Organizations, Inc., in Broward County, Fla., publishes a monthly

newsletter available to its members and the general public on the group's website.  In the newsletter, the group wanted to discuss issues on the November 2008 ballot of interest to its constituents.
- The National Taxpayers Union, based in Alexandria, Va., regularly publishes voter guides on tax-related ballot issues in all 50 states.  But to even mention ballot issues in a state with a law like Florida's would require compliance with electioneering communications laws, including registration and disclosure requirements.  National think-tanks could be forced to register and file disclosure information in every state or city with such laws.

As these examples show, electioneering communications laws like Florida's transform grassroots organizations whose missions are not focused on electoral politics into fully regulated political groups, much like PACs, if they merely mention or express an opinion about a candidate or issue on the ballot.  This extension of campaign finance regulations over ever more political speech and over non-political groups raises the specter that such groups will be forced to either pay a higher price for their speech, as regulatory burdens divert them from their core missions and disclosure requirements scare away donors, or stay silent, suppressing their own speech and depriving the public of their viewpoints on important issues of the day.

# METHODS AND RESULTS

## Survey of Nonprofit Associations

To examine how these electioneering communications laws and the disclosure requirements they impose are likely to affect the activities of real-world nonprofit organizations, I surveyed more than 1,000 Florida nonprofits during the months of October through December 2008. The sample was drawn from the population of all organizations registered as nonprofits in the state of Florida, and written surveys were followed up by a second wave of surveys and then telephone calls. In all, more than 230 valid survey responses were returned, and the results analyzed. The full survey and results are listed in Appendix A. Although some statistical analyses were performed to determine whether the missing responses were random or systematic (See Appendix B for results), the results reported here depend only on response percentages.

## The Burden of Speech Regulation on Nonprofit Organizations

I found that the disclosure requirements of electioneering communications laws will force organizations to change the way they conduct their activities. There are two main categories of what we call "burden" in this report. The first is a change in the way that organizations keep track of contributions, expenditures and employee time. The second is the way that information about contributions and contributors is reported and shared.

Based on the size of the organizations in our sample, it is highly probable that many grassroots organizations, even those formally registered as nonprofits, focus nearly all their efforts on their main activities. This means little

**TABLE 2**  *The Burden of Tracking and Processing Contributions and Expenditures*

| Who Keeps Track Now? | Contributions | Expenditures | Employee Time |
|---|---|---|---|
| *No One Keeps Track/ No Formal Record is Kept* | 12% | 4% | 60% |
| *One Person, Part-Time* | 45% | 46% | |
| *One Person, Full-Time* | 21% | 18% | |
| *Part-Time, Several People* | 12% | 18% | |
| *Full-Time, Several People* | 5% | 10% | |

regard is likely paid to internal bookkeeping or accounting, because the amounts are so small and the budgets of the organizations so limited. The median number of people employed in the organizations we sampled is between three and four. In fact, these organizations operate with more volunteers—a median of 20—than paid employees. Median annual contributions (the greatest source of revenue) total only $30,000 from state funders and another $5,000 from national donors.

But under the disclosure laws, electioneering activities would require that nearly every aspect of the organizations' activities be subjected to extensive and intrusive accounting and reporting requirements. If these requirements are not followed exactly, there are civil penalties, some quite severe. Alaska's fines, for instance, can be up to $500 per day,[13] and Vermont's penalties include a $10,000 fine.[14] And some states, such as Connecticut[15] and Florida,[16] even specify criminal penalties for violations, including up to one year of jail time.

The results regarding the likely burden of electioneering disclosure laws were striking. As shown in Table 2, in more than half of the organizations—more than 56 percent—either no one keeps track of contributions, or it is done by one person, part-time. Almost half of the organizations (just under 51 percent) had either no one keeping track of expenditures on a weekly basis, or else just one person, part-time. Less than 30 percent of nonprofits had even one person keeping records of contributions or expenditures full-time. Further, in fully 60 percent of the organizations no one, either full-time or part-time, kept any track whatsoever of the proportion of employee effort devoted to specific projects. This means that were such organizations required to comply with the electioneering communications law, yet another layer of burden would be imposed, as they would have to track employee time dedicated to producing or disseminating information in communications.

Moreover, as Figures 1 and 2 illustrate, these burdens would fall disproportionately on smaller organizations. Figure 1 shows the percentage of organizations (organized by number of contributions received) that do not employ anyone to process or record donations or employ only one person part-time to track and record expenditures. As shown, a greater percentage of smaller organizations have no such person, while all of the larger organizations have at least one person dedicated to that task. Figure 2 illustrates the identical phenomenon but uses number of employees as the measure of organizational size. With both measures the implication is the same: Electioneering communications laws that would



FIGURE 1  *Organizations With Less Funding Are More Likely to Have No Employees Recording Contributions and Expenditures*

require the recording and reporting of information such as contributions and expenditures would impose a significant and disproportionate burden on small nonprofits.

also have either no one or one part-time person who keeps track of expenditures. Being forced to change the nature of record-keeping, and hiring more record-keepers, therefore, would change these organizations and their culture fundamentally.

> The extra burden of complying with complex and extensive disclosure requirements diverts nonprofits away from their core mission. Instead of spending money to advance their purpose, these disclosure laws would divert employee time, organization money and administrative attention toward make-work disclosure tasks.

