# REPORT OF MICHAEL C. MUNGER, PhD
## January 21, 2010
### *REGARDING ISSUES ON "CROSS-OVER VOTING"*
### *IN IDAHO PRIMARIES*

I was asked to prepare a report evaluating the evidence, both statistical and anecdotal, regarding "cross-over voting" in primaries for electoral office in Idaho. This report has the following outline: I. Documents I reviewed specifically for this case; II. Analysis; III. Conclusions from that information.

## I.  Documents I reviewed specifically for this case.

### A. Scholarly articles and reports:

Abramowitz, Alan, John McGlennon, and Ronald Rapoport. "A Note On Strategic Voting in a Primary Election." *Journal of Politics*. 43 (1981): 899-904.

Adamany, David. "Communications: Cross-Over Voting and the Democratic Party's Reform Rules." *American Political Science Review*. 70 (1976): 536-544.

Aldrich, John. *Why Parties?* Chicago: University of Chicago Press. (1995).

Alvarez, Michael, and Jonathan Nagler. "Should I Stay Or Should I Go? Sincere and Strategic Crossover Voting in California Assembly Races," in *California's Open/Blanket Primary: A Natural Experiment in Election Dynamics*,Cain, Bruce E. and Elisabeth R. Gerber, eds. University of California Press, 2002.

Burden, Barry C., and Philip Edward Jones, " Strategic Voting in the United States," Paper presented at the Plurality and Multiround Elections Conference at the Université de Montréal, June 17-18, 2006.

Cain, Bruce E. "Party Autonomy and Two Party Electoral Competition." *University of Pennsylvania Law Review*, Vol. 149, No. 3 (Jan., 2001), pp. 793-814

Chen, Kong-Pin, and Sheng-Zhang Yang. " Voting in Open Primaries" *Public Choice*, Vol. 112, No. 1/2 (Jul., 2002), pp. 1-30.

Cherry, Todd L., and Stephan Kroll. "Crashing the Party: An Experimental Investigation of Strategic Voting in Primary Elections." *Public Choice*. 114 (2003): 487-420.

Gaines, Brian, and Wendy Tam Cho. "Crossover Voting Before the Blanket: Primaries Versus Parties in California History," in *California's Open/Blanket Primary: A Natural Experiment in Election Dynamics*,Cain, Bruce E. and Elisabeth R. Gerber, eds. University of California Press (2002).

Gerber, Elisabeth, and Rebecca Morton. "Primary Election Systems and Representation." *Journal of Law, Economics, and Organization*. 14 (1998): 304-314.

Guttman, Julia E. "Primary Elections and the Collective Right of Freedom of Association." *Yale Law Journal*. 94 (1984): 117-137.

Hedlund, Ronald D. "Cross-Over Voting in a 1976 Open Presidential Primary." *Public Opinion Quarterly*. 41 (1978): 498-514.

Kang, Insun. "Open Primaries and Crossover Voting" *Paper presented at the annual meeting of the Midwest Political Science Association, Palmer House Hotel, Chicago, IL*, Apr 12, 2007

Kaufmann, Karen, James Gimpel, and Adam Hoffman. "A Promise Fulfilled? Open Primaries and Representation." *The Journal of Politics* (2003), 65 : 457-476

Kselman, Daniel, and Emerson Niou. "Strategic Voting in Plurality Elections." *Political Analysis*. Electronic Access Pre-published November 12, 2009.

Lewy, Glen S.  "The Right to Vote and Restrictions on Crossover Primaries."  *University of Chicago Law Review.* 40 (1973):  636-660.

Munger, Michael.  "Political Parties and Campaign Finance," Written Testimony, Rules and Administration Committee, U.S. Senate, April 5, 2000. URL: http://rules.senate.gov/hearings/2000/04500hrg.htm

Norrander, Barbara.  "Measuring Primary Turnout in Aggregate Analysis."  Political Behavior.  8 (1986): 356-373.

Sides, John, Jonathan Cohen, and Jack Citrin, "The Causes and Consequences of Crossover Voting in the 1998 California Elections," in *California's Open/Blanket Primary: A Natural Experiment in Election Dynamics,*Cain, Bruce E. and Elisabeth R. Gerber, eds. University of California Press, 2002.

Southwell, P.L.  "Open Versus Closed Primaries:  The Effect on Strategic Voting and Candidate Fortunes.  *Social Science Quarterly.*  72:  789-796.

