LAWRENCE G. WASDEN
ATTORNEY GENERAL

BRIAN KANE (ISB No. 6264)
Assistant Chief Deputy Attorney General

Steven L. Olsen (ISB No. 3586)
Chief of Civil Litigation Division

Michael S. Gilmore (ISB No. 1625)
Clay R. Smith (ISB No. 6385)
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
650 West State Street, Lower Level
P. O. Box 83720
Boise, ID  83720-0010`
Telephone:  (208) 334-4130
Fax:  (208) 854-8073
mike.gilmore@ag.idaho.gov
clay.smith@ag.idaho.gov

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE IDAHO REPUBLICAN PARTY, its EXECUTIVE COMMITTEE, its STATE CENTRAL COMMITTEE, and CHAIRMAN, EXECUTIVE DIRECTOR; SIDNEY C. SMITH, <br><br> Plaintiffs, <br><br> vs. <br><br> BEN YSURSA, In his Official Capacity as Secretary of State of the State of Idaho, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:08-CV-00165-BLW

**POST-TRIAL MEMORANDUM BY DEFENDANT BEN YSURSA**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 3

I.  IDAHO HAS NO CONSTITUTIONAL DUTY TO REGISTER POTENTIAL
    ELECTORS BY POLITICAL PARTY PREFERENCE AS A CONDITION
    PRECEDENT TO OPERATING A MANDATORY STATE PRIMARY SYSTEM .......... 4

II. SECTION 34-904 IS EQUIVALENT A "CLOSED" PRIMARY
    SYSTEM BECAUSE BALLOT SELECTION SERVES AS A LEGAL PROXY
    FOR PARTY REGISTRATION ........................................................................... 8

III. THE REPUBLICAN PARTY FAILED TO ESTABLISH THAT IDAHO'S
     PRIMARY SYSTEM IMPOSES A "SEVERE BURDEN" ON THE PARTY'S
     ASSOCIATIONAL INTERESTS ...................................................................... 11

     A.  The Republican Party Failed to Adduce Credible Evidence Concerning the
         Extent or Nature of "Crossover" Voting in Idaho ...................................... 11

         1.  The Moore Survey and Ripley Memorandum Contain Results and Conclusions
             that Lack Methodological Credibility or Statistical Reliability ............... 12

             a.  Fed. R. Evid. 702 and *Daubert* Standards ...................................... 12
             b.  Application of Fed. R. Evid. 702 and *Daubert* Standards to the Moore Survey
                 and Ripley Memorandum ................................................................. 14

                 (1) Moore Survey ........................................................................... 14

                     i.   Lack of Representative Sample ............................................. 15
                     ii.  Improper Question Formulation ............................................ 17
                     iii. Inaccurate and Misleading Survey-Results Memorandum .......... 21

                 (2) Ripley Memorandum ................................................................. 22

         2.  The Munger Report Has No Reliable Idaho-Specific Findings Because of Its
             Reliance on the Moore Survey and Ripley Memorandum ....................... 24

     B.  The Republican Party Offered No Evidence Establishing that Requiring
         Public Disclosure of Party Preference at the Time of Requesting a Ballot
         Would Affect Materially the Amount of "Crossover" Voting ....................... 27

IV. IDAHO'S INTERESTS IN BALLOT SECRECY AND ELECTION DAY
    REGISTRATION JUSTIFY THE "NON-SEVERE" BURDEN PLACED ON
    THE REPUBLICAN PARTY'S ASSOCIATIONAL RIGHTS ......................... 28

CONCLUSION ................................................................................................ 30

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

*ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 133 (D. Conn. 2005) ............................................ 29

*Alaskan Independence Party v. Alaska*, 545 F.3d 1173 (9th Cir. 2008) ...................................... 1

*Burdick v. Takushi,* 504 U.S. 428 (1992) .................................................................................. 1

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ..............................................*passim*

*Clausen v. M/V New Carissa,* 339 F.3d 1049 (9th Cir. 2003) ................................................... 13

*Clingman v. Beaver*, 544 U.S. 581 (2005) ..........................................................................*passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) ...........................2, 12, 13

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ..................................... 13

*Democratic Party v. Wisconsin ex rel. LaFollette*, 450 U.S. 107 (1981) ...............................8, 9

*Democratic Party v. Reed*, 343 F.3d 1195 (9th Cir. 2003) ................................................. 10, 24

*Democratic Party Wash. State v. Reed*, No. C00-5419FDB, 2002 WL 32925223 (W.D. Wash. Mar. 27, 2002) *rev'd on other grounds*, 343 F.3d 1198 (9th Cir. 2003) .............................. 24

*Idaho Republican Party v. Ysursa*, 600 F. Supp. 2d 1195 (D. Idaho 2009) ........................2, 11

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ..................................................... 13

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc*., 420 F. Supp. 2d 1070 (N.D. Cal. 2006) *aff'd*, 221 Fed. Appx. 996 (9th Cir. 2007) ............................................................................ 25

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) .................................................................... 13

*Tashjian v. Republican Party*, 479 U.S. 208 (1986) ..............................................................4, 7

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ....................................7, 11, 28

*White v. Ford Motor Co*., 312 F.3d 998 (2003) ...................................................................... 13

*STATUTES*                                                                      *PAGE*

Idaho Code § 34-904 ............................................................................*passim*
Idaho Code § 34-408A ...................................................................... 3, 28
National Voter Registration Act ("NVRA"), 42 U.S.C. ......................................... 29

*IDAHO CONSTITUTION*

Art. VI, § 1, Idaho Const. ................................................................. 28

*FEDERAL RULES*

Fed. R. Evid. 702 .......................................................................2, 12, 14
Fed. R. Evid. 703 .......................................................................2, 24

## <u>INTRODUCTION</u>

This case presents an intra-party dispute between Idaho voters (the Party in the Electorate) who identify with the Republican party by selecting the Republican option in the primary election voting booth, the Idaho Republican Party in Government that has given those voters that option, and the Idaho Republican Party Organization which seeks to take that option away. Plaintiffs (collectively "Republican Party" or "Party") ask this Court to endorse a stark and absolute rule of constitutional law: A political party may require a State to limit participation in election primaries to those individuals who have "registered" as party members prior to the election.  Doc. 1, ¶ 22 (quoting "Closed Republican Party Primary Rule" under which "[o]nly persons who have registered as a Republican prior to the Primary Election will be allowed to vote on an Idaho Republican Party ballot in that Primary Election").

The Supreme Court declined ten years ago in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), to address whether the Freedom-of-Association implicit in the First Amendment to the United States Constitution, as incorporated into Fourteenth Amendment, effectively grants political parties largely unfettered authority over who may participate in primaries conducted by a State or allows the State or the voters themselves to retain those associational rights.  *Id.* at 577 n.8.  Its subsequent decision in *Clingman v. Beaver*, 544 U.S. 581 (2005), however, establishes that parties do not possess the plenary power claimed by the Party. An accommodation between a political party's associational rights and the States' no less settled entitlement under Article I, Section 4 of the Constitution to determine "[t]he times, places and manner of holding elections for senators and representatives" and, by inference for state and local government officials must be struck.

The Court identified the basic standards for testing the constitutionality of election laws generally, and state primary-election laws specifically, in *Burdick v. Takushi,* 504 U.S. 428 (1992).  Those standards demand a compelling governmental interest where a "severe" burden on the constitutional interest asserted exists but only an "important governmental interest" where a lesser burden exists.  *Id.* at 443-44; *accord Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1176 (9th Cir. 2008).  The issue here is the precise nature of the "burden" imposed on the

Republican Party's associational interests imposed by Idaho Code § 34-904.  This Court, in denying the cross-motions for summary judgment, directed further factual development over two issues of fact that it deemed singularly significant in determining the constitutionally relevant burden: "[W]hether and to what extent 'cross over' voting exists in Idaho, and whether and to what extent the threat of such 'cross over' voting affects the message of IRP and its candidates." Doc. 43 at 15; *Idaho Republican Party v. Ysursa*, 600 F. Supp. 2d 1195, 1201 (D. Idaho 2009).

