UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO REPUBLICAN PARTY, and NORM SEMANKO, Chairman,<br><br>        Plaintiffs,<br><br>   v.<br><br>BEN YSURSA, In his Official Capacity as Secretary of State of the State of Idaho,<br><br>        Defendant. | Case No. 1:08-CV-165-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

This case presents the question whether the State of Idaho's use of an open primary system to determine nominees for the general election violates the Idaho Republican Party's First Amendment rights. Because the open primary permits substantial numbers of independent voters, as well as voters associated with other political parties, to "cross over" and participate in the Republican Party's selection of its nominees, the Court concludes that, by mandating such a nomination process, the State violates the Party's constitutionally guaranteed right to freedom of association.

The Idaho Republican Party and its Chairman, Norm Semanko, brought this action against Idaho Secretary of State Ben Ysursa, to challenge the State of Idaho's use of an

open primary to select candidates for the general election. Several interested groups have been permitted to intervene, including: (1) a group of Idaho registered voters who do not align themselves with any political party, and who consider themselves independents; (2) the American Independent Movement of Idaho, LLC ("AIM"); and (3) the Committee for a Unified Independent Party, Inc. ("CUIP"). *Motion to Intervene*, Dkt. 3. Neither the Democratic Party nor the Libertarian Party, both of which have had nominees selected using Idaho's open primary over the last 5 election cycles, have sought leave to intervene in this suit.

The Court conducted a bench trial on October 13-14, 2010. The parties then submitted their post-trial briefs. The Court now issues its final decision.

## ANALYSIS

### Current System for Primary Elections in Idaho

Current Idaho law requires registration of voters[1] for federal, state and county offices, and allows registration and voting on election day. However, Idaho's election laws do not require a declaration of party affiliation to register or vote in primary or general elections. Idaho Code §§ 34-404, 34-408, 34-408A, 34-401– 34-439 generally, 33-904 (2008).

A "political party" is defined in Idaho's election laws as "an affiliation of [voters]

---

[1] The Idaho election law refers to voters as "electors." To make the Court's decision more understandable to the lay reader, the court will substitute the term "voter" for "elector" in quoting from and referring to the Idaho statutes governing elections, unless the context requires otherwise.

representing a political group under a given name as authorized by law," Idaho Code § 34-109 (2008), and as "an organization of [voters] under a given name." Idaho Code § 34-501(1) (2008). Political parties may qualify for the ballot in any of three ways: (1) having three or more candidates for Federal or State office on the general election ballot; (2) polling 3% of the vote for governor or presidential electors; or (c) by submitting a petition containing signatures of voters equaling 2% of the votes cast during the most recent presidential election. Idaho Code § 34-501(1)(a)-(c) (2008). Qualified political parties must hold state conventions and have state central committees. Idaho Code § 34-501(2) and § 4-504 (2008). With certain exceptions not relevant here, Idaho law requires that political party general election candidates for federal, state and local office be chosen in the Idaho primary election. *Ysursa Aff.*, Dkt. 26-3, ¶ 5; Idaho Code § 34-703(1) (2008).

Idaho's primary election is an "open primary" system. Although any qualified voter may vote in the primary election without prior registration as a member of a political party, the voter must choose a single political party for which to cast his/her votes in the primary. Thus, a voter may cast his/her primary ballot for candidates of one, and only one, political party in the primary election. The voter's decision as to which political party's primary contest to participate in is made in the privacy of the voting booth and not by declaration to election or party officials. *Complaint*, Dkt. 1, ¶ 26; *Answer*, Dkt. 5, ¶ 18; *Ysursa Aff.*, Dkt. 26-3, ¶¶ 8, 10; Idaho Code § 34-2410(1)(d) (2008).

The open primary system is enforced in a number of ways. With respect to paper

ballots, the Idaho election law provides that "there shall be a single primary election ballot on which the complete ticket of each political party shall be printed. . . . Each political ticket shall be separated from the others by a perforated line that will enable the [voter] to detach the ticket of the political party voted from those remaining." Idaho Code § 34-904. Thus, Idaho primary election paper ballots are prepared so that all of a political party's candidates are grouped together and physically separated from the candidates of all other political parties on the ballot. *Ysursa Aff.*, Dkt. 26-2, ¶ 10; Idaho Code § 34-904. Voters are allowed to place votes for only one party in the ballot box. *Ysursa Aff.*, Dkt. 26-2, ¶ 10. Ballots tallied by optical scanner or computer punch card readers use programs that do not count ballots which contain votes for candidates from multiple political parties. *Ysursa Aff.*, Dkt. 26-2, ¶ 10; Idaho Code § 34-2410(1)(d)-(h).