In addition, the extra burden of complying with complex and extensive disclosure requirements diverts nonprofits away from their core mission. Instead of spending money to advance their purpose, these disclosure laws would divert employee time, organization money and administrative attention toward make-work disclosure tasks.

The survey results, then, show how electioneering communications disclosure laws lead to a professionalization of political participation. Most of the organizations in the sample (more than 56 percent) have either no one or one part-time employee who keeps track of contributions. Most (just under 51 percent)

The responses to the survey also reveal another striking aspect of the burdens of electioneering communications disclosure laws: increased costs of raising money for the core purpose of the nonprofit organization. To see why, consider the contents of Table 3.

FIGURE 2  *Organizations With Fewer Employees Are More Likely to Have No One or a Part-Time Employee Recording Contributions and Expenditures*



The nonprofit organizations were asked what information they would willingly share, and in what forums they currently share information, about donors.  As shown in Table 3, fully 43 percent of the nonprofits would not willingly share any information, of any kind, about their donors.  (And these are nonprofits that responded to a survey that appeared in the mail, suggesting that this is a group relatively more likely to share information. The likely bias among the nonrespondents is toward even higher levels of preference for nondisclosure.) Adding the nonprofits willing to share only general averages and totals of donations, nearly 70 percent of the sample is strongly resistant to revealing any individual-level information about donors at all.

And this preference is clearly reflected in the forums in which contributor information is currently available, shown on the right half of the table.  Only 11 percent make their contributor lists publicly available at all, even by request, and for an additional 40 percent of the sample, contributors'

identities are not only unavailable to the public, they are not even widely known inside the organizations.

Compare this to the actual reporting requirements of most electioneering communications disclosure laws:  Full name of contributor (22 percent are willing to provide this); address (8 percent would be willing); individuals' occupations (5 percent are willing); and amount of contribution (8 percent are willing).

Presumably, nonprofits do not want to share this information because donors prefer it that way. Requiring disclosure could jeopardize support from those who would rather give without their contributions or identities being reported to the government or disseminated to the general public. For nonprofits that do not want to compromise donor wishes for anonymity and yet want to keep their support, the best bet in a state with electioneering communications laws is to stay silent about politics.

TABLE 3   *The Burden of Disclosing Sensitive Information About Donors*

| Information About Donors | Would Share | Where Some Information is Currently Available | |
|---|---|---|---|
| *Full Name* | 22% | *Published, Publicly Available* | 5% |
| *Address* | 8% | *Available on Request Only* | 6% |
| *Occupation* | 5% | *Not Publicly Available, But Known Internally* | 23% |
| *Specific Amounts of Contribution* | 8% | *Not Publicly Available, Not Known Internally (Except Fundraising Staff)* | 38% |
| *Ranges of Contribution* | 14% | *Other (Including Anonymous or Confidential)* | 22% |
| *General Averages* | 25% | | |
| *Would Not Share ANY Information* | 43% | | |

## ▪▪▪ Speech Regulation: Chilling Speech and Trapping the Unwary

The survey results provide evidence that staying silent is exactly what some nonprofit groups would do in the face of electioneering communications laws and their disclosure requirements, pointing to the law's "chilling effect" on political speech—and the costs to the general public in information and opinions that would go unspoken. The results also suggest that it would be easy for the nonprofits in our sample to unwittingly find themselves subject to electioneering communications laws, demonstrating how these laws can create a legal trap for the unwary.

More than five percent of the groups communicate in their newsletters about specific ballot issues, and more than six percent discuss ballot issues on their websites. In a state with an electioneering communications law that covers speech about ballot issues, these groups would be subject to regulation. Moreover, I found that nearly 30 percent of the groups at least occasionally communicate with the general public about "general policy issues." If those issues are raised in an election—either directly as an issue on the ballot or as an important topic during a candidate campaign—even more groups could inadvertently find themselves subject to electioneering communications regulations for speech that had once been routine in newsletters or on websites. These groups would suddenly face the burdens of disclosure and possible punishment for their speech, making them less likely to continue to speak about politics.

Nearly eight percent of all the respondents claim that they would cut back on, or would stop completely, providing any information about candidates or ballot issues if forced to reveal the identities of donors whose contributions were used for those communications. More than 10 percent said that the effect of such a requirement on their ability to raise money to support their work would be "significant," "very significant" or "catastrophic." Moreover, if the law affects all contributions, rather than just those that fund electioneering communications, 11 percent of the respondents said that they would cut back on, and more than three quarters of those say they would eliminate completely, all mention of candidates or ballot issues. And, in terms of fundraising, 36 percent say that such a law would reduce their ability to raise money at least moderately, with more than 20 percent of those saying the effect would be "catastrophic."

Importantly, only five percent of these organizations had a "Political Committee" registered in Florida. In that state, if an organization wants to spend more than $500 a year on "express advocacy," that is, explicitly favoring one candidate or one position on a ballot issue, it must establish a political committee, or PAC. Any other paid communications that mention a candidate by name, or a specific ballot issue by name or content, are also permitted for political committees. But they are not allowed for nonprofit organizations if they have not registered with the state as an "electioneering communications organization," or ECO. What this means is that fully 95 percent of my sample is exposed to punishment if one of their newsletters or web pages mentions a candidate or ballot issue, let alone expresses an opinion about it.