## B.  Affidavits:

- Affidavit of Curtis Bowers
- Affidavit of Darrel Deide
- Affidavits (2) of David Ripley
- Affidavit of Dennis Mansfield
- Affidavit of Gregg Vance
- Affidavit of Henry Kulczyk
- Affidavit of Lenore Barrett
- Affidavit of Rod Beck
- Affidavit of Steve Adams

## C.  Data:

- Survey of 400 Idaho Primary Voters, Conducted by Moore Information—Opinion Research
- Turnout and Election Data from Idaho, 2004, 2006, and 2008 elections

## II.  Analysis

I surveyed the empirical literature on "cross-over voting," to investigate the definitions and categories.  It is useful to define cross-over voting, at the outset.  Cross over voters—"voters who do not identify with the party in whose primary they cast ballots." (Adamany, 1976).  One of the most consistent sets of finding in the literature, most clearly beginning with Hedlund (1978), is that there is little demographic difference between cross-over voters and "real" party voters.  But nearly every scholar has found that there is a significant difference in terms of ideology.  Cross-over voters are not, in any refereed article I could find, drawn from the same ideological population as partisan voters.

The main concern in the literature is what scholars have called "mischief," which we might define as the lack of party control over the candidate selection process, making party membership unimportant.  If

cross-over voting exists, it can render parties impotent to carry out their functions of (a) organizing and mobilizing electorate, (b) recruiting candidates, (c) simplifying and packaging issues.

There are in the literature several attempts at taxonomies; the simplest is that of Alvarez and Nagler (2002). They outline the following "types," of which several might exist in any given election:

*Sincere crossover voting:* A person votes in the "other" primary because s/he likes one of those candidates more than any of the candidates in his/her own party. That is, the sincere cross-over voter has evaluated all candidates, for all primaries, and votes for the most preferred candidate, regardless of party affiliation. This form of voting is not strategic, but sincere.
*Hedge voting*: A form of strategic where the outcome in the voter's own party is certain, because of incumbency, or lack of opposition. The voter then crosses over and votes in another party primary, because the race is more "interesting," or competitive, and thus the voter's vote has a greater chance of influencing the outcome. This is a "hedge," in the sense that if the voter's own party candidate does not win, the voter may influence the eventual winner, even if that candidate is from the other party.

*Impact voting:* If the state is effectively a "one-party" state, and it is impossible for the voter's own party to win, the voter might cross over, or even register strategically, to be able to cast a vote in the election that actually matters, because the impact of the vote will be higher there. This could only happen in states where party competition is completely foreclosed, as in the "white primary" cases of the South in the 1950s and 1960s. It is important to note that impact voting can occur only if the dominant party can control access to the party label, as was done in the South with whites-only "pre-primaries," to choose a candidate who would then have bloc support.

*Raiding:* Strategic cross-over voting where voters from one party systematically vote for a weak or undesirable candidate, often using "bullet voting," or selective voting in just one or two elections, and ignoring the rest of the slate of elections. In a close primary, the cross-over voters can throw the race to the weaker candidate, thereby improving the chances of their own preferred party candidate.

As was noted above, these forms of cross-over voting may well occur together. *Impact voting* and *raiding* might well occur together, where an incumbent is unopposed in one party, so partisans cross over and choose a weaker candidate for the incumbent to oppose in the general election, thereby ensuring the incumbent's easy reelection.

I am an expert in a type of analysis called "spatial theory," having written two books and a number of articles on this approach. On analyzing the literature on cross-over voting, I realized that the above typology is incomplete, because it assumes that parties can control who signs up

3

as a candidate.  If parties do not have such control, then there is an additional type of cross over voting:  Trojan Horse cross-over voting.

*Trojan Horse cross-over voting:*  A candidate with core ideological beliefs more appropriate for one party signs up as a candidate in a primary for the other party.  Voters registered for the other party cross over and vote for this candidate.  One Trojan Horse candidate may command enough cross-over votes to win, especially if (as usually happens) traditional party turnout is low in the primary.

I have prepared the following diagrams as exhibits of how cross-over voting works.  Figure 1 illustrates the standard primary and general election set-up, using three distributions.  The small distribution on the left, marked "Left Party," is the set of strong partisans and activists, the subset of the larger population that would likely vote in the Left Party primary.

The small distribution on the right is the analogous subset of strong party identifiers and activists for the Right Party, the subset of the larger population that would likely vote in the Right Party primary.

The large distribution, spanning both parties and having a higher peak in the "center" represents the electorate for the general election.  Many of these voters self-identify as party "leaners" (lean Left, or lean Right), or else have no self-identified partisan affiliation whatsoever (independents, unaffiliated, etc.).