The evidence adduced at trial by the Republican Party added little, if anything, to the "mere assertions[] that Republican candidates have modified and will continue to modify their political messages, ideologies and positions because of Idaho's current open primary system" found insufficient to warrant summary judgment in its favor.  Doc. 43 at 14; 600 F. Supp. 2d at 1201.  The "expert" testimony and reports relied upon by the Party instead fail in substantial part to pass muster under Fed. R. Evid. 702 and 703 and, in accordance with this Court's "gatekeeping role" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), cannot be given evidentiary weight.  The Party's non-expert, anecdotal testimony— which not only is rife with speculation and hearsay-grounded conclusions as to the extent of "crossover" voting but also reflects no meaningful "message" modification—fares no better.  In short, the record establishes neither the amount nor the composition of "crossover" voting in Idaho nor any non-*de minimis* negative impact.

This case thus turns, as it did in the summary judgment phase, on whether the "open" primary process adopted decades ago in § 34-904 violates the Republican Party's associational rights under the First Amendment by not replicating a traditional "closed" primary system.  The answer to that question is no because (1) Idaho has no constitutional duty to register potential electors by party preference as would be required by the Closed Republican Party Primary Rule; (2) the selection of a single party's ballot under § 34-904 embodies an act of political party preference that effectively creates a "closed" system in which electors agree to vote only for candidates of a particular party in that primary; (3) the burden imposed on the Party is non-severe since, absent any constitutional obligation to condition voter registration on

specifying a party preference,[1] the only difference between the current Idaho primary system and a standard "closed" primary would be mandating electors to proclaim publicly their Republican ballot preference prior to voting, and there is no probative evidence that such a requirement would affect materially the composition of a particular party's primary electorate; and (4) Idaho has a legitimate interest in, *inter alia*, (a) maximizing primary ballot confidentiality through an electoral process that does not require disclosure of party preference or affiliation as a condition to voter registration or voting itself and (b) ensuring efficient operation of its election-day-registration option for voters in Idaho Code § 34-408A.

## ARGUMENT

The Closed Republican Party Primary Rule adopted in June 2007 limits participation in Party primaries to persons who have "registered as a Republican" prior to the election.  Doc. 1, ¶ 22 (emphasis added).  The rule, given its most natural reading, would impose on Idaho the responsibility to require residents to identify a party preference as an element of voter registration.  The Party's political science expert, Dr. Michael C. Munger, accordingly justified the voter "behavior" formulation of Question 3 in the Moore Information primary voter survey (Ex. 1006) on the lack of a party-preference requirement for elector registration in Idaho.  Tr., 145:22-146:18, 218:18-219:13; *see also id*. 143:7-16 (defining "crossover" voter, if the Closed Republican Primary Rule were followed, as any elector not "a registered Republican"); *id*. 152:2-5 ("it is my understanding that people who now vote Independent would be welcome to vote in the Republican primary, provided that they registered Republican"); *id*. 211:12-17 (acknowledging that Exhibit 1004 erred to the extent it referred to "registered" voters in Idaho). Regardless of precisely how the "registration" requirement would be implemented, no dispute exists that part and parcel of the Party's freedom-of-association theory is Idaho's creating and enforcing some form of state elector classification by party preference.[2]

---

[1]  The term "party preference," as used in this memorandum, refers to elector self-identification as affiliated with a particular political party or as not affiliated with any party—*i.e.*, an Independent.

[2]  Norman M. Semanko, the Idaho Republican Party chairman, stated throughout his September 2008 deposition that he was unsure of how the "registration" requirement would be implemented if § 34-904 were invalidated.  *E.g*., Ex. 1022 at 119:21-25 ("Maybe there's a better way to do it.  Who knows what the details of party registration would look like, how you would treat all the folks that

The threshold question raised by the Republican Party's claim is accordingly whether Idaho has a duty under the First Amendment to establish as a voter-registration prerequisite disclosure of party preference.  If this question is answered negatively, the inquiry shifts to the proper characterization of § 34-904 under Supreme Court precedents and whether the "burden" it imposes is "non-severe" and justified by an important governmental interest.  These questions are considered in order below.

## I.   IDAHO HAS NO CONSTITUTIONAL DUTY TO REGISTER POTENTIAL ELECTORS BY POLITICAL PARTY PREFERENCE AS A CONDITION PRECEDENT TO OPERATING A MANDATORY STATE PRIMARY SYSTEM

The Republican Party's freedom-of-association claim rests on the straightforward proposition that Idaho has a constitutional duty to limit access to Republican primaries on those conditions prescribed under Party rules. Its position runs headlong into the Supreme Court's post-*Jones* decision in *Clingman*.  There, the Court addressed whether the Libertarian Party of Oklahoma could require the State to open its primary to all registered voters regardless of party registration and in contravention of Oklahoma's "semiclosed" primary law that limited participation in a political party's primary to voters registered with the party and Independents.  Although a majority of the Court did not agree upon a common rationale, six Justices upheld the law.  The four-Justice plurality opinion, authored by Justice Thomas, prefaced its analysis by explaining that the controversy "present[ed] a question . . . left open" in *Tashjian v. Republican Party*, 479 U.S. 208 (1986), where the Court had invalidated application of a Connecticut "closed" primary statute permitting only voters registered as affiliated with a political party to participate in the party's primary.  *Clingman*, 544 U.S. at 587.

---

want to be involved.  I don't know that.  I can't prejudge that").  Nevertheless, Chairman Semanko's statements make quite clear that the Party claims an absolute right under the First Amendment to dictate a "registration" requirement which Idaho must enforce if it chooses to operate a state primary and that "registration," however configured, necessarily will result in disclosure of party preference by any elector choosing to vote for Republican candidates.  *E.g.*, *id.* at 44:14-45:9, 84:13-85:1, 99:10-22, 107:2-108:9, 120:8-121:11.  Dr. Munger, in his capacity as the Party's expert political scientist, expressed the same view in defining "crossover" voting. Tr., 142:22-143:16, 182:11-183:9, 190:2-19, 202:24-204:18.

The plurality turned then to identifying the nature of the "burden" imposed on the Libertarian Party and the interests furthered by the "semiclosed" primary system.  It observed that the system did not limit the Party's ordinary associational interests or impose requirements not shared by other political parties.  Rather,

> Oklahoma merely prohibits the LPO from leaving the selection of its candidates to people who are members of another political party.  Nothing in § 1-104 prevents members of other parties from switching their registration to the LPO or to Independent status.  The question is whether the Constitution requires that voters who are registered in other parties be allowed to vote in the LPO's primary.

*Id.* at 587-88 (footnote omitted).  In answering this question negatively, the plurality added that "the Republican and Democratic voters who have brought this action [together with the Libertarian Party] do not want to associate with the LPO, at least not in any formal sense" but "wish to remain registered with the Republican, Democratic, or Reform parties."  *Id.* at 588.  "Their interest[,]" in other words, lay "in casting a vote for a Libertarian candidate in a particular primary election, rather than in banding together with fellow citizens committed to the LPO's political goals and ideas."  *Id.*  The plurality reasoned further that the constitutional rule advanced by the Libertarian Party would allow a voter "to participate in numerous party primaries, or cast ballots for several candidates, in any given race" and result not in "'dual associations'" as suggested in a partial concurrence by Justice O'Connor but in "seemingly boundless ones."  *Id.* at 589.

Balanced against this lack of associational interest in allowing voters registered with another party to participate potentially in multiple primaries were the non-burdensome alternatives available to permit a voter to participate in the Libertarian Party's primary:

> Oklahoma's semiclosed primary system imposes an even slighter burden on voters than on the LPO. Disaffiliation is not difficult: In general, "anyone can 'join' a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election." . . . In Oklahoma, registered members of the Republican, Democratic, and Reform Parties who wish to vote in the LPO primary simply need to file a form with the county election board secretary to change their registration. . . . Voters are not "locked in" to an unwanted party preference . . .  because with only nominal effort they are free to vote in the LPO primary.

544 U.S. at 590-91 (citations omitted).  The principal opinion concluded that portion of the opinion not joined by two other Justices with the observation that, given the ease of "disaffiliation," Oklahoma's "registration requirement [did] not unduly hinder the LPO from associating with members of other parties."  *Id.* at 591.