### Constitutional Limits on the States' Regulation of Election Laws

In our federal system, the state plays a major role in structuring the primary election process. But the process by which a political party selects its nominees for general elections is not a wholly public affair which a state may freely regulate. *California Democratic Party v. Jones*, 530 U.S. 567, 573-74 (2000). A state must act within constitutional limits when it regulates a political party's internal processes. *Id*. Among those constitutional limits is the First Amendment right to freedom of association, which protects the freedom to join together in furtherance of common political beliefs. *Jones*, 530 U.S. at 575 (Internal quotations and citations omitted). This right "necessarily presupposes the freedom to identify the people who constitute the association, and to limit

the association to those people only." *Id*. An important corollary of the right to freely associate is a right not to associate. *Id*.

This political freedom of association (and right to exclude) is most critically manifested in the political party's process of selecting its nominees. This process "often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id*. (Internal citations omitted). For this reason, the Supreme Court consistently "affirm[s] the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party select[s] a standard bearer who best represents the party's ideologies and preferences." *Id*. (Internal citation and quotations omitted).

Thus, when a court considers a challenge to state election law, the court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takashi*, 504 U.S. 428, 434 (1992) (Internal citations and quotations omitted). Under this standard, the rigorousness with which a court inquires into the propriety of a state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights. *Id*. On the one hand, a state regulation must be narrowly drawn to advance a compelling state interest

when First and Fourteenth Amendment rights are subjected to severe restrictions. *Id*.; *see also Washington State Grange v. Washington State Republican*, 128 S.Ct. 1184, 1192 (2008). On the other hand, a state's regulatory interests generally justify the restrictions when the provision of a state election law imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of the voters. *Id*.; *see also Washington State Grange*, 128 S.Ct. at 1192.

### The Idaho Republican Party's Challenge to Idaho's Primary Election Statutes

In June 2007, the Idaho Republican Party State Central Committee adopted the Closed Republican Party Primary Rule. It states in relevant part that "[o]nly persons who have registered as a Republican prior to the Primary Election will be allowed to vote on an Idaho Republican Party ballot in that Primary Election." *Semanko Aff.*, ¶ 9, Dkt. 28-4. The Idaho Republican Party asserts that, in light of the Closed Republican Party Primary Rule, Idaho's primary election statutes violate its freedom of association.

The Supreme Court concluded in *Democratic Party of the United States of America v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981), and reaffirmed in *California Democratic Party v. Jones*, 530 U.S. 567, 573-74 (2000), that allowing nonparty members to participate in the selection of a party's nominee in conflict with the party's expressed desires constitutes a "substantial intrusion into the associational freedom" of the party's members. *Jones*, 530 U.S. at 576 (*citing La Follette*, 450 U.S. at 126. In *Jones*, four political parties – the California Democratic Party, the California Republican Party, the Libertarian Party of California, and the Peace and Freedom Party –

MEMORANDUM DECISION AND ORDER - 6

filed suit against the California Secretary of State after citizens of California adopted Proposition 198. Proposition 198 changed California's partisan primary from a closed primary, in which only a political party's members could vote on its nominees, to a blanket primary, in which each voter's ballot lists every candidate regardless of party affiliation and allowed the voter to choose freely among them.

The plaintiffs alleged that California's new blanket primary violated their First Amendment right of association. The District Court held that the blanket primary did not place a severe burden on the political parties' right of association. *Id*. at 571. The District Court therefore concluded that state interests justified the blanket primary. *Id*. at 571. The Ninth Circuit adopted the District Court's reasoning and affirmed the decision. The Supreme Court reversed after concluding that the blanket primary caused a heavy burden on a political party's associational freedom, and that it was not narrowly tailored to serve a compelling state interest. *Id*. at 582.

This case is somewhat different from *Jones* because, unlike the blanket primary created by California Proposition 198, Idaho statutes mandate an open primary. As the Supreme Court explained in *Jones*, "[a]n open primary differs from a blanket primary in that, although as in the blanket primary any person, regardless of a party affiliation, may vote for a party's nominee, his choice is limited to that party's nominees *for all offices*." *Id*. at 576, n.6 (Italics in original). For example, a voter may support a Republican nominee for Governor and a Democratic nominee for Attorney General in a blanket primary. The voter cannot do that in an open primary. *Id*. In *Jones*, the Supreme Court

recognized that "the blanket primary . . . may be constitutionally distinct from the open primary. . . ." *Id*. at 577. Thus, in *Jones*, the Supreme Court was not required to determine the constitutionality of open primaries like the one held in Idaho. *Id*. at 577, n.8.