TABLE 4   *The Chilling Effect of Disclosure Laws on Provision of Political Information by Nonprofit Groups*

| With Whom Does Your Organization Communicate? | | What Information Do You Make Available to Anyone Who is NOT an Employee, Member or Volunteer? | |
|---|---|---|---|
| *Members* | 62% | *Free Advertising* | 29% |
| *People on Mailing Lists* | 62% | *Paid Advertising* | 23% |
| *General Public* | 71% | *Newsletter* | 52% |
| *Legislature* | 33% | *Reports* | 36% |
| *Media* | 51% | *Issue Summaries* | 17% |
| | | *Op Eds/ Letters to Editor* | 16% |
| | | *Radio or TV Appearances by Staff* | 38% |

Tables 4 and 5 demonstrate the depth and variety of communications that nonprofit groups in Florida transmit and disseminate. Many of the communications go to "members" of the groups, but 71 percent of the groups say they routinely communicate with the general public. Further, anywhere from one-fifth to one-third of the organizations communicate directly, via newsletter, with citizens who are not members, and anywhere from almost a quarter to one half communicate with nonmembers through some means other than a newsletter. For example, almost 50 percent of respondents say that they routinely post information other than a newsletter to a publicly available website, where thousands of nonmembers technically (in the eyes of the law) have access to it. And more than six percent said that they post the contents of pending ballot issues to a publicly available website. Extreme care would have to be exercised to avoid even casual mention of pending ballot issues anywhere on the web site, ever, since even one specific reference makes the entire web site an electioneering communication.

Further, Table 5 shows that 45 percent of the nonprofit organizations routinely communicate with "large populations," which in electioneering disclosure regulations is often a target audience of 1,000 people or more. Newsletters are sent by direct mail to members in 43 percent of the organizations, but they are also available to the general public, either in hardcopy or electronically via the Internet. Moreover, nearly half of the sample posts information to public websites accessible by thousands.

In short, most nonprofits I surveyed routinely engage in communications that reach an audience large enough to fall under Florida's electioneering communications laws, thus exposing them to registration and reporting requirements if they merely mention or state an opinion about a candidate or issue on the ballot.

TABLE 6  *Primary Substantive Focus of Organizations in the Sample*

| Primary Substantive Focus (Self-Reported) | Proportion of Sample |
|---|---|
| Arts/Culture | 12% |
| Educational | 24% |
| Health | 16% |
| Human Services | 21% |
| Political | <1% |
| Religious | 15% |
| Social Services | 16% |
| Other (Youth Sports, Environment, etc.) | 26% |

This is true even though most of these groups are not "political." Table 6 illustrates the diversity of groups and goals in the sample. The largest numbers of nonprofits in our sample focus on education and human services. In the course of their activities, they might very plausibly want to inform the public of the fact that there is an election, or that a specific ballot issue is coming up for a vote, and to express an opinion about it that falls short of "express advocacy." But doing so would expose these groups to the full disclosure requirements of electioneering communications laws and the sizable burdens that come with them.

TABLE 5  *Availability of Communications to the Public*

| How Is the Communication Disseminated? | Newsletter | All Other Communications | Routinely Communicate with More Than 1,000 Nonmembers |
|---|---|---|---|
| *Email* | 35% | 48% | 45% |
| *Direct Mail* | 43% | 36% | |
| *Available at Events* | 38% | 51% | |
| *Available to Public (Hardcopy)* | 33% | 36% | |
| *Available to Public (Website, no password)* | 36% | 50% | |

### ■■■ How Electioneering Communications Laws Burden Free Speech and Civic Engagement

This report documents a variety of real-world costs to nonprofit organizations created by electioneering communications laws that require registration and reporting for everyday political speech.  Previous Institute for Justice research documented how similar disclosure laws for contributions to ballot issue committees both

nearly identical across states and are not analyzed here; a state either has a statute or it does not.  If a state has a statute, then the trigger is an electioneering communication, which means that the communication mentions a candidate by name or unmistakable reference, or it mentions a ballot proposition by content or unmistakable reference.

The *exemptions*, likewise, have very little effective differences across state statutes.  The exemptions often include the following categories:  (a) media organizations; (b) certain debates and forums; and (c) an organization's communications solely to its members.

> The requirements these laws impose are expensive, intrusive and time-consuming, even if organizations are aware of the law and their obligations under it. Electioneering communications laws impose severe costs on political speech.

The *requirements* of the statutes are the sources of their real impacts.  Organizations that trigger the statutes in non-exempt forms of communications must keep records of expenditures and donations that many of them do not normally keep and (as the survey responses show) would not willingly report.  Filling out the forms completely, correctly and in a timely fashion would become the number one priority for many of these tiny organizations, even if (as seems likely) their core mission were neglected as a consequence.  Many of these organizations, it turns out, have effectively no staff, or only very limited staff (a median of 3.5, to be precise), available to carry out these functions, which means they very likely do not have the spare time needed for such requirements.

deter political speech in the form of contributions and tie up grassroots groups in a complex web of bureaucratic red tape.[17]  The results of this report demonstrate just how burdensome disclosure laws can be for non-political citizen groups and how these laws can deter citizen groups from engaging in political speech.