The standard account of properly functioning primaries and general elections can be seen on this figure.  The winning candidate of the Left Party (the smiling emoticon) is at the center of the distribution of voters in the primary; the same is true for the candidate of the Right Party (the other smiling emoticon).  After each party chooses the candidate at the center of the distribution (following the "Median Voter Theorem") of the preferences represented in the primary, then the general election takes place.  Whichever candidate is closer to the grand population median of voters who turn out for the election, wins the office.



Figure 1: Primary Turnouts Are Lower, Candidate Closer to Overall Median Wins General Election

The next figure, Figure 2, illustrates a combination of impact voting and raiding.  The Right Party has only one candidate, the incumbent B.  The Left Party is on its way toward choosing a very competitive candidate, A.  In fact, since A is closer than B to the overall median, then A will win the election if nominated.

The Right Party voters, realizing this, cross over and vote for a weaker candidate, Candidate C.  Candidate C has some support, from the extreme left wing of the Left Party, but is too extreme for most primary voters in the Left Party.

But the Right Party voters vote for C in the primary, precisely because he is too extreme to win the general election.  They do not honestly like C, but vote for C strategically in order to improve the chances for their own party candidate, B.

If the cross-over voters succeed in electing C as the Left Party candidate, then B will win the general election, and both the Left Party and the voters will have been cheated out of their most preferred candidate.  This outcome is always a possibility with Open Primaries, and it is a considerable concern to parties nationwide.



Figure 2: Right Party "Raids" Left Party, Chooses Unelectable Candidate for General Election

Number of Voters

Candidates C, A

Candidate B

Step 2: "C" wins Left Party Primary, Because Cross-Over Voters "Raid"

Overall Median, Winner of General Election

Step 3: "B" wins General Election, Even Though "A" is Closer to Overall Center, Because COVs select C as LP Candidate

Step 1: "B" is unopposed in Right Party Primary, So RP votes in LP Primary

Voter Ideological Position

The final figure, Figure 3, illustrates the possibility of Trojan Horse cross-over voting. In this instance, the Right Party decides to pursue a Trojan Horse strategy in certain districts. A candidate who is "really" (based on ideological beliefs) a member of the Right Party signs up as a Left Party candidate. Normally, in a closed primary, this candidate would have no chance of winning a Left Party primary because he is way too far to the right, ideologically. But the Right Party primary voters (dotted line distribution in Figure 3) all cross over and vote strategically.

As a result, C the Trojan Horse candidate, a stealth Right Party representative, manages to win the Left Party primary, and then wins the general election, because of cross-over voting.



Figure 3: Right Party Elects a Trojan Horse Candidate From Left Party

In the literature, this possibility is explicitly recognized, and in fact scholars have found instances of its occurrence, quite commonly. A comprehensive survey by Gerber and Morton (1998) found that open primaries have the effect of selecting "less extreme" candidates, and electing candidates "closer to the center" in general elections.

Overall, the literature suggests that these features, taken together, imply four predictions if there is "Trojan Horse" cross-over voting going on, in some races.

(a) We should expect ideological differences, some of them possibly large, among "real" partisan voters and cross-over voters whose sole object is to support a Trojan Horse candidate.

 (b) Overall turnout in primaries should increase markedly, and then fall back again.

(c) We expect to see bullet voting, with voters casting votes in only a few selected races

(d) There should be substantial evidence of reverse "roll-off."

Roll-off is the phenomenon that participation falls off as you move down the ballot. The greatest interest, and the greatest number of votes, nearly always occurs at the top of the ballot. Most people vote for a Presidential candidate, or Senate candidate, in primaries where those offices are contested. But as you move "down" the ballot, from the high visibility races at the federal level, past governor and other statewide offices, toward local offices such as soil commissioner or school board, the number of votes falls, sometimes dramatically. The voter is said to "roll off," or lose interest or lack the knowledge to cast a vote in the down-ballot races.

But if there is Trojan Horse cross-over voting, one would expect that turnout would increase in the election where the strategy is attempted. A significant number of voters would cast votes only in the race where the Trojan Horse candidate is running, exhibiting "bullet voting," or casting votes only in a narrow pattern. And such voters are likely to vote "None of the above," or fail to vote at all, at races on the top of the ballot, since those candidates really are legitimate members of the other party, and are not Trojan Horse candidates.