A majority of the Court joined in that portion of the principal opinion distinguishing *Tashjiian*.  It relied on two factors, "[t]he first and most important was that [the Connecticut statute] required Independent voters to affiliate publicly with a party to vote in its primary[,]" while the Oklahoma law demanded only that voters "declare themselves Independents, which would leave them free to participate in any party primary that is open to registered Independents."  544 U.S. at 592.  The second factor was not an actual difference between the two States' primary—since both required voters to take affirmative action in the form of registration to become eligible to participate in a particular political party's primary—but in the conclusion that in both instances "[t]hese minor barriers" were not severe and did "not compel strict scrutiny."  *Id.* at 593.  "To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."  *Id.*

Justice O'Connor, joined in part by Justice Breyer, agreed with much of the principal opinion but argued that the claim advanced by the respondents—who included both the Libertarian Party and several voters registered as Democrats or Republicans (544 U.S. at 584)—"implicates important associational interests" not appropriately recognized by the plurality:

> The plurality questions whether the LPO and voters registered with another party have any constitutionally cognizable interest in associating with one another through the LPO's primary. . . .  Its doubts on this point appear to stem from two implicit premises: first, that a voter forms a cognizable association with a political party only by registering with that party; and second, that a voter can only form a cognizable association with one party at a time.  Neither of these premises is sound, in my view.  As to the first, registration with a political party surely may signify an important personal commitment, which may be accompanied by faithful voting and even activism beyond the polls.  But for many voters, registration serves principally as a mandatory (and perhaps even ministerial) prerequisite to participation in the party's primaries.  The act of casting a ballot in a given primary may, for both the voter and the party, constitute a form of association that is at least as important as the act of registering.

*Id.* at 600-01 (citation omitted).  Justice O'Connor thus "question[ed] whether judicial inquiry into the genuineness, intensity, or duration of a given voter's association with a given party is a fruitful way to approach constitutional challenges to regulations like the one at issue here." Nevertheless, the concurring opinion agreed with the plurality's application of the *Burdick* framework and the proposition that its animating concern is ensuring against "the political party or parties in power" shaping "the rules of the electoral game to their own benefit."  *Id.* at  603.

Although the analysis in the plurality and concurring opinions in *Clingman* provides valuable guidance concerning proper resolution of the Republican Party's claim under *Burdick* standards, the case's immediate relevance lies in the implicit rejection of the assertion by Chairman Semanko and Dr. Munger that the Party possesses a virtually absolute constitutional right to determine who among Idaho's electorate may participate in Republican primaries. *Clingman* plainly cannot be reconciled with their categorical position.  Idaho, like other States, has a right to impose reasonable and non-discriminatory regulations on the conduct of all public-office elections.  *Tashjiian*, 479 U.S. at 217; *see also Clingman*, 544 U.S. at 603 (O'Connor, J., concurring in part).  The *scope* of state discretion in this regard, under current Supreme Court precedent, must be measured under *Burdick* standards and not the *per se* test envisioned by the Party here.  *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 360 (1997) (discussing general applicability of *Burdick* to "whether a state election law violates First and Fourteenth Amendment associational rights," and applying its analytical framework to a Minnesota statute that "preclude[d] one party's candidate from appearing on the ballot, as that party's candidate, if already nominated by another party").  Nothing in *Jones* suggests the contrary—as *Jones* itself and the later-decided *Clingman* reflect.  *See Jones*, 530 U.S. at 579-82 (rejecting Ninth Circuit's determination that the California's blanket primary system's burden on associational rights was not severe, and subjecting justifications for the system to the narrowly-tailored, compelling state interest test).

## II.  SECTION 34-904 IS EQUIVALENT TO A "CLOSED" PRIMARY SYSTEM BECAUSE BALLOT SELECTION SERVES AS A LEGAL PROXY FOR PARTY REGISTRATION

A prerequisite to the Republican Party's claim is its characterization of § 34-904 as an "open" primary that authorizes "crossover" voting by individuals who are not affiliated with the Party.  Its position presents squarely the question whether, in a State like Idaho that does not include disclosure of party preference as an element of the voter registration process, an elector's determination to participate in one, and only one, political party's ballot in the primary election serves for First Amendment purposes the same function as party registration in those States that do require such disclosure.  If ballot selection under § 34-904 does operate as a proxy for party registration, Idaho's primary system is the functional equivalent of a "closed" system and thus consistent with the Party's asserted associational rights since no "crossover" voting can exist.

In *Democratic Party v. Wisconsin ex rel. LaFollette*, 450 U.S. 107 (1981), the Supreme Court invalidated application of Wisconsin's presidential primary statute, which allowed any voter to participate in the Democratic primary without "publicly declar[ing]" and "publicly record[ing]" affiliation with the party as required by the National Party's rules (*id.* at 109 n.1), to the extent that it required Wisconsin delegates to be seated at the national party's convention in accordance with the primary's outcome.  The majority opinion identified the dispositive question as "whether, once Wisconsin has opened its Democratic Presidential preference primary to voters who do not publicly declare their party affiliation, it may then bind the National Party to honor the binding primary results, even though those results were reached in a manner contrary to National Party rules" and not "whether the National Party may require Wisconsin to limit its primary election to publicly declared Democrats."  *Id.* at 120.  The State's challenged conduct, in other words, turned on its attempt to regulate actions taken by the national party at its convention: the nomination of its presidential candidate.  In this context, the Court found fault with the statute insofar as it contravened "the freedom of the National Party to define its own eligibility standards" (*id.* at 123 n.24)—even though the public avowal of party affiliation required by [the National Party's rule may] provide[] no more assurance of party loyalty than does Wisconsin's requirement that a person vote in no more than one party's primary"—because "the stringency, and wisdom, of membership requirements is for the association and its members

to decide-not the courts-so long as those requirements are otherwise constitutionally permissible" (*id.* at 123 n.25).

Justice Powell, joined by two other Justices, dissented.  The dissenting opinion reasoned in part that "[a]ll that Wisconsin has done is to require the major parties to allow voters to affiliate with them-for the limited purpose of participation in a primary—*secretly*, in the privacy of the voting booth" (450 U.S. at 129-30) and that, consequently, "[t]he real issue in this case is whether the Party has the right to decide that only *publicly* affiliated voters may participate" (*id.* at 130 n.2).  The dissent was "unwilling—at least in the context of a claim by one of the two major political parties—to conclude that every conflict between state law and party rules concerning participation in the nomination process creates a burden on associational rights" but "would look closely at the nature of the intrusion, in light of the nature of the association involved, to see whether we are presented with a real limitation on First Amendment freedoms." *Id.* at 130-31.  In its view, "the National Party ha[d] failed to make a sufficient showing of a burden on its associational rights."  *Id.* at 134.

The majority opinion's careful limitation of the issue to be resolved reflects the unique nature of the associational interest at stake in *LaFollette*.  The Wisconsin statute's sweep extended beyond regulating an election for state general-election purposes and into controlling the *internal* activities of the national Democratic Party with respect to the selection of a nominee for the Presidency.  In this circumstance, it was hardly remarkable for the Court to conclude that whatever the practical effect, if any, of the absence of a "public avowal" requirement in the Wisconsin law, the controlling consideration was the essentially categorical right of the Democratic Party to choose "among the various ways of determining the makeup of a State's delegation *to the party's national convention*."  *Id.* at 124 (emphasis added); *cf. Jones*, 530 U.S. at 592 n.3 (Stevens, J., dissenting) ("*LaFollette* is a case about state regulation of internal party processes, not about regulation of primary elections").  The presidential primary, in other words, was directed at imposing voting obligations on convention participants, not in determining which candidate was entitled to appear on the general election ballot.  *Id.* at 112 n.6.  Moreover, unlike § 34-904, the elector was not required to select a primary ballot for *all* offices that would appear

on the general-election ballot.  The Wisconsin presidential ballot instead was limited to that office and thereby allowed an elector who had voted in another party's primary for other offices to cast a ballot in a different party's presidential primary.  *Id.* at 110 n.3.  Wisconsin's differential treatment of the presidential and the remaining primary contests thus created, in effect, a partial blanket primary.

Nineteen years later in *Jones*, the majority opinion explicitly left open the question whether an open primary was "constitutionally distinct" from the California blanket primary invalidated there.  530 U.S. at 577 n.8.  In so doing, the Court quoted from Justice Powell's dissenting opinion in *LaFollette* for the proposition that "the act of voting in the Democratic primary fairly can be described as an act of affiliation with the Democratic party."  *Id.*  Justice Stevens returned to this proposition in his dissent when discussing the weight of the associational interests at stake.  The dissent observed that "[a] meaningful 'right not to associate,' if there is such a right in the context of limiting an electorate, ought to enable a party to insist on choosing its nominees at a convention or caucus where nonmembers could be excluded" but that "[i]n the real world, however, anyone can 'join' a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election."  *Id.* at 596.  The *Clingman* plurality cited this component of the *Jones* dissent for the proposition that Oklahoma's primary system imposed a minimal burden on voters.