Recognizing the difference between blanket and open primaries, this Court nevertheless finds the Supreme Court's analysis in *Jones* instructive. The Court in *Jones* relied heavily on its earlier decision in *La Follette*, a case dealing with an open primary. In *La Follette*, the Supreme Court confronted a challenge to the State of Wisconsin's open presidential preference primary. In that system, voters did not select the delegates to the Democratic Party's National Convention directly. Instead, they were chosen at party caucuses at a later time. Still, Wisconsin law required the delegates to vote in accord with the primary results, which allowed nonparty members to participate in the selection of the party's nominee. This conflicted with the national Democratic Party's rules. The Supreme Court struck down Wisconsin's system, finding that it constituted an unjustified and substantial intrusion into the Democratic Party's associational rights. In *Jones*, the Court characterized the holding in *La Follette* as follows: "Whatever the strength of the state interests supporting the open primary itself, they could not justify this substantial intrusion into the associational freedom of members of the National Party." *Jones,* 530 U.S. at 576 (internal quotation and citation omitted). Thus, it is clear that open primary elections are also subject to careful constitutional scrutiny.

Ultimately, the Supreme Court in *Jones* determined that California's blanket

primary imposed a severe burden on the political parties' First Amendment rights by forcing them "to associate with – to have their nominees, and hence their positions, determined by – those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." *Id*. at 577. To reach its conclusion, the Supreme Court relied on statistical surveys of California voters where 37 percent of Republicans said they planned to vote in the 1998 Democratic gubernatorial primary, and 20 percent of Democrats said they planned to vote in the 1998 Republican United States Senate primary. *Id*. Such figures were comparable to results of studies in other States with blanket primaries. *Id*.

The Supreme Court also relied on expert testimony indicating that only 25-33 percent of all voters in Washington – a blanket primary state at that time – limited themselves to candidates of one party throughout the ballot. *Id*. The surveys relied upon by the Supreme Court also revealed different policy preferences between primary voters who crossed over from another party and the party members. *Id*.

Additionally, the Supreme Court relied on expert testimony that policy positions of legislators elected from blanket primary states are more moderate and reflect the preferences of voters at the center of the ideological spectrum. *Id*. at 580. The Supreme Court cited one expert who determined that it is inevitable under a blanket primary that political parties will be forced to give their official designation to a candidate who is not preferred by a majority or even a plurality of party members. *Id*. at 579.

The Supreme Court explained that these surveys, statistics, and opinions suggested

MEMORANDUM DECISION AND ORDER - 9

that a blanket primary impedes the ability of political parties to select their own candidates. Based on this evidence, the Supreme Court concluded that "the prospect of having a party's nominee determined by adherents of an opposing party [in a blanket primary] is far from remote – indeed, it is a clear and present danger." *Id*. at 578. The Supreme Court further explained that the "substantial numbers" of crossover voters in a blanket primary will alter the identity of the nominee, and "[e]ven when the person favored by a majority of the party members prevails, he will have prevailed by taking somewhat different positions – and, should he be elected, will continue to take somewhat different positions in order to be renominated." *Id*. at 579-80.

On summary judgment in this case, this Court expressed concerns that the record was inadequate to determine whether Idaho's open primary creates any of the same concerns that led the Supreme Court to deem California's blanket primary unconstitutional. The Court's major concern was whether crossover voting existed in Idaho under its open primary as it did in California under its blanket primary. The record before the Court on summary judgment contained no evidence on that issue. Without evidence about crossover voting in Idaho or other open primary states, the Court could not determine whether Idaho's open primary subjects the Idaho Republican Party's candidate-selection process to persons wholly unaffiliated with the party. *Id*. at 581. This, in turn, prevented the Court from determining whether, and to what extent, the threat of crossover voting affects the positions of the Idaho Republican Party and its candidates.

The Court could not simply borrow the statistics, opinions, and surveys from *Jones* because that case dealt with a blanket primary instead of an open primary. The Court could not determine what burdens or restrictions, if any, are placed on the Idaho Republican Party by Idaho's open primary. In turn, the Court could not weigh the character and magnitude of the Idaho Republican Party's asserted injury against the interests of the State as justification for any such burden imposed by its statutes. *Burdick*, 504 U.S. at 434. Accordingly, the Court denied the motion for summary judgment and set the matter for a bench trial to fully develop the record.