As was pointed out above, the electioneering disclosure laws have three parts:  *triggers*, *exemptions* and *requirements*.  The *triggers* are

I found evidence that under the broadest disclosure regime—requiring reporting of all contributions—more than 36 percent of the

organizations that responded to our survey expect moderate, significant or catastrophic effects on their ability to raise funds.  One sixth of the sample said that the effect would be either "very significant" or "catastrophic."  Contrast this with assertions by supporters of these laws who claim that registration with the government and disclosure of a group's contributions and expenditures is benign—that it is "just disclosure" and so has no practical impact or is a small price to pay.[18]  Nonprofit groups may speak as freely as they like about whatever issue they choose, the argument goes, as long as they simply register with and disclose information to the government.

But the results here show that under electioneering communications regulations, nonprofit groups may not in fact speak freely.  The requirements these laws impose are expensive, intrusive and time-consuming, even if organizations are aware of the law and their obligations under it.  Electioneering communications laws impose severe costs on political speech.

The costs fall especially hard on amateur and volunteer organizations.  Professional political organizations can handle the requirements rather easily and are aware of their responsibilities to do so.  Amateur groups and local groups that just want to provide information are the ones in danger of being exposed to substantial civil fines and possible criminal prosecution.  Shutting out the enthusiasm and the spontaneous and vigorous desire for change of political amateurs will make our democracy sterile and inert.

Disclosure laws also harm the public at large.  Less information is provided—and from fewer sources—about important issues of the day.  There is no demonstrable public benefit to denying the public information, from every possible source, on important issues of the day just because discussing them often invariably involves mentioning candidates or ballot issues.  And in fact the states that have passed these laws have made no effort to demonstrate the existence of any compelling state interest in regulating and discouraging political electioneering communications that fall short of express advocacy.  Yet in state after state, legislators and bureaucratic agencies are imposing large burdens on the provision of basic political information to citizens.

# CONCLUSION

The very essence of American politics, its distinguishing feature and its greatest strength, is the vitality of grassroots activism and participation. One of the keenest observers of American democracy was, perhaps not surprisingly, a visitor from another nation:  Alexis de Tocqueville.  In his book, *Democracy in America*, published in 1835, Tocqueville describes his travels in the U.S. and focuses in particular on the tendency of private citizens to work through associations to solve pressing public problems:

> They all, therefore, become powerless if they do not learn voluntarily to help one another. If men living in democratic countries had no right and no inclination to associate for political purposes, their independence would be in great jeopardy, but they might long preserve their wealth and their cultivation: whereas if they never acquired the habit of forming associations in ordinary life, civilization itself would be endangered . . . [N]o form or combination of social polity has yet been devised to make an energetic people out of a community of pusillanimous and enfeebled citizens.[19]

What Tocqueville means is that nonpolitical voluntary private associations are not just separate loose ends to be tidied up by regulation.  Small private associations are the cords that hold together the fabric of democracy at every level. But with the growth of campaign finance laws regulating an ever-expanding arena of speech and speakers, associations that are not politically oriented or organized for political purposes are subject to regulation at a level entirely unprecedented in American history.

Given the number and breadth of communications efforts made by these diverse organizations, it is nearly inevitable that one of two things will happen.  Either someone will accidentally provide information to the public and be forced to pay the regulatory penalty, or else the groups will avoid providing even routine and innocuous information.   And that is the real danger of government regulation of speech.  Citizens

> Electioneering disclosure laws disinform the public and disenfranchise citizens.  They are bad law, bad policy and bad for democracy.

and groups in society form the very basis of democratic action.  An informed citizenry is a politically active and effective public good.  But electioneering disclosure laws disinform the public and disenfranchise citizens.  They are bad law, bad policy and bad for democracy.  Legislators would do well to consider repealing these laws and avoid similar expansions of the regulation of political speech, and courts should take seriously the anti-democratic impacts of electioneering communications regulations and the real-world burdens they impose on First Amendment rights.

# APPENDIX A
## Complete Survey Responses

### 1. How many employees do you have whose job is all, or mostly, processing or recording contributions?

| | |
|---|---|
| No one keeps track specifically | 11.7% |
| One person, part-time | 44.8% |
| One person, full-time | 21.3% |
| More than one person, part-time | 11.7% |
| More than one person, full-time | 5.4% |
| We contract this out | 0.4% |

### 2. How many people in your organization track expenditures you make to outside people, groups or vendors? (Expenditures, for example, include purchases, payments, distributions, loans, advances, transfers or gifts)

| | |
|---|---|
| No one keeps track specifically | 3.8% |
| One person, part-time | 45.6% |
| One person, full-time | 18% |
| More than one person, part-time | 18.4% |
| More than one person, full-time | 9.6% |
| We contract this out | 1.7% |

### 3. Do you currently track how much time employees spend on different projects?

| | |
|---|---|
| We do not allocate time by projects | 59.8% |
| Employees are assigned to a project full-time, so all of their time "counts" on that project, regardless of what they work on | 4.6% |
| Employees keep track of days that they work on different projects | 4.2% |
| Employees keep track of hours they work on different projects | 13% |
| Other arrangement | 13% |

### 4. Do you track specific costs associated with producing and disseminating newsletters?  Check all that apply.

| | |
|---|---|
| We don't publish a newsletter | 34.3% |
| We track employee time | 6.3% |
| We record printing and mailing costs | 53.6% |
| We track other costs | 7.9% |