I have reviewed the academic literature on roll-off voting, and have proposed five categories or types of cross-over voting: sincere, hedging, impact, raiding, and Trojan Horse. There is considerable evidence in the literature that the first four types of cross-over voting are widely observed in states with open or semi-closed primaries. *In fact, some level of cross-over voting has always, in every case, been found to exist unless the primaries are closed.*

The estimates of the magnitudes of these categories of cross-over voting are nearly always more than 10%, and sometimes more than 30%. I have not found any studies that were specific to Idaho's primary system, in terms of estimating cross-over votes in the past, but there is no reason

to assume that the Idaho open primary system has produced results any different than in other states.

Further, there is considerable direct evidence, in *three different forms of information*, that allow an analysis of Idaho's system in particular.

- The first is the affadivits and personal accounts of the candidates and political operatives listed in Section I.a. above.
- The second is the data on turnout and voting in the 2004, 2006, and 2008 Idaho primary elections, available from IdahoVotes, combined with the analysis provided by David Ripley in two affidavits.
- The third is a systematic random survey of 400 Idaho citizens performed by Moore Information Opinion Research on January 6-7, 2010.

I have examined all these documents carefully, and have considered whether they represent, to a high level of probability and statistical confidence, a consistent and coherent indication of the existence, magnitude, and effects of cross-over voting, especially Trojan Horse cross-over voting, in Idaho over the last six years.

The conclusions of this analysis are contained in the following section.


## III.  Conclusions from that information

My analysis leads me to reach the following conclusions.  Because the data are statistical, and some of the most important data are from a random survey, these conclusions are not presented as a mathematical certainty.  Likewise, the summary of other studies in the literature represents statistical and not deductive conclusions.  Survey results can only lead to conclusions with a high degree of probability.  Given the way that the survey was conducted, the results are generally in the region of 95% confidence or more, unless explicitly otherwise noted below.

### A.    There is considerable evidence, from all three sources of information (personal affidavits, turnout data, survey data) that voters cross over in Idaho Republican primary elections.

The personal accounts of candidates display consistent, though anecdotal, evidence that cross over voting not only exists, but is widely acknowledged to exist, in at least some Idaho elections.

The data from IdahoVotes on primary turnout and bullet voting, and the analysis in the affidavit provided by David Ripley, show strong patterns consistent with cross over voting.  In fact, these data reveal levels of bullet voting, and reverse roll-off, that are higher than I have seen in other states.  The pattern is very significant, both substantively and statistically.

11

Finally, there is direct evidence from the survey that is simply remarkable. Remember, this is not an inference made from data collected from someone else. These are self-reported data from people who have, if anything, strong reasons to under-report the extent of cross over voting. And yet we see that in Question 15, of the 41% who always, or usually, vote Democrat, fully 39% themselves report that they have voted in a Republican party primary. And of the remainder of the non-GOP registered voters, and additional 35% routinely vote for candidates of either party. It is plausible to think that at least 1/3 of these have voted in a Republican primary. Consequently, I can conclude that more than half of those registered something other than Republican have voted in Republican primaries. And most of these are actually Democrats, in terms of their own self-reported voting habits and preferences.

**B.  In the literature, cross-over voting is found in every state with open primaries.**
I have listed, in Section I above, a number of studies that have measured the extent of cross-over voting in other states. The consistent result is cross-over voting is prevalent, and in fact in some cases exceeds 1/3 of the electorate in a partisan primary race. The most skeptical reports, using the narrowest definitions of "raiding," still find that cross-over rates are at least 2%. The estimates of the kind of cross-over described in the Idaho context, which I have called "Trojan Horse" cross over voting, has not been measured. But even conservative estimates of impact voting and hedge voting, the types closest to the Trojan Horse category, are in the 20% to 30% range for states with open primaries.

**C.     Cross-over voting weakens parties, and interferes with their ability to carry out their core functions in a democratic society.  Specifically, cross over voting can risk the coherence of a party's message, its ability to raise funds to run campaigns, its ability to recruit and train effective candidates.  Finally, cross over voting can distort positions taken during the campaign and also in office.**
This conclusion is based more on the substantive political science literature than on evidence in the record in this case. The issue has been argued at length in the seminal book on party growth and function, Aldrich (1995). And I have myself developed the argument about the importance of strong and responsible parties in my testimony before the U.S. Senate Rules and Administration Committee (Munger, 2000).