The Court's jurisprudence since *LaFollette* thus supports the principle that, by omitting party affiliation as a required element of the voting registration process, Idaho effectively uses primary ballot selection as a proxy for such affiliation.  The Court of Appeals decision in *Democratic Party v. Reed*, 343 F.3d 1195, 1203-04 (9th Cir. 2003), does not mandate a different conclusion because it addressed the validity of a blanket primary and thus fell within the logical sweep of *LaFollette*'s treatment of Wisconsin's partial blanket primary.  The "minimal" burden attached to the party preference registration requirement by the *Clingman* plurality instead counsels exactly the opposite conclusion unless constitutional significance is attached to the difference between a statute that limits voting in a party's primary to individuals with a requisite

publicly-recorded party preference and a statute, like § 34-904, that dispenses with the latter requirement but otherwise operates identically.

## III. THE REPUBLICAN PARTY FAILED TO ESTABLISH THAT IDAHO'S PRIMARY SYSTEM IMPOSES A "SEVERE BURDEN" ON THE PARTY'S ASSOCIATIONAL INTERESTS

The initial inquiry under *Burdick* requires assessment and categorization of the "burden" imposed under the challenged statute. *E.g.*, *Timmons*, 520 U.S. at 358 ("[w]hen deciding whether a state election law violates First Amendment associational rights, we weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary") (some internal quotation marks omitted). If "severe," only a narrowly-tailored compelling governmental interest will save the law; if a lesser or "non-severe" burden, "a State's 'important regulatory interests' will usually be enough to justify 'reasonable, non-discriminatory restrictions.'" *Id.* (some internal quotation marks omitted). This Court directed the parties in its September 2009 summary judgment ruling to focus on the extent and message-effect of "crossover" voting for purposes of determining the severity of the burden imposed under § 34-904. Doc. 43 at 14-15; 600 F. Supp. 2d at 1201. However, additional considerations, such as the type of "crossover" voter—*i.e.*, whether self-identifying as an Independent or as associated with another political party—and the impact of a registration or other public disclosure of party preference on the level of "crossover" voting, warrant consideration in determining the burden's "character and magnitude."

### A. The Republican Party Failed to Adduce Credible Evidence Concerning the Extent or Nature of "Crossover" Voting in Idaho

The Republican Party relies principally on proffered expert testimony from three witnesses in addressing those questions of material fact specified by this Court: Dr. Munger, Robert Moore, and David Ripley. It also offered anecdotal, non-expert affidavits and deposition testimony from ten individuals: seven unsuccessful candidates for state legislative office, one state representative, one political consultant, and Party Chairman Semanko. In reaching his expert conclusions, Dr. Munger considered the results of voter survey conducted by Moore

Information ("Moore survey") (Ex. 1006), a "case study" (Tr., 160:6) of selected state legislative and congressional races by Mr. Ripley ("Ripley memorandum") (Ex. 1008),[3] and the anecdotal evidence.  Ex. 1004 at 11.  The admissibility and, if otherwise admissible, the probative value of the Moore survey and the Ripley memorandum therefore are central issues in determining the amount and nature of "crossover" voting in Idaho Republican primaries because Dr. Munger did not conduct an independent inquiry into that issue.[4]   Because serious methodological and statistical flaws exist in the survey and memorandum, his testimony offers virtually no assistance in resolving the merits of the Party's challenge to § 34-904.

     **1.    The Moore Survey and Ripley Memorandum Contain Results and Conclusions that Lack Methodological Credibility or Statistical Reliability**

        **a.    Fed. R. Evid. 702 and *Daubert* Standards**

The Supreme Court has assigned "a gatekeeping role for [district court] judges" with respect to the admission of expert testimony under Fed. R. Evid. 702.  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993).[5]  This role extends to "all expert matters described in Rule 702" without regard to whether the asserted expertise relates to "'scientific' knowledge'" or conclusions reached "through use of what Judge Learned Hand called 'general truths derived from . . . specialized knowledge.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999); *see also White v. Ford Motor Co*., 312 F.3d 998, 1007 (2003) ("*Daubert* and *Kumho Tire*

---

[3] The Ripley memorandum is appended to the Second Affidavit of David Ripley as Exhibit A.  Ex. 1008 at 7.  For purposes of this submission, however, the memorandum will be referred to as Exhibit 1008, and citations will be to the relevant page(s) of the memorandum.

[4] The anecdotal evidence, in Dr. Munger's opinion, "g[a]ve zero evidence of statistically significant crossover voting."  Tr., 198:13-14.  He added that while "[t]he people who filed the affidavits all believed that the [successful] candidates did not believe themselves to be Republicans" (Tr., 198:24-199:1), he considered their views to be "an anecdote" and not "evidence" (Tr., 199:5-6).  In light of this testimony, the trial record left unclear what weight, if any, Dr. Munger assigned to the anecdotal evidence in reaching his conclusions.

[5] Rule 702 provides:

    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[do] indeed require that the judge apply his gatekeeping role under *Daubert* to all forms of expert testimony, not just scientific testimony"). As to the latter form of expert testimony, the *Kumho Tire* Court emphasized that four general considerations identified with respect to "scientific" expert testimony outlined in *Daubert* did "*not* constitute a 'definitive checklist or test'" but instead must be applied with an eye to "the particular circumstances of the particular case at issue." 526 U.S. at 150; *see Daubert*, 509 U.S. at 592-94.

Nevertheless, Rule 702 requires as to all proffered expert evidence a foundation that "'establishes a standard of evidentiary reliability'" and, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 590, 592); *see also Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) ("[i]n some cases, statistical evidence may suffer from serious methodological flaws and can be excluded, consistent with the trial court's 'gatekeeping' power, under Rule 702"). It is thus has been deemed in a relevant consideration with respect to proffered scientific evidence "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). In the latter instance, the putative expert ordinarily must establish that the analysis conformed with ordinary standards in the relevant field. *See Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056 (9th Cir. 2003) (discussing standards for admitting scientific evidence "[w]here peer review and publication are absent"). No reason exists, given *Kumho Tire*'s direction that the "gatekeeping" function be discharged flexibly, not to extend the same caution as to non-"scientific" evidence when merited by "the particular circumstances of the particular case at issue."

### b. Application of Fed. R. Evid. 702 And *Daubert* Standards To The Moore Survey And Ripley Memorandum

#### (1) Moore Survey

Moore Information, an opinion research firm with an emphasis on political campaigns (Tr., 12:8-12), conducted a survey on January 6 and 7, 2010 among 400 registered voters who had participated in the 2008 Idaho primary. Ex. 1006. The survey's purpose, as explained by Robert Moore, who was responsible for its design and oversaw its implementation, was "[t]o explore voting patterns among primary voters in Idaho." Tr., 14:17-20. In developing the survey sample and formulating the survey's questions, Mr. Moore consulted with political consultant David Ripley, the Executive Director of Idaho Chooses Life. Tr., 16:25-17:5; Ex. 1007 at ¶ 7; Ex. 1007A at 6:18-10:16; Ex. 1007B at 168:3-169:13. Mr. Moore's undergraduate degree is in Business Administration, and, while he has extensive experience in political polling, no post-graduate degree in any discipline. Tr., 12:20-14:2. He relied on "[j]ust [his] 30 years in the polling business, the public opinion research experience" in formulating the survey's questions. Tr., 17:13-14. Mr. Ripley's background reflects no academic training or professional expertise in drafting polling survey questions. The record established that he first came to Idaho in 1984 to assist a Democratic congressional candidate and, prior to assuming his current position, worked as a political consultant and an Idaho Education Association ("IEA") employee. Ex. 1007 at ¶¶ 2-6. Mr. Ripley possesses an undergraduate degree in philosophy and history and "[took] some courses" in political science 30 years ago while attending the University of Minnesota. Ex. 1007B at 154:3-13. The sole basis for assigning any measure of reliability to the Moore survey is thus Mr. Moore's general experience in conducting political polls.