At trial, the parties submitted both expert and lay testimony about the effects of crossover voting. The parties agreed to submit the evidence subject to post-trial Rule 702 motions. For their part, Plaintiffs submitted expert testimony from Robert Moore and David Ripley. They also submitted expert testimony from Michael Munger, who relied heavily upon the reports of Moore and Ripley. After the evidentiary hearing, Defendant and Intervenors moved to exclude Plaintiffs' expert testimony pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999), and Fed. R. Civ. P. 702.

The Court has serious concerns with admitting Plaintiffs' expert testimony under *Daubert*, *Kumho*, and Fed. R. Civ. P. 702. However, the Court will not resolve that motion, because it finds that it does not need to rely on Plaintiffs' experts. Defendant's own experts provide the Court with clear evidence of crossover voting. Defendant's experts, Martin & Saunders, admit that "[i]nside the Idaho open primary system,

especially in a one-party state like Idaho where the Republican Party primaries are in most cases the 'only game in town,' voters do likely cross over; they have to in order to have any meaningful influence in elections and express their sincere preferences with regard to their own representation. . . ." *Martin & Saunders Report*, Ex. E, p. 11, Dkt. 60-9. Martin & Saunders note that Idaho is the most one-party state and least electorally competitive state in the United States. *Id*.

Martin & Saunders' statement is supported by the political imbalance that has persisted in Idaho for years. Election results tallied by the Idaho Secretary of State show the degree of imbalance over the past two decades. *www.sos.idaho.gov/elect/results.htm*. Currently, Republicans hold 28 seats in the Idaho State Senate, while Democrats hold only 7. Of the 70 members of the House of Representatives, 57 are Republicans and only 13 are Democrats. All statewide elected offices, including Governor, Lieutenant Governor, Attorney General, Secretary of State, State Controller, State Treasurer, Superintendent of Public Schools, both United States Senators and both United States Representatives are Republicans.

Furthermore, since 1992, Idaho has had 35 legislative districts, with one State Senator and two State Representatives per district, totaling 105 seats. Elections are held every two years. Contested Republican primaries far outnumber contested Democratic primaries every year. The following chart shows the number of Republican and Democratic contested primaries out of the total 105 seats from 1992 to 2010.

| YEAR | REPUBLICAN CONTESTED PRIMARIES | DEMOCRATIC CONTESTED PRIMARIES |
|---|---|---|
| 1992 | 30 | 12 |
| 1994 | 18 | 5 |
| 1996 | 33 | 6 |
| 1998 | 31 | 2 |
| 2000 | 33 | 2 |
| 2002 | 52 | 8 |
| 2004 | 37 | 3 |
| 2006 | 27 | 1 |
| 2008 | 28 | 0 |
| 2010 | 31 | 2 |

Moreover, Republican candidates often run unopposed in the general election, making the primary that much more important. The same is not true for Democrats. The chart below shows the number of Republican and Democratic candidates who ran unopposed in the general election from 1992 to 2010.

| YEAR | UNOPPOSED REPUBLICAN CANDIDATES IN GENERAL ELECTION | UNOPPOSED DEMOCRATIC CANDIDATES IN GENERAL ELECTION |
|---|---|---|
| 1992 | 28 | 14 |
| 1994 | 50 | 6 |
| 1996 | 38 | 4 |
| 1998 | 50 | 5 |

**MEMORANDUM DECISION AND ORDER - 13**

| | | |
|---|---|---|
| 2000 | 42 | 4 |
| 2002 | 18 | 1 |
| 2004 | 35 | 3 |
| 2006 | 31 | 11 |
| 2008 | 32 | 6 |
| 2010 | 43 | 2 |

Martin & Saunders also explain that extant empirical literature on crossover voting shows "that an effective estimate of the average of crossover voting in the literature comes in at around 10%, under the strict definition of crossover voting – of one side's partisan identifiers voting in another party." *Martin & Saunders Report*, Ex. E, p. 15, Dkt. 60-9. However, Martin & Saunders also state that "[t]he amount of raiding[2] from Democratic partisans is very likely small. . . ." *Martin & Saunders Report*, Ex. E, p. 17, Dkt. 60-9. A 10% crossover may be somewhat lower than the numbers relied upon in *Jones*, but in *Jones* the Ninth Circuit and Supreme Court defined a crossover voter to include both independents and voters registered to a competing political party. *Jones*, 530 at 579, n.9. Here, Defendant's expert did not include independent voters as part of the crossover voter percentage. They did testify, though, that if they included independent voters, there is more likely 20-30% crossover voting. Tr., 327:1-16. These

---

[2] "Raiding" is a form of strategic cross-over voting in which voters from one party systematically vote for a weak or undesirable candidate, often using selective voting in just one or two elections and ignoring the rest of the slate of elections. In a close primary, the cross-over "raider" can potentially throw the race to the weaker candidate, thereby improving the chances of their own preferred party candidate. *Munger Report*, p. 3, Dkt. 61-4.