### 5. What information do you or would you be willing to share with the public about your donors? Check all that apply.

| | |
|---|---|
| Full name | 21.8% |
| Address | 7.9% |
| Occupation (for individuals) | 4.6% |
| Principal type of business (for corporations) | 15.5% |
| Specific amounts for each contribution | 8.4% |
| Amounts of contributions, by range | 13.8% |
| Whatever is indicated above, we would only provide this information on major donors | 3.3% |
| General statistics on donors | 24.7% |
| No information of any kind | 42.7% |

### 6. Which of the following best describes the availability of your donor list?

| | |
|---|---|
| Published, and publicly available on-line | 5% |
| Published, but access only on request | 5.9% |
| Not publicly available, but widely known within our organization | 23% |
| Not publicly available, and not known within our organization, except for fundraising staff | 38.1% |
| Other | 22.2% |

### 7. What proportions of your total operating funds come from the following categories? (Median Percentage for Each Response)

| | |
|---|---|
| Anonymous gifts; where even you don't know the identity of the donor | 1% |
| Confidential gifts; where you know the identity but are asked not disclose it | 3% |
| Other contributions | 19% |
| Dues | 18% |
| Sales | 10% |
| Events | 16% |
| Grants | 19% |

### 8. What proportion of your contribution revenue comes anonymously or confidentially, on average? (I am asking about money received, not the number of contributions)

| | |
|---|---|
| None, most years | 51.9% |
| Less than 2% | 28% |
| 2% or more, but less than 5% | 4.2% |
| 5% or more, but less than 10% | 2.9% |
| 10% or more, about… | 7.1% |

### 9. How much of the value of total contributions you receive are "in kind," that is, contributions of goods, equipment, supplies, space, media access, or web hosting?

| | |
|---|---|
| None; we never receive such contributions | 23% |
| Some; but it's hard to estimate the amounts, because we don't know the monetary value | 44.8% |
| Some; and the monetary value is:_____ | 17.6% |
| A lot; but it's hard to estimate the amounts, because we don't know the monetary value | 5.9% |
| A lot | 5% |

### 10. From whom does your group solicit and/or accept contributions?  Check all that apply.

| | |
|---|---|
| Members | 54.8% |
| People on our mail or email lists | 55.2% |
| General public | 70.3% |
| Corporations or foundations | 65.3% |
| Other | 22.2% |

## 11. With whom does your organization try to communicate? Check all that apply.

| | |
|---|---|
| Members | 61.5% |
| People on our mailing lists | 61.9% |
| People on email lists, with an "opt out" provision | 31% |
| General public | 71.1% |
| Members of the legislature | 32.6% |
| Media | 51% |
| Other | 17.2% |

## 12. What kind(s) of information do you make available to anyone who is not an employee or volunteer? Check all that apply.

| | |
|---|---|
| Free advertising | 28.9% |
| Paid advertising | 23.4% |
| Newsletter | 51.9% |
| Reports | 35.6% |
| Issue summaries | 17.2% |
| Blog articles | 8.8% |
| Op-ed articles | 15.9% |
| Letters to the editor | 15.9% |
| Radio or TV appearances by staff member | 37.7% |
| Other | 22.6% |

## 13. If you provide information in a newsletter, how is it disseminated? Check all that apply.

| | |
|---|---|
| Email to members | 34.7% |
| Email to nonmembers | 20.1% |
| Direct mail to members | 43.1% |
| Direct mail to nonmembers | 20.9% |
| Available at meetings or events | 37.7% |
| Available to the public from our office | 33.1% |
| Posted to website, password protected for member-only access | 4.2% |
| Posted to website, publicly available | 36% |
| Other | 5% |

## 14. If you provide information other than in a newsletter, how is it disseminated? Check all that apply.

| | |
|---|---|
| Email to members | 48.1% |
| Email to nonmembers | 24.3% |
| Direct mail to members | 35.6% |
| Direct mail to nonmembers | 23.4% |
| Available at meetings or events | 51% |
| Available to the public from our office | 35.6% |
| Posted to website, password protected for member-only access | 7.1% |
| Posted to website, publicly available | 49.8% |
| Other | 10.9% |

## 15. Please complete the following sentence: "Our website at least occasionally contains information about_____." Check all that apply.

| | |
|---|---|
| Nothing. We do not have a website | 17.2% |
| Our mission, location, and staff | 76.2% |
| Events sponsored by our organization, giving times and locations | 70.3% |
| General policy issues | 25.9% |
| The contents of a pending ballot issue | 6.3% |
| Our views about a pending ballot issue | 5.9% |
| Specific ballot issues, suggesting how people should vote on each | 3.3% |
| Pending bills in the legislature that may mention individual candidates | 2.5% |
| Specific candidates by name, in the context of some policy problem | 1.7% |
| "Scorecards," or ratings of voting records, mentioning some candidates by name | 1.3% |
| Specific candidates, mentioned by name, with suggestions on how people should vote | 0.4% |
| Debates or forums where opposing sides present positions | 0.4% |
| Other political events | 2.5% |
| Topics only our members can see, because our website is password protected | 1.3% |

## 16. Please complete the following sentence: "Our newsletter at least occasionally provides information about_____." Check all that apply.