The most concise way to reproduce that argument is to quote at some length from the Chicago Law Review article by Lewy (1973), arguments echoed in the Yale Law Journal by Guttmann (1984). The brief summary of the argument is this: if cross-over voting is widespread, and parties want to curtail such cross-over voting but are prevented from doing so, then their abiity to fulfill their core functions is compromised. As one of the affidavits asserted, cross-over voting is akin to allowing the Board of Directors for Ford Motor Company to vote at a General Motors Board meeting. And as Justice Scalia, writing for the majority in *Democratic Party v. Jones*

(2000), said, "the prospect of having a party's nominee determined by adherents of an opposing party is far from remote" if it can shown that cross-over voting exists.

Since it has been established, in the previous sections, and from the three types of data I have to analyze, it is useful to spell out the consequences. As Lewy (1973) puts it:

"…The courts may have lost sight of a crucial fact-that the most important function of political parties in the American political system is to aggregate interests and to create coalitions. A political party is, by definition, a group that seeks power. .…. A party is successful only when it gains the reins of government. In American politics the vehicle for attaining power is the election process. Hence, the political parties are the contestants of elections. In order to be successful the parties must create coalitions, and the recruitment of candidates and the mobilization of voters are parts of the process of coalition building.…" (P. 654)

He continues:

"If judicial decisions were to prevent the political party from taking steps to select its nominees prior to primary elections, rather than simply organizing conventions or preprimaries, the result would be a fragmentation of the coalition. The party would cease to function if victory in the primary would no longer include an automatic claim to the support of the preexisting coalition, since, if the party cannot select or control its nominees, then it cannot deliver on the promises made to the members of the coalition, and the party would lose its means of creating and maintaining its coalition. As a result, candidates represent-ing the interest groups would have to create their own coalitions, which would be more ad hoc and temporary in nature. The parties would, to some degree, be incapable of performing those functions generally attributed to them. Instead, those functions would have to be performed by other groups, more temporary and often less capable of doing so. The recruitment and mobilization functions would be undertaken by ad hoc groups concerned with a single candidate or single issue. The candidates would be likely to have an independent basis of support and would have to have large amounts of private money at their disposal to be successful. The aggregation and coalescing of interests would be done on a less permanent basis and probably at the governmental level itself with a consequent increase in instability. Furthermore, it seems likely that many of the functions political parties perform between elections would, of necessity, be taken over by other institutions, most probably the government, much in the same way that the decline of the urban political machines thrust much of the task of public welfare on the government bureaucracy." (p. 657)

Lewy concludes:

"The ideal situation may be to give each party the power to determine eligibility to participate in its own primary. While crossover voting restrictions protect the strength and autonomy of political parties, they may be accompanied by offsetting disadvantages. A party may find that, although allowing crossovers would increase the danger that the party would lose control of its candidate recruitment process, this danger is outweighed by the gains in voter recruitment, recognition of potential additions to its coalition, and increased enthusiasm among its supporters that might result from allowing broader participation in its nominating procedures. <u>There seems to be no reason why each party should not be</u>

allowed to make its own calculus regarding the impact of crossovers, and to determine the optimum way in which to perform its functions with respect to its ultimate goal of vote maximization. The right of political association should require these decisions to be made by each party. The government is prohibited from impairing the organization of a group seeking to nominate a candidate. Requiring a group to open its doors to all comers dilutes the effectiveness of the group and serves the same result as prohibiting their organization in the first place. If the result of crossovers is that John Connally is the nominee of the Raza Unida Party or James Eastland of the Mississippi Freedom Democrats, the party is no better off than it would have been had the state expressly prohibited its organization." (p. 659; emphasis added in two passages underlined.)


**D.     A Note on methodology and reliability of the data.**

As noted at the outset, there are three sources of data used here to support the analysis and from which I drew conclusions.  The first is a set of sworn affadavits; these are reliable, but anecdotal, statements about the experiences and perceptions of candidates and political operatives.

The second source of data is information about historical turnout, vote totals, bullet voting, and roll-off in the Idaho primaries of 2004, 2006, and 2008, and the sworn affidavit of Mr. David Ripley about his summaries of these data.  I have independently verified that the summaries of the data are correct, and Mr. Ripley's analysis, though not standard in terms of jargon, represents a fair and accurate assessment of the content and meaning of these data.

Finally, the third source of data was a random survey of Idaho primary voters, conducted by a highly professional polling organization (Moore Information Opinion Research).  This survey appears to have been conducted according to the required formal protocols of random survey administration.  Under the circumstances, we can be confident that the results are accurate at plus or minus 5%, at the standard 95% confidence level of interpretation.