The trial record, however, negates any contention by the Party that the Moore survey has statistically reliability or speaks meaningfully to the questions identified by this Court in denying the cross-motions for summary judgment. The record shows (1) the voter samples, particularly as to sub-populations, on which the survey's responses are reported were not reliably representative of 2008 primary voters as a whole; (2) the key question in the survey with regard to the "crossover" voting—No. 3—departed from the settled party preference formulation used

consistently by political scientists, and that departure taints the other core "crossover" voting questions—Nos. 15 and 16; and (3) the memorandum reporting the survey's results contained erroneous or misleading statements and failed to acknowledge the survey's weaknesses as to sample representativeness.  Taken separately or in the aggregate, these flaws vitiate any plausible claim of Rule 702 compliance.  The report, for which Mr. Moore vouched in his testimony, instead was not based upon reliable facts or data; was solely the product of his "experience" without any consideration given to, or apparently any knowledge of, fundamental political science standards related to inquiries into voters' party preferences; and summarized the survey's results in a manner that served chiefly to mark the memorandum as advocacy rather than a credible statistical analysis from which this Court may predicate conclusions responsive to the fact issues identified in the September 2009 memorandum.

　　　　　　　**i.  Lack of Representative Sample.**  Approximately 182,000 voters participated in the 2008 Idaho primary.  Tr., 53:14-20; Ex. 2001 at 1.  Mr. Ripley supplied Moore Information with a "sample frame" of 14,000 of those voters from which the actually sampled respondents were drawn.  Tr., 53:21-54:8.  Mr. Moore testified that survey sample size was set at 400 "to get a large enough sample to have some reliability, statistically speaking," and to remain within the client's economic constraints.  Tr., 55:4-9.  The "some reliability" measure as to the representativeness of the sample's responses to the overall group of 2008 Idaho primary voters—*i.e.*, the margin of sampling error ("MOSE")—is plus/minus five percent at a 95 percent confidence level.  Tr., 57:17-25; *see also* Ex. 2104 at 15 (Fig. D-1).   So, for example, Mr. Moore agreed that 12 percent MOSE would be "quite high."  Tr., 60:24-61:1.

　　　　Mr. Moore also testified on direct examination the MOSE must be recalculated when a sub-population of the 400 respondents forms the group whose responses are analyzed.  Tr., 58:13-24, 62:20-63:9.  On recross examination, however, he took the position that the MOSE associated with the responses to the survey's Question 16, whose purpose was to determine how many "non-GOPs" had ever voted in an Idaho Republican primary for a state legislative position, was derived from the 400 overall sample and not the sub-population of the "non-GOPs"— approximately 80 respondents—from whose responses the percentages in the question were

calculated.  Tr., 127:20-25.  This change in testimony on Mr. Moore's part is significant, since the MOSE associated with a sample of 80 is approximately 11 percent and thus approaches, if not within, the "quite high" range identified by him during direct examination.  Ex. 2104 at 15 (Fig. D-1); *see also* Am. Research Group, Inc., *Margin of Error Calculator*, *available at* http://www. americanresearchgroup.com/moe.html (last visited Nov. 12, 2010).  Dr. Munger, who was proffered in part as "an expert in statistical inference" from polling results (Tr., 179:25-180:1), resolved this conflict when he testified that the MOSE for the sub-population measured in Question 16 must be recalculated for that population on the basis of its number.  Tr., 172:6-21; *see also* 174:20-175:11 (classifying the populations measured in Questions 15 and 16 as "subsample[s]," and clarifying his report's statement concerning the MOSE attendant to the Moore survey's results as plus/minus five percent at 95 percent confidence level referred to "the survey as a whole").

Aside from the more than double MOSE attendant to the Question 16 results from the "some reliability" standard of plus/minus five percent at a 95 percent confidence level, other aspects of the survey's results impugn its reliability as a measure of the 2008 primary voters as a group.  Most telling were the results in the presidential and United States Senate balloting summarized in Tables D-2 and D-3 of the Martin-Saunders report.  Ex. 2104 at 8-9.  They show in part that, while then-Senator Obama received only 14.24 percent of the actual presidential primary vote, 28.43 percent of the survey respondents reported voting for him.  Then-Senator Clinton's percentages reflected the opposite; she actually received 9.58 percent of the vote, but only 4.35 percent of the survey respondents reported as voting for her.  The same general pattern existed for Senator McCain and Representative Paul, with survey respondents reporting 12.6 percent higher support for the Senator and 60.17 percent less support for the Representative than the actual voting.  The successful Democratic and Republican candidates in the Senate primary also polled at substantially higher support levels than reflected in the actual tally.  The comparisons reported in Tables D-2 and D-3 excluded those respondents who answered "don't know/don't remember" to how they voted in these primaries, but their inclusion did not alter materially the skewed percentages between successful and unsuccessful candidates.  *See* Ex.

2113 at 2.

It is plain from these election-result data that the overall sample provides an unreliable portrayal of the 2008 primary voters as a whole. The "exceptionally high" MOSE attendant to Question 16 sub-population is another manifestation of the Moore survey's failure to secure a representative sample. The precise cause of unreliability—*e.g.*, the absence of sufficiently robust pre- or post-survey weighting protocols (Tr., 35:11-36:5, 37:15-39:21), inadequate controls for the effect of the "social desirability" phenomenon (Tr., 22:9-23:17, 32:5-33:15), or the fact that the survey was conducted 19½ months after the last primary election with attendant loss of memory (Tr., 29:21-32:4)—may be debated, but the fact remains that the Moore survey reported results for a sample that was not representative of 2008 primary electorate.

**ii. Improper Question Formulation.** Mr. Moore agreed that the construction of the survey's questions was "extremely important" because, as he stated in answer to a later question, "[t]hat's what they responded to." Tr., 18:2-5, 20:24-25. Despite that recognition, the survey's key questions failed to address straightforwardly the purpose for which the results eventually were offered: to establish the extent of "crossover" voting in Idaho Republican primaries. The Moore survey instead pursued an idiosyncratic query trail that, statistical reliability issues aside, ultimately leads to no reliable inferences concerning "crossover" voting patterns.

**a.** Question 3 in the Moore survey provides the foundation upon which the Republican Party grounds its attempt to answer the first question posed in this Court's September 2009 decision. Although it is described in Mr. Moore's memorandum as addressing "party affiliation" (Ex. 1006 at 2 (capital letters removed)), the question actually asks the respondent how he or she "usually vote[s]" with reference to four categories—"mostly or only" for Democrats or Republicans and "a few more Democrats than Republicans." *Id.* at 5. Mr. Moore clarified during his testimony that two other reported categories—"the person/Independent" and "don't know"—were not given as alternatives but, instead, had to be volunteered by the respondent. Tr., 96:11-21, 120:22-121:23. He acknowledged that the question was directed to voter behavior. Tr., 20:5-10. Mr. Moore justified the question's formulation because he had

used a similar one in other polls and considered voting history to be a proxy for "party affiliation." Tr., 45:1-4, 66:21-67:3.

Mr. Moore did not consult any political science material in formulating the question (Tr., 65:10-17) and had no knowledge of the American National Election Studies ("ANES") (Tr., 46:8-15) or, as far as the trial record shows, its "canonical" survey question on party preference: "Generally speaking, do you think of yourself as a Republican, a Democrat, an Independent, or what?". *See* Ex. 2105 at 5-6. He dismissed the ANES formulation with the observation that "[t]hese are academicians" who are "not working in the real world when we're trying to find out what's going on out there." Tr., 66:15-16. Notwithstanding his unfamiliarity with relevant studies or even the preeminent scholarly organization on election studies, he responded "I don't believe it" when asked whether he was "aware of the fact that in virtually all of the . . . political science literature, in studying crossover voting and voting behavior," some formulation of the ANES question has been posed. Tr., 65:25-66:8; *see* Ex. 2105 at 4 (discussing general use of ANES question or a close approximation).