**MEMORANDUM DECISION AND ORDER - 14**

numbers are closer to those in *Jones*.

But even if the more strict definition of crossover voting is considered, and independent voters are not included,[3] the number is still significant. In fact, an even smaller number of crossover voting would cause constitutional concerns. In *Jones*, the Ninth Circuit acknowledged that, even where statistics showed significant numbers of crossover voting, "the prospect of malicious crossover voting, or raiding, is slight, . . . and they would be determinative in only a small number of races." *Jones*, 530 at 579. Nevertheless, in reversing the Ninth Circuit, the Supreme Court observed that even "a single election in which the party nominee is selected by nonparty members could be enough to destroy the party." *Id*. The Supreme Court gave the example of the 1860 Presidential election, stating that "if opponents of the fledgling Republican Party had been able to cause its nomination of a proslavery candidate in place of Abraham Lincoln, the coalition of intraparty factions forming behind him likely would have disintegrated, endangering the party's survival and thwarting its effort to fill the vacuum left by the dissolution of the Whigs." *Id*. The Supreme Court went on to state that even if "being saddled with an unwanted, and possibly antithetical, nominee would not destroy the

---

[3] There are compelling reasons why independent voters should be included in assessing the impact of cross-over voting. Although there is a tendency to regard independent voters as lining up philosophically somewhere between the two major political parties, there is no certainty that independent voters are philosophically or politically agnostic. Voters may well choose to be independent voters because their views lie outside the heartland of political thought and they perceive both parties as being insufficiently conservative or liberal for their tastes. But, regardless of their reasons for remaining unaffiliated, the independent voters, in voting in a political party's primary, have the same potential to influence and modify that party's platform, message, and slate of candidates.

**MEMORANDUM DECISION AND ORDER - 15**

party," it would "severely transform it." *Id*. The Supreme Court explained that "regulating the identity of the parties' leaders . . . may . . . color the parties' message and interfere with the parties' decisions as to the best means to promote that message." *Id*. The Supreme Court further explained that not only can the identity of the nominee be altered, but even when the candidate favored by a majority of the party members prevails, that candidate will have prevailed by taking somewhat different positions. *Id*. at 580. If that candidate is elected, he or she will continue to take somewhat different positions in order to be renominated. *Id*.

Thus, even if we use the most conservative estimate of 10% crossover voting, with only a small number of partisan raiders, the effects can be devastating to a party.[4] Additionally, the Supreme Court in *Jones* explained that even the respondents' own expert in that case concluded that the policy positions of Members of Congress elected from blanket primary states are more moderate and more reflective of the preferences of

---

[4] In addition to "raiding," political scientists have identified three other types of crossover voting, including "sincere crossover voting," "hedge voting," and "impact voting." While not as pernicious as "raiding," each of the other forms of crossover voting have significance for the Republican Party's freedom of association – particularly given the reality of Idaho politics. "Sincere crossover voting" occurs when a person votes in the 'other' primary because she likes one of those candidates more than any of the candidates in her own party. "Hedge voting" occurs where the outcome in the voter's own party is certain, because of incumbency, or lack of opposition. The voter then crosses over and votes in another party primary because the race is more 'interesting,' or competitive, and thus the voter's vote has a greater chance of influencing the outcome. This is a 'hedge' in the sense that if the voter's own party candidate does not win, the voter may influence the eventual winner, even if that candidate is from the other party. "Impact voting" occurs in a state, like Idaho, which is effectively a 'one-party' state. If it is perceived that it is impossible for the voter's own party to win, the voter may cross over to be able to cast a vote in the election that actually matters, because the impact of the vote will be higher there. *Munger Report*, p. 3, Dkt 61-4.

the bulk of voters at the center of the ideological spectrum. *Id*. Here, we are not dealing with a blanket primary, but Defendant's own experts warn that changing Idaho's primary from open to closed will likely have the "very real and immediate effect of . . . producing more ideologically extreme candidates." *Martin & Saunders Report*, Ex. E, p. 18, Dkt. 60-9. At first blush, that would appear to be a strong argument for maintaining the status quo. But, choosing ideologically extreme candidates is precisely what a political party is entitled to do in asserting its right of association under the First Amendment. The Court cannot "simply move[] the general election one step earlier in the process, at the expense of the part[y's] ability to perform the 'basic function' of choosing [its] own leader[]." *Jones*, 530 U.S. at 580.