| | |
|---|---|
| Nothing. We do not have a newsletter | 21.8% |
| Our mission, location, and staff | 63.2% |
| Events sponsored by our organization, giving times and locations | 66.1% |
| General policy issues | 28.9% |
| The contents of a pending ballot issue | 5.4% |
| Our views about a pending ballot issue | 3.8% |
| Specific ballot issues, suggesting how people should vote on each | 2.5% |
| Pending bills in the legislature that may mention individual candidates | 0.4% |
| Specific candidates by name, in the context of some policy problem | 0.4% |
| "Scorecards," or ratings of voting records, mentioning some candidates by name | 0.4% |
| Specific candidates, mentioned by name, with suggestions on how people should vote | 0.4% |
| Debates or forums where opposing sides present positions | 0.8% |
| Other political events | 2.5% |

## 17. Do you have other communications or activities that seek to inform your members about candidates or pending specific ballot issues around the state?

| | |
|---|---|
| Yes | 7.5% |
| No | 87% |

## 18. Do you have other communications or activities that seek to inform nonmembers about candidates or pending specific ballot issues around the state?

| | |
|---|---|
| Yes | 4.2% |
| No | 88.7% |

### 19. Consider the communication that you send out to the largest number of people. Can you estimate how many people are likely to receive that communication?

| | |
|---|---|
| Less than 1,000 | 44.4% |
| 1,000 or more, but less than 5,000 | 26.4% |
| 5,000 or more, but less than 10,000 | 6.7% |
| 10,000 or more, but less than 100,000 | 9.2% |
| 100,000 or more | 2.5% |

### 20. Suppose your state legislature passed a new law affecting donors whose contributions go toward communications that mention candidates or specific pending ballot issues. For these donors, you would have to report the full names, addresses, and amounts, plus, for any contribution greater than $100, occupation (for individuals) or principal type of business (for corporations). How would this affect your ability to raise money?

| | |
|---|---|
| Not at all | 58.2% |
| Some, but not much | 7.9% |
| Moderately | 3.8% |
| Significantly | 6.7% |
| Very significantly | 3.8% |
| The effect would be catastrophic | 1.7% |
| None of the above, or other | 7.5% |

### 21. Assuming that the law described in the question above was passed, how would you change the information that you provide about candidates or specific pending ballot issues?

| | |
|---|---|
| Eliminate all that type of information | 5% |
| Decrease it a lot | 0.8% |
| Decrease it a little | 2.1% |
| Not at all; we would be happy to disclose donor information | 6.7% |
| Doesn't apply; we never mention specific ballot issues or candidates | 50.2% |
| Increase it a little | 0% |
| Increase it a lot | 0.4% |
| None of the above, or other | 10% |

### 22. Suppose your state legislature passed a new law affecting all contributions to nonprofit groups. Under the law, you would have to report all of your donors' full names, addresses, and amounts contributed, plus, for any contribution greater than $100, occupation (for individuals) or principal type of business (for corporations). How would this affect your ability to raise money?

| | |
|---|---|
| Not at all | 28% |
| Some, but not much | 19.2% |
| Moderately | 9.2% |
| Significantly | 11.3% |
| Very significantly | 8.4% |
| The effect would be catastrophic | 7.5% |
| None of the above, or other | 7.9% |

### 23. Assuming that the law described in the question above was passed but only affects your organization if you mention candidates or specific pending ballot issues, how would you change the information that you provide about candidates or specific pending ballot issues?

| | |
|---|---|
| Eliminate all that type of information | 8.4% |
| Decrease it a lot | 1.3% |
| Decrease it a little | 1.3% |
| Not at all; we would be happy to disclose donor information | 5% |
| Doesn't apply; we never mention specific ballot issues or candidates | 50.2% |
| Increase it a little | 0.4% |
| Increase it a lot | 0.4% |
| None of the above, or other | 8.4% |

### 24. Approximately how many members does your organization have?

| | |
|---|---|
| *Nationwide* | |
| 0-10 | 20.9% |
| 11-100 | 5.9% |
| 101-1000 | 7.1% |
| 1001-10,000 | 5% |
| 10,001-100,000 | 2.9% |
| More than 100,000 | 3.3% |
| Average | 35,947.88 |
| Median | 22.5 |
| *Florida* | |
| 0-10 | 16.3% |
| 11-100 | 12.6% |
| 101-1000 | 25.1% |
| 1001-10,000 | 10.5% |
| 10,001-100,000 | 4.2% |
| More than 100,000 | 2.1% |
| Average | 11,625.72 |
| Median | 267.5 |

### 25. Individuals become members of your organization by doing one or more of the following. Check all that apply.

| | |
|---|---|
| We don't have membership | 35.1% |
| Paying regular dues | 36% |
| Having voting rights | 8.8% |
| Making at least one contribution | 15.5% |
| Signing up, electronically or by mail | 13.8% |
| Volunteering their time to the organization | 23.8% |
| Other | 13.8% |
| Membership requires more than one of the above | 13.8% |

## 26. Approximately how much does your organization receive in total annual contributions?

| Nationwide | |
|---|---|
| 0-10,000 | 15.1% |
| 10,001-100,000 | 9.6% |
| 100,001-1,000,000 | 4.2% |
| More than 1,000,000 | 3.8% |
| Average | $493,552.49 |
| Median | $5,000.00 |
| Florida | |
| 0-10,000 | 24.3% |
| 10,001-100,000 | 18.4% |
| 100,001-1,000,000 | 15.9% |
| More than 1,000,000 | 7.1% |
| Average | $688,441.56 |
| Median | $30,000.00 |

## 27. If you are a branch of a larger organization, in how many states does that larger organization operate and collect contributions?

| | |
|---|---|
| 0-10 | 40.5% |
| 11-49 | 10.8% |
| 50 | 48.6% |
| Average | 28.55% |
| Median | 49% |

## 28. Does your organization, or your affiliated national organization, have a Political Committee registered in Florida?

| | |
|---|---|
| Yes | 4.6% |
| No | 85.4% |

## 29. How many total employees (paid) does your organization have in Florida?

| | |
|---|---|
| 0 | 18.4% |
| 1-10 | 41.8% |
| 11-50 | 12.1% |
| 51-100 | 4.2% |
| 101-1000 | 5.9% |
| More than 1,000 | 0.8% |
| Average | 73.13 |
| Median | 3.5 |

## 30. How many volunteers does your organization have in Florida?

| | |
|---|---|
| 0 | 8.4% |
| 1-10 | 21.3% |
| 11-100 | 36% |
| 101-1,000 | 13.4% |
| 1,001-10,000 | 2.5% |
| More than 10,000 | 2.5% |
| Average | 2,631.92 |
| Median | 20 |

## 31. Of the contributions you receive, about what proportions fall into the following amount ranges?

| $0-$100 | |
|---|---|
| Average | 39.31% |
| Median | 30.00% |
| $101-$250 | |
| Average | 15.09% |
| Median | 10.00% |
| $251-$500 | |
| Average | 11.06% |
| Median | 9.50% |
| $501-$1,000 | |
| Average | 10.67% |
| Median | 6.50% |
| $1,001 or above | |
| Average | 23.46% |
| Median | 7.50% |

## 32. What is the primary substantive focus of your organization?

| | |
|---|---|
| Arts/Culture | 12.1% |
| Educational | 24.3% |
| Health | 16.3% |
| Human Services | 20.9% |
| Political | 0.8% |
| Religious | 14.6% |
| Social services | 16.3% |
| Other | 25.9% |

## 33. What type of organization are you, in terms of tax status?

| | |
|---|---|
| 501(c)(3) | 92.1% |
| 501(c)(4) | 0.4% |
| 527 | 0% |
| Other | 2.9% |

## 34. Have you accepted contributions from_____? Check all that apply.

| | |
|---|---|
| 501(c)(3) organizations | 37.7% |
| 501(c)(4) organizations | 4.2% |
| 527 organizations | 2.5% |
| Other nonprofits | 29.7% |
| For profit corporations | 48.5% |
| Not sure; we don't collect that information | 17.2% |

**Note:** For some questions, percentages may not total to 100 due to nonresponse.



24



# APPENDIX B
## Non-response Bias Analysis

The organizational size of respondents was systematically larger than the mean, or median, nonprofit organization in Florida.  The answers to questions 24 (employees) and 32 (type of nonprofit) on the survey were compared to the overall averages for nonprofits using data from the Florida Association of Nonprofit Organizations (FANO).

## Employees

It is difficult to know exactly how many nonprofit organizations there are in Florida, but there are three possibilities:[20]

Exempt Organization Master File (EOMF; 2005):  46,587 organizations

IRS Form 990/PF Flier Listing (2006):  17,814 organizations

ES-202, State of Florida Listing (2005):  6,192 organizations

The most accurate data, for our purposes, are the form 990 listings that organizations must file annually.  For this purpose, then, the number of employees of all types statewide is approximately 630,000, as of the second quarter of 2005. This includes 380,000 paid workers and an additional 250,000 volunteers.

*Table B1 Workers per Organization*

|  | Paid | Volunteer |
|---|---|---|
| Universe (means) | 21 | 14 |
| Respondents (mean/median) | 73/3.5 | 2,600/20 |

Clearly, the bias in response was toward larger organizations, quite possibly much larger than average.  If the same difference between mean and median exists in the universe as in our sample, then the median nonprofit organization in Florida is quite small.  It likely lacks the resources to fill out surveys of this type, much less fill out electioneering disclosure forms.

In terms of statistical effects, then, we are likely underestimating the effects of the electioneering laws by overestimating the capacity of organizations in our sample to fill out the forms.  The burden on all nonprofits is even larger than what we find, because our sample is taken disproportionately from the relatively professionalized organizations with more employees and more resources.

## ■■■ Type

As a check on possible sample bias, we also collected information on the "primary substantive focus" of the organizations.  The results from the universe and our sample are reported in Table B2.  The categories do not match up perfectly.  However, in broad outline, the proportions of the sample do not diverge sharply from the universe.

**TABLE B2**  *Comparing the Focus of the Universe of Florida Nonprofits to Our Sample*

| Focus of the Organization | Universe* | Sample |
|---|---|---|
| Arts/Culture | 16% | 12.1% |
| Educational | 18% | 24.3% |
| Health (NOT hospitals) | 14% | 16.3% |
| Human Services | 18% | 20.9% |
| Political/Advocacy | 5% | 0.8% |
| Religious | (unknown) | 14.6% |
| Social Services | 13% | 16.3% |
| Other | 16% | 25.9% |

*Some categories are approximate matches.  Percentages recalculated to take "hospitals" and "nursing homes" out of both numerator and denominator of ratios.



# ENDNOTES

1   *Broward Coal. of Condos., Homeowners Ass'ns, and Cmty. Orgs. v. Browning*, No. 08-445, 2008 U.S. Dist. LEXIS 91591, at *2 (N.D. Fla. Oct. 29, 2008); *Broward Coal. of Condos., Homeowners Ass'ns & Cmty. Orgs. v. Browning*, No. 08-445 (N.D. Fla. filed May 22, 2009); Hafenbrack, J., & Deslatte, A. (2009, May 27). Judge throws out Florida rules regulating '527' political groups; Law that applied to campus, condo groups was too broad, opinion said. South Florida Sun-Sentinel, p. 3B.

2   424 U.S. 1 (1976).

3   540 U.S. 93 (2003).

4   127 S. Ct. 2652 (2007). This case is commonly referred to as *WRTL II* to distinguish it from an earlier Supreme Court ruling involving the same parties, *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006).

5   127 S. Ct. at 2667.

6   *Id.* at 2669.

7   Definitions taken from the following statutes:  Alaska (Alaska Stat. § 15.13.400); California (Cal. Gov't Code § 85310); Colorado (Colo. Const. art. XXVII, § 2 and Colo. Rev. Stat. 1-45-103);  Connecticut (Conn. Gen. Stat. § 9-601a); Florida (Fla. Stat. § 106.011); Hawaii (Haw. Rev. Stat. § 11-207.6); Idaho (Idaho Code § 67-6602); Illinois (10 Ill. Comp. Stat. 5/9-1.14); Louisiana (La. Rev. Stat. 18:1463(C)(5)); North Carolina (N.C. Gen. Stat. § 163-278.80(2), (5)); Ohio (Ohio Rev. Code Ann. 3517.1011(A)(7)(a)); Oklahoma (74 Okl. St. Chap. 62, Appx., 257:1-1-2); Vermont (17 Vt. Stat. Ann. § 2891); Washington (Wash. Rev. Code § 42.17.020(20)); West Virginia (W. Va. Code § 3-8-1a(12)(A)).

8   Some contributions of $50 or less may be reported in the aggregate.  Alaska Stat. § 15.13.040(l)(2)(B). PACs are subject to different contribution reporting requirements.   Alaska Stat. § 15.13.040(b)(2).

9   *Electioneering Communications Organizations; Political Committees*, DE 08-08, Op. Dept. of State, Div. of Elections, at 3-4 (June 18, 2008).

10   *Id.*

11   The triggers also rule out "express advocacy" because any organization engaged in express advocacy is potentially subject to even more stringent regulation as a political committee.

12   http://www.ij.org/index.php?option=com_content&task=view&id=2396&Itemid=165.

13   Alaska Stat. § 15.13.390.

14   17 Vt. Stat. Ann. § 2806 (b).

15   Conn. Gen. Stat. § 9-623.

16   Fla. Stat. § 106.19.

17   Carpenter, D. M. (2007). *Disclosure costs:  Unintended consequences of campaign finance legilstion.* Arlington, VA: Institute for Justice; Carpenter, D. M. (2009). Mandatory disclosure for ballot initiative campaigns. *Independent Review, 13*(4), 567-583; Milyo, J. (2007). *Campaign finance red tape: Strangling free speech and political debate*. Arlington, VA: Institute for Justice.

18   Bauer, R. F. (2007). Not just a private matter: The purposes of disclosure in an expanded regulatory system. *Election Law Journal, 6*, 38-55.

19   Tocqueville, A. (1961). *Democracy in America* (Vol. 2). New York: Vintage.

20   Salamon, L. M., Lessans, S., & Sokolowski, G. S. W. (2008). *Florida's nonprofit sector: An economic force*. Jacksonville, FL: Johns Hopkins Center for Civil Society Studies and Florida Philanthropic Network.

# ABOUT THE AUTHOR

## Michael C. Munger, Ph.D.

Dr. Munger serves as Professor and Department Chair of Political Science at Duke University. Munger received his Ph.D. in Economics at Washington University in St. Louis in 1984. Following his graduate training, he worked as a staff economist at the Federal Trade Commission. His first teaching job was in the Economics Department at Dartmouth College, followed by appointments in the Political Science Department at the University of Texas at Austin and the University of North Carolina at Chapel Hill. He moved to Duke in 1997 and has been Chair since 2000. He has won three university-wide teaching awards (the Howard Johnson Award, an NAACP Image Award for teaching about race, and admission to the Bass Society of Teaching Fellows). His research interests include the study of ideology, legislative institutions, elections and public policy, especially campaign finance. In addition to more than 80 articles and papers published in professional journals and edited volumes, Professor Munger has authored, coauthored or coedited four books. Current research interests include the evolution of the ideology of racism in the antebellum South, the Bipartisan Campaign Reform Act, and a study of the effects of imperfect information on experimental elections, using human subjects.



## About the Institute for Justice

The Institute for Justice is a nonprofit, public interest law firm that litigates to secure economic liberty, school choice, private property rights, freedom of speech and other vital individual liberties and to restore constitutional limits on the power of government.  Founded in 1991, IJ is the nation's only libertarian public interest law firm, pursuing cutting-edge litigation in the courts of law and in the court of public opinion on behalf of individuals whose most basic rights are denied by the government.



Institute for Justice
901 N. Glebe Road
Suite 900
Arlington, VA 22203

www.ij.org

p 703.682.9320
f 703.682.9321