The Martin-Saunders report explains the rationale for party preference questions directed to attitudinal predisposition and not actual voting behavior with reference to the "funnel of causality." Ex. 2105 at 2-3. The funnel's diagram makes clear that an elector's actual vote is the product of not simply "party attachment" but also a range of other considerations and that "party attachment" ordinarily is formed at an intermediate stage in the decisional process preceding the actual vote. *Id.* at 3 (Fig. E-1); *see also* Tr., at 218:7-13 (Dr. Munger observing that "the [Martin-Saunders] report does a good job of describing the funnel of causation reasoning that leads [ANES] to think that that's the best question"). Dr. Munger thus testified that, in light of the lack of party registration requirement under Idaho law, "I would like to have both" although "if I had to pick one, I'd use voting." Tr., 217:23-24.[6]

---

[6] Dr. Munger testified that the ANES developed and implemented its formulation at a time when party preference designation "was more common" and that the formulation has been continued to facilitate maintaining a time series of survey results. Tr., 216:1-12. The logic of this assertion is murky because it appears premised only on the proposition that self-identified party preference can be compared against publicly available party-preference data generated in a particular State as, in essence, a crosscheck. Tr., 218:18-219:3. At most, however, such a comparison would appear

This testimony, when read in conjunction with the Martin-Saunders report, leads to the conclusion that the Moore survey was deficient methodologically by its failure to include a separate question directed to voter party preference "attitude."   In not doing so, the survey departed from the framework consistently used in political science studies and ignored the accepted principle that voting behavior is not co-extensive with party preference but, as reflected in the funnel of causality, affected by many other factors.   *See, e.g.*, Ex. 2105 at 5 n.1.   The survey's deficiency in this regard is particularly damaging because 40 percent of the survey group fell within the "[a] few more Republicans than Democrats," "the person/Independent" and "[a] few more Democrats than Republicans" categories that separate respondents on the basis of very fine distinctions and that make the "party affiliation" proxy relationship assumed by Mr. Moore highly questionable.   Also significant is that the only justification suggested by the Republican Party's witnesses for not including one more question was the potential additional cost, but the Party itself has never contended lack of resources was the reason or estimated what the cost would have been.   *See* Tr., 219:7-13 (Dr. Munger justifying the "behavioral" focus of Question 3 on "cost constraints").   In sum, the survey failed to ask a key question with no legitimate justification, and this failure raises significant doubt over the reliability of its results insofar they purport to quantify the extent of "crossover" in Idaho.   "Crossover" voting, in other words, may well occur in this State's primary elections, but the Moore survey is not a reliable analysis of *how much* "crossover" voting is taking place.

**b.**     Question 3 was deficient in another material respect: It failed to give respondents the opportunity to self-identify as having no party preference or as Independents.   Only those respondents who volunteered as voting for "the person" or as being an "Independent" were so classified.   The likely effect was to reduce the proportion of respondents who, if given the category, would have classified themselves as Independents.   The skewing effect can be seen in the significant difference between the "the person/Independent" percentage in the Moore survey

---

relevant only to whether a representative sample existed—an obviously important consideration but one which can be addressed through a properly implemented survey attended by reliable—*i.e.*, at least within plus/minus five percent MOSE at a 95 percent confident level.

and the "Independent" percentage in the party identification analysis conducted by the Boise State Public Policy Center.  Ex. 2102 at 2.  The Moore survey thus gives no guidance on how much partisan "crossover" voting exists in Idaho even if its "non-GOPs" results merited acceptance.  The absence of guidance renders the survey unsusceptible to comparison with other relevant studies that examine "attitudinal party identification" or, as an arithmetic matter, determining the level of partisan "crossover" voting.  *See* Ex. 2105 at 9 ("[a]ttitudinal party identification is a fundamental measure by which we can determine crossover voting, especially if partisan registration data are not present"); *id.* at 15 ("how you conceive of and measure crossover voting determines how much crossover voting you will find") (emphasis removed).  Once again, Moore Information made a methodological choice—conducting a survey that did not offer respondents to an opportunity to disclaim any party preference or affiliation—that vitiates the survey's reliability as to a potentially important aspect of the Party's First Amendment challenge: the extent of "crossover" voting by non-Republican partisans.

       **c.**      Question 16 embodies the Moore survey's most direct attempt to measure the extent of "crossover" voting in Idaho primaries and is limited to state legislative offices.  It is directed to a quite specific sub-population of "Non-GOPs": The 41 percent of respondents who fell within Question 15's "I always vote for Democrats[,]" "I usually vote for Democrats[,]" and "I vote for more Democrats that Republican" categories.  It has two fundamental flaws that go to its reliability as a measure of "crossover" in any particular Republican primary.  First, it asks respondents if they have "*ever* voted in a Republican primary for a State Legislative candidate?".  Ex. 1006 at 9.  It therefore says nothing probative about the frequency *or* locus of the queried "crossover" activity and is necessarily an unreliable measure of how much "crossover" voting occurred in the 2008 or any other Idaho primary.  Second, the question's inclusion of Question 15 "I always vote for Democrats" respondents was improper since, to the extent any of those respondents are included within the "yes" category, their responses between the two questions are legally inconsistent. Mr. Moore had no explanation for their inclusion and no knowledge of how many respondents in the "yes" category were derived from the "I always vote for Democrats" group.  Tr., 51:14-52:5.  Those respondents, moreover, should have excluded from

the sub-population examined in Question 16, and that exclusion would have reduced the sub-population by almost 25 percent and increased the MOSE at a 95 percent confidence level to approximately 11.7 percent.

    **iii. Inaccurate and Misleading Survey-Results Memorandum.** Mr. Moore's January 14, 2010 memorandum (Ex. 1006) to the Republican Party's counsel is replete with mischaracterizations of the survey results and failure to acknowledge the survey's anomalous results when compared to actual voter data.

- The "Methodology" section on page 1 reports "[t]he potential sampling error associated with this survey is plus or minus 5% at the 95th confidence level." [Emphasis remove.] As discussed above, the MOSE at that confidence level increases when sub-populations are measured. Thus, for example, the MOSE for the sub-population examined in Question 16 is more than twice the MOSE reported in the "Methodology" entry.

- The "Summary" section on page 1 begins with the statement that "[a] significant number of Idaho voters who do not consider themselves to be Republicans[] have voted in GOP primaries." As the survey questions indicate and as Mr. Moore himself testified, respondents were not asked to self-identify by party preference. The "attitudinal" component of voter party preference was not examined.

- The "Party Affiliation" section title on page 1, as well as the "Party Affiliation" heading on page 2, is a misleading characterization of the survey data. Respondents were not asked about their "party affiliation" but instead were asked only about voter behavior. Again, Mr. Moore described the survey "[t]o explore *voting patterns* among primary voters in Idaho primaries." Tr., 14:17-20 (emphasis added).

- The "Primary Voting Patterns" section on page 3 describes the survey results with respect to the 2008 federal office primaries. The description fails to note the significant differences between the survey's and actual results--differences that Moore Information knew or should have known existed. Plainly enough, so doing would have created substantial, and warranted, doubts about the sample representativeness of the entire 2008 Idaho primary electorate.

    These departures from an objective summary of the survey results are not trivial. Rather,

they go to the very heart of its statistical reliability, *i.e.*, the errors of commission and omission in the "Methodology" and "Primary Voting Patterns" sections—and the very question of whether it measures "crossover" voting by reference to *party preference/affiliation* or simply to *voter behavior*—*i.e.*, the mischaracterizations contained in the "Summary" and "Party Affiliation" sections.

### (2) Ripley Memorandum

The Ripley memorandum offers claimed expert analysis concerning the existence and, and in certain instances, the amount of "crossover" voting in nine state legislative and one congressional primary elections.   Ex. 1008 at 1.   Mr. Ripley concludes, *inter alia*, that the outcome of four state legislative elections was changed by Democratic "crossover" voters and that the outcome of four other state legislative races might have been altered.   *Id.* at 1-2.   These conclusions are predicated on one metric—"bullet balloting"—reflected in higher levels of voting in down-ticket state legislative races than in "top-of-the-ticket" statewide or federal races, and his "bullet balloting" analysis consists of simple arithmetic calculations.   *Id.* at 1.   Mr. Ripley attributes what he believes is abnormally high balloting in the lower tier races to Democratic "crossover" voting resulting, in most of the races, from an IEA strategy to secure election of Republican candidates favorably disposed toward its policy goals.   Assuming that the deviation in total vote from what might otherwise be expected in the purportedly targeted race, he then draws conclusions about the amount and effect of the perceived "Democratic cross-over voters" on the involved race's outcome.

As developed above, Mr. Ripley has no significant academic background in political science or in statistical theory or methodology.   *See* Ex. 1007A at 37:21-23.   His brief election-by-election analysis does not reflect an extensive inquiry into the dynamics of the particular race or the ideological composition of the "Republican" electoral base.   The Martin-Saunders report details the methodological shortcomings of Mr. Ripley's memorandum and associated analysis. Ex. 2108.   They are multiple and include, perhaps most fundamentally, his failure to examine other explanations for the perceived "bullet-balloting."   The Martin-Saunders report observes with respect to his overall analytical approach that "[w]ithout considering other alternative

explanations for these patterns, it is impossible to know whether the patterns are caused by crossover voting or something else." *Id.* at 3 (emphasis removed).  This failure reflects Mr. Ripley's falling prey to the "ecological fallacy" insofar as he draws "inferences about specific individuals by only looking at aggregate data"—*i.e.*, he assumes from the perceived presence of an organized "Democratic" effort to encourage participation in a Republican primary that the "bullet ballot[s]" were cast by "Democrats." *Id.*  The Martin-Saunders report further applies the "method of bounds" with reference to the 2006 Latah County state senate primary race between Gary Schroeder and Gregg Vance to show the wide variation in "potential Democratic crossover voters" even were Mr. Ripley's assumptions about the size of the "crossover" vote accepted.

The Republican Party did not respond directly to the Martin-Saunders report's analysis. Instead, Dr. Munger's testimony served chiefly to underscore the Ripley memorandum's unreliability.  He characterized Mr. Ripley's input as "black-swan analysis or existence-proof analysis" and that "[t]here's no data . . . in [his] reports." Tr., 159:19-160:3.  It was, again in Dr. Munger's view, "a process-tracing technique" or "case study" that "has no statistical validity." Tr., 160:5-13.  He acknowledged that no reason existed "to say that there's any general statistical inference we can make about the prevalence of crossover voting from his analysis" and that "[t]here are other hypotheses, alternative hypotheses, . . . that might explain these same data." Tr., 207:3-6, 208:18-21.  In short, although deeming Mr. Ripley's analysis "appropriate," Dr. Munger had "never seen anything like it in political science." Tr., 261:2-4.

Mr. Ripley's memorandum and his related deposition testimony clearly do not satisfy Rule 702.  His failure to examine alternative explanations for the perceived "bullet-balloting" means that his proffered analysis not "based upon sufficient facts or data."  The mathematical assumptions made concerning the amount of "crossover" voting by "Democrats" is not "the product of reliable principles and methods."  His analysis instead exemplifies the "ecological fallacy" and asserts a high degree of precision where, as shown through application of the "method of bounds," none exists.  *See Democratic Party Wash. State v. Reed*, No. C00-5419FDB, 2002 WL 32925223, at *11 (W.D. Wash. Mar. 27, 2002) (denying admission of analysis purporting to establish that "more voters were allowed to participate in the party's

primary than were known to be supporters of the party" because the analyst "reached his conclusions by simply performing mathematical calculations" upon otherwise unsupported assumptions), *rev'd on other grounds*, 343 F.3d 1198 (9th Cir. 2003). Since Mr. Ripley did not apply accepted "principles and methods," the third Rule 702 requirement becomes moot. His memorandum and testimony do not pass through the *Daubert* gateway.

### 2. The Munger Report Has No Reliable Idaho-Specific Findings Because of Its Reliance on the Moore Survey and Ripley Memorandum

Unlike the Republican Party's other proffered experts, Dr. Munger is qualified to offer opinions about the nature of "crossover" voting generally and in Idaho specifically. The question here instead is the "data sources" referred to in Part III.D of his report (Ex. 1004 at 14) upon which he makes conclusions about this State: the several "anecdotal" affidavits from unsuccessful primary candidates and other individuals associated with those candidates or the Party itself; the Moore survey; and the Ripley memorandum. The Idaho-specific conclusions appear in Part III.A of his report and, in summary, find (1) that "crossover" voting occurs here (*id.* at 11) and (2) that, based upon the Moore survey results, "more than half of those registered something other than Republicans have voted in Republican primaries[,]" with "most of these . . . actually [being] Democrats, in terms of their own self-reported voting habits and preferences" (*id.* at 12). At trial, Dr. Munger also relied on the Ripley memorandum as reflecting Mr. Ripley's "claim" that "the [successful] candidates were not really Republicans, that they were Democrats, that their voting records differed significantly from other Republicans" and deemed them examples of "Trojan Horse candidates"—as species of "crossover" activity that he has created. Tr., 194:17-195:4; *see id.* at 187:12-14 (Munger characterizing the "Trojan Horse" category as a "neologism" because "[a]s far as I know, I made it up").

Experts are permitted under Fed. R. Evid. 703 to base "an opinion or inference" upon "facts or data" that have been "made known to expert at or before the hearing" even if those "facts or data" are inadmissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." These aspects of Rule

703 have been in place since the Federal Rules of Evidence were enacted in 1975.  Pub. L. 93-595, 88 Stat. 1926 (1975).  The Advisory Committee Notes to the 1972 proposed rules stated that this aspect of the Rule was "designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of experts themselves when not in court."  The Advisory Committee gave as an example "facts or data" supplied by others—*e.g.*, patients, relatives, and notes or reports from other medical professionals—and reviewed by the expert a physician for diagnostic purposes.  As Committee observed, "[t]he physician makes life-and-death decisions in reliance upon them[,]" and by logical extension, "[h]is validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes."

The Advisory Committee's example underscores that the flexibility Rule 703 provides comes with a corresponding duty to ensure that the "facts or data" relied upon has been developed consistently with those standards of reliability recognized by the relevant discipline.  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088-89 (N.D. Cal. 2006) (rejecting challenge to expert's reliance on test results prepared by laboratory "according to methods commonly accepted in the industry"), *aff'd*, 221 Fed. Appx. 996 (9th Cir. 2007).  The testifying expert nonetheless "may not adopt another's data without verifying the validity and reliability of that data."  *Id.* at 1088.  Here, the requisite independent verification was not shown to have taken place.  The discussion above establishes that the Moore survey lacked the requisite representative sample generally and that, even were such a sample present at the 400 respondent level, its estimates of "crossover" voting by "non-GOPs" are seriously tainted by a MOSE at 95 percent confident level at approximately plus/minus 11 percent.  Dr. Munger thus admitted during his testimony that his report's concluding statement about confidence in the survey's results at a plus/minus five percent level referred only to the analysis at the overall 400-respondent level and that the MOSE must be recalculated for sub-populations.  Tr., 174:20-175:11.  The record indicates that Dr. Munger neither examined independently whether a representative sample existed (Tr., 168:11-22) nor considered the much higher MOSE attendant to the Question 16 results.  So far as the record reflects, Dr. Munger simply took Mr. Moore's

memorandum at face value.  His report's conclusions predicated on the survey, which go to the amount of Idaho "crossover" voting, are therefore compromised and should be given no weight.

Dr. Munger's reliance on the Ripley memorandum was similarly inappropriate.  While he may have verified the accuracy of Mr. Ripley's arithmetic calculations, the flaws in the latter's analysis related to his failure to examine rigorously a full suite of alternative explanations, his improper assumptions with respect to amount of purported "crossover" voting, and the failure to apply a "method of bounds" analysis to assess the possible range of the potential "crossover" voting by "Democrats" even if he had appropriately identified that amount.  Once again, there is nothing in the record to show that Dr. Munger scrutinized Mr. Ripley's analysis with rigor.  That failure is particularly significant given Dr. Munger's acknowledgment of the anomalous character of the Mr. Ripley's "case study" approach in identifying what Dr. Munger, but apparently not Mr. Ripley, viewed as the "black swan"—*i.e.*, the existence of Trojan Horse candidates.  *See* Ex. 1007B at 137:4-8 (Mr. Ripley deposing that "[s]o it's not a question of sabotaging and all that nonsense.  It's more a question of trying to get pro-education or pro-environment Republicans elected, because they can't elect Democrats").  Consequently, to the extent that Dr. Munger relied on the Ripley memorandum during his trial testimony for purposes of validating his neologism's actual existence, his testimony should be given no weight.[7]

The only valid conclusions remaining in Dr. Munger's written analysis and testimony, once stripped of reliance on the Moore survey and the Ripley memorandum, are those appearing in Part III.B and C of the report.  Those conclusions are non-Idaho specific and establish only his view that political science "literature" finds "crossover" voting in every State with an open primary and sets out his view about the negative consequences of such voting.

---

[7] The Martin-Saunders report devotes two chapters to the Trojan Horse hypothesis as a general strategy and with specific reference to the Idaho Legislature.  Exs. 2106 & 2107.  As the report explains, a Trojan Horse candidate is likely consigned to "one-and-done" status, and the strategy therefore makes little long-term political sense.  Ex. 2106 at 1, 3.  The strategy has other significant drawbacks, including the need for "a great deal of coordination among candidates and voters."  *Id.* at 3.  The report additionally contains a quite-detailed analysis of voting records for three sessions of the Idaho Legislative—*i.e.*, 2003 through 2008—of each state representative and senator.  Ex. 2107 at Figs. G-1 – G-6.  Overall, the voting patterns reflect a clear distinction between Democratic and Republican lawmakers.  *See id.* at Figs. G-1 – G-3.

**B.   The Republican Party Offered No Evidence Establishing That Requiring Public Disclosure Of Party Preference At The Time Of Requesting A Ballot Would Affect Materially The Amount Of "Crossover" Voting**

There is, or should be, no dispute over the proposition that the Republican Party's associational-rights claim would evaporate if, at the time requesting a primary ballot, an elector was required to designate the political party in whose primary the elector wished to participate. The combination of disclosure and the attendant limitation of the franchise to candidates on the selected party's primary ballot would embody the requisite party affiliation.  The *Clingman* plurality opinion's favorable reference to Justice Stevens' dissent in *Jones* merits repeating on this point: "[D]isaffiliation is not difficult" under Oklahoma law since "'anyone can "join" a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election.'"   544 U.S. at 590.  Although the Court was addressing there the burden imposed on voters by the statute's "affiliation" requirement, the fact remains that the request for a ballot juxtaposed with public disclosure of the ballot requested manifests the elector's intent to affiliate with the particular party for purposes of that primary election.   The Republican Party can claim no greater "affiliation" threshold as a matter of constitutional right.

The issue therefore becomes whether the lack of public disclosure of party preference under § 34-904 creates a "severe" burden on the Republican Party's associational rights. Nothing in the record so suggests.   Admittedly, public disclosure would increase by some incremental measure the "cost" of party affiliation.   *See* Tr., 355:4-356:2, 362:1-14, 377:9-14. Even the Party's counsel suggested, however, that a party registration requirement would not set "a very high bar." Tr., 376:14-24. Also militating against anything greater than the *de minimis* impact of a public disclosure requirement is the Party's heavy reliance—as manifested most keenly in the Ripley memorandum—on the IEA's claimed efforts to channel "Democrats" into certain Republican primaries.  Those "crossover" get-out-the-vote campaigns were not, under the Party's account, conducted in a *sub rosa* fashion; rather, high visibility was a central component to the strategy's success because it served to increase the "crossover" turnout.   Under these

circumstances, the "cost" of disclosing publicly the identity of the party whose primary ballot is requested is markedly low, if not wholly non-existent.  Simply put, a "Democrat" to whom the IEA purportedly was speaking had no significant disincentive not to disclose party identification for purposes of the primary because the elector had been urged quite openly by what the Republican Party views as a "Democrat"-controlled organization to engage in "crossover" voting.

Absent evidence that a public-disclosure requirement would have a non-trivial impact, the approach to primary-ballot access adopted by Idaho in § 34-904 must be held as imposing a "non-severe" burden on the Republican Party's associational rights.  The true "cost" of participating in a particular party's primary is the inability to have a voice in the outcome of another party's primary.   An elector who decides to forego that opportunity, as the questioning of Dr. Saunders by the Party's counsel indicated, is unlikely to be dissuaded by a public disclosure requirement.

## IV. IDAHO'S INTERESTS IN BALLOT SECRECY AND ELECTION DAY REGISTRATION JUSTIFY THE "NON-SEVERE" BURDEN PLACED ON THE REPUBLICAN PARTY'S ASSOCIATIONAL RIGHTS

As the Supreme Court reiterated most recently in *Clingman*, "[w]hen a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'"  544 U.S. at 593 (quoting *Timmons*, 520 U.S. at 358).  Instantly, Idaho has at least two such interests: maintaining maximum ballot secrecy and effective administration of its same-day-registration statute, Idaho Code §34-408A, as well as avoiding changeover costs.

The Idaho Constitution since its adoption has guaranteed "[a]n absolutely secret ballot." Art. VI, § 1, Idaho Const.  While arguably comparable ballot-secrecy provisions have been held generally not to *preclude* a closed primary system by requiring party preference to be disclosed,[8] Idaho nevertheless has a legitimate interest not only in avoiding litigation over that question but

---

[8] *E.g.*, *O'Callaghan v. State Dir. of Elections*, 6 P.3d 728, 731-32 (Alaska 2000); *Ferency v. Sec'y of State*, 476 N.W.2d 417, 424 (Mich. Ct. App. 1991); *State v. Beggs*, 271 P. 400, 401-02 (Kan. 1928); *Hager v. Robinson*, 157 S.W. 1138, 1143-44 (Ky. 1913); *Katz v. Fitzgerald*, 93 P. 112, 113 (Cal. 1907).

also in ensuring a degree of ballot secrecy beyond that which may be dictated constitutionally. In *Jones*, for example, the majority opinion declined to assign *compelling-state-interest* status to "the protection of privacy." 530 U.S. at 585. It did not suggest, however, that maximizing elector privacy is not a legitimate and non-discriminatory public policy goal, particularly in light of state constitutional provision that directs "absolute[]" ballot secrecy. Nothing in the record stands for the contrary.

Idaho adopted its same-day-registration statute in the wake of Congress' passage of the National Voter Registration Act ("NVRA"), 42 U.S.C. §§ 1973gg-1973gg-10. The NVRA imposes various requirements on States with respect to the conduct of elections for federal office but provided an exemption from those requirements for States "in which, under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of this [Act], so long as that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office." *Id.* § 1973gg-2(b)(2). This State had then, and has now, a strong interest in avoiding the administrative costs accompanying compliance with the federal law. *See ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 133 (D. Conn. 2005) (only three States used the exemption—Idaho, New Hampshire, and Wyoming; Wyoming Secretary of State "confirmed [through deposition testimony] that [election day registration] was adopted in Wyoming to avoid the costs of implementing the NVRA"). It has an equally strong interest in facilitating access to the voting booth—an interest that the NVRA sought to protect as to federal office elections through its requirements and the "carrot" (*ACORN*, *supra* at *id.*) provided to States that adopted same-day-registration statutes. A public disclosure requirement would carry with it the need to create separate ballots, as opposed to the single ballot now used, and would impose new administrative burdens and costs on, most importantly, county election officials because they would have to be prepared for demands for each party's ballot that would be difficult, if not impossible, to gauge prior to the election. This uncertainty could be addressed by imposing a registration deadline prior to the day of voting, but exercising that legislative option would subject Idaho to NVRA-mandated procedures. The Republican Party thus effectively

seeks to place the State between Scylla and Charybdis.  Lastly, Idaho has an interest in avoiding the substantial changeover costs.  It is entirely rational, and plainly political party-neutral, to chart a path that avoids both.

### **CONCLUSION**

Judgment should be entered in favor of Defendant Ysursa.

DATED this 16th day of November, 2010.

_/s/ Michael S. Gilmore_
Michael S. Gilmore
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of November, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

J E SUTTON & ASSOCIATES
200 N. 3rd St., Ste. 2 & 3
Boise, ID 83701
(208) 336-4444
Fax: (208) 336-4444
Email: jesutton@jesutton.com

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: _____
☒ CM/ECF

Gary Allen
GIVENS PURSLEY
P.O. Box 2720
Boise, ID 83701-2720
garyallen@givenspursley.com

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: _____
☒ CM/ECF

Harry Kresky
LAW OFFICE OF HARRY KRESKY
250 W. 57th Street, Suite 2017
New York, NY 10107
212-581-1516
harrykres@aol.com

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: _____
☒ CM/ECF

Christ T. Troupis
TROUPIS LAW OFFICE P.A.
1299 E. Iron Eagle, Ste. 130
P.O. box 2408
Eagle, ID  83616
Fax: (208) 938-5482
ctroupis@troupislaw.com

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: _____
☒ CM/ECF

_____/s/ Michael S. Gilmore_____
Michael S. Gilmore
Deputy Attorney General