The Court cannot find any meaningful distinction between the open primary in Idaho and the blanket primary found unconstitutional *Jones.* Like the blanket primary system addressed in *Jones*, the current open primary system in Idaho forces the Idaho Republican Party to open up its candidate-selection process to persons wholly unaffiliated with the Party. And, like the blanket primary, "[s]uch forced association has the likely outcome . . . of changing the [party's] message." *Id*. at 581-82.

Finally, Defendant contends that a closed primary would make no real difference with respect to affiliation because Idaho voters make that choice when they pick a ballot at the voting booth anyway. The evidence suggests otherwise. Although crossover voting may also occur in a closed primary, Defendant's own experts concede that it happens "perhaps at a reduced rate because of increased costs to the voter." *Martin &*

*Saunders Report*, Ex. E, p. 17, Dkt. 60-9.  The Court also notes that in explaining that a blanket primary is "qualitatively" different from a closed primary, the Supreme Court in *Jones* stated that under a closed primary system, "even when it is made quite easy for a voter to change his party affiliation the day of the primary, and thus, in some sense, to 'cross over,' at least he must formally *become a member of the party*; and once he does so, he is limited to voting for candidates of that party."  *Id*. (Italics in original).  Idaho's current open primary does not require such a formal declaration of membership.

In *Jones*, the Supreme Court stated that it "can think of no heavier burden on a political party's associational freedom" than changing the party's message.  *Id*. at 582.  Like the blanket primary system in *Jones*, Idaho's current open primary system, as applied, forces the Idaho Republican Party to associate with, and have their nominees and positions determined by, those who have refused to affiliate with the party.  *Id*. at 577.  Therefore, like the blanket primary system in *Jones*, the current primary system in Idaho imposes a severe burden on the Idaho Republican Party's First Amendment rights.  Accordingly, this Court must deem the current Idaho primary system unconstitutional unless it is narrowly tailored to serve a compelling state interest.  *Id*.

### **State Interests**

Defendant made no real attempt to show that Idaho election statutes are narrowly tailored to serve a compelling state interest.  Assuming the Court would not conclude that the current system places a heavy burden on the Idaho Republican Party's associational freedom, Defendant argued only that it need show an important regulatory interest.

Defendant argued that two such interests apply: (1) maintaining maximum ballot secrecy and effective administration of its same-day registration statue; and (2) avoiding changeover costs.

With respect to secrecy, the Supreme Court in *Jones* has already determined that it is not a compelling interest. The Supreme Court explained that a state's interest in assuring the confidentiality of one's party affiliation information in all cases cannot conceivably be considered a "compelling" one. *Id*. at 585. "If such information were generally so sacrosanct, federal statutes would not require a declaration of party affiliation as a condition of appointment to certain offices." *Id*.

The same-day registration argument also comes up short. Defendant explains that a public disclosure requirement would require separate ballots, as opposed to the single ballot used today. Defendant argues that this will create administrative burdens and costs because election officials will need to prepare for demands for each party's ballot, which would be difficult to gauge prior to the election. Defendant is correct that the Party's Closed Republican Primary Rule will likely cause some administrative burdens and costs to the State. However, there is no support for an argument that avoiding these burdens and costs are a compelling state interest.

Finally, Defendant's argument that the State has an interest in avoiding changeover costs also fails. Again, there will likely be such costs, but there is no evidence that avoiding these one-time costs are a compelling state interest.

**Requested Relief**

In Plaintiffs' Statement of Clarification Re: Requested Relief, Plaintiffs clarify that they seek only a declaration that Idaho's current primary system violates their First Amendment rights. Dkt. 90. The Idaho Republican Party asks for a declaration that Idaho Code § 34-904 is unconstitutional as applied to it. Plaintiffs do not request an affirmative remedy. Oct. 15, 2010 Tr., 21:1-22:13.

## CONCLUSION

For the above reasons, the Court finds that Plaintiffs have met their burden. Accordingly, the Court concludes that Idaho Code §§ 34-904 is unconstitutional as applied to the Idaho Republican Party. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: **March 2